ORAL ARGUMENT REQUESTED

**CASE NO. 16-7096**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

DENNIS L. MONTGOMERY
Plaintiff-Appellant,

v.

JAMES RISEN, HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY, AND HOUGHTON MIFFLIN HARCOURT COMPANY

Defendants-Appellees.

---

APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**PLAINTIFF-APPELLANT'S INITIAL BRIEF**

---

Larry Klayman, Esq.
Klayman Law Group
2020 Pennsylvania Ave. N.W.
Suite 800
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Attorney for Plaintiff-Appellant*

**Dated**: January 27, 2017

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 26.1, the Plaintiff-Appellant, Dennis L. Montgomery, is a natural person and is not an officer, director, or majority shareholder of any publicly traded corporation.

# TABLE OF CONTENTS

Jurisdictional Statement ................................................................................1

Statement of the Issues Presented for Review......................................1

Statement of the Case ................................................................................2

Summary of the Argument ........................................................................5

Standard of Review ....................................................................................8

Argument........................................................................................................9

    The District Court Erred When it Based its Ruling on the Existence of the
Alleged Classified Software and not the Defamatory Statements Wholly
Separate From Whether the Software Did or Did not Work ..............................9

        The Defamatory Publications and a Brief Analysis .......................................9

        General Defamation ........................................................................21

            False and Defamatory Statements...........................................................21

            Defendants-Appellees Published Without Privilege and Went Far
Beyond What Was Published Previously ................................................24

            Defendants-Appellees Acted with Actual Malice or
Reckless Disregard for the Truth ...........................................................31

            The Statements were Actionable as a Matter of Law ..............................33

        Defamation *Per Se* ....................................................................33

        Defamation by Implication ..............................................................35

    The District Court Erred When it Treated Plaintiff-Appellant as a Limited-
Purpose Public Figure ........................................................................36

        Public Figure Analysis ....................................................................36

            Plaintiff-Appellant's Role in the Public Controversy ............................38

            The Relevance of Defendants-Appellees' Defamatory Statements to
the Plaintiff-Appellant's Role in the Public Controversy .......................40

        Defendants-Appellees Acted with Actual Malice or Reckless Disregard for
the Truth in Any Event....................................................................43

    The District Court Erred When it Ruled that Defendants-Appellees Did not
Forfeit Their Right to Analyze the Software....................................................46

The District Court Erred When it Overlooked That the Software Could not have Been Produced to the Court or to the Opposing Party Due to its Potential Classification.........................................................................................48

The District Court Erred When it Tossed Plaintiff-Appellant's Tort Claims Because his Defamation Claims Should Still Stand ............................51

Conclusion..................................................................................................52

Certificate of Compliance ........................................................................54

Certificate of Service ...............................................................................55

# TABLE OF AUTHORITIES

## Cases

*Arnold v. Taco Properties, Inc*., 427 So.2d 216 (Fla. App. 1 Dist. 1983).........40, 41

*Associated Press v. NLRB*, 301 U.S. 103 (1937) ....................................................24

*Branzburg v. Hayes*, 408 U.S. 665 (1972). .....................................................24, 25

*Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495 (Fla. 1953).................34

*Dunn v. Gannett New York Newspapers, Inc*., 833 F.2d 446 (3d Cir. 1987) ..........32

*Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997)...........................45

*Farah v. Esquire Magazine*, 736, F.3d 528 (D.C. Cir. 2013) .................................51

*Fleming v. AT&T Information Servs., Inc*., 878 F.2d 1472 (D.C. Cir. 1989) .........33

*Gertz v. Robert Welch, Inc*., 418, U.S. 323 (1974)...............................25, 37, 38, 39

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) ......................................43, 44

*Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) .............8, 22

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989)...................44

*Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738 (Mich. Ct. App. 1996) ..........31

*Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C. 1970) ...........................33

*Khawar v. Global Int'l, Inc*., 965 P.2d 696 (Cal. 1998)...........................................44

*Levy v. American Mut. Ins. Co.*, 196 A.2d 475 (D.C. 1964) ..................................32

*Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984)...............45

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003)...........................................37

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990) ......................................................33

*Newton v. National Broadcasting Co*., 930 F.2d 662 (9th Cir. 1990)....................33

*New York Times v. Sullivan*, 376 U.S. 254 (1964) .................................................36

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005)........................................................21

*Paul v. Davis*, 424 U.S. 693 (1976).......................................................................33

*Peters v. National R.R. Passenger Corp*., 966 F.2d 1483 (D.C. Cir. 1992).............8

*Rety v. Green*, 546 So.2d 410 (Fla. App. 3 Dist. 1989)...........................42

*S. Business Machs v. Norwest Fin. Leasing*, 390 S.E.2d 402
(Ga. Ct. App. 1990) ................................................................................35

*Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d 87 (Fla. App. 2 Dist.
1992).................................................................................................42, 43

*Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204 (D.C. 1991) ................33

*Stewart v. Sun Sentinel Co.*, 695 So.2d 360 (Fla. App. 4 Dist., 1997)...................27

*Straub v. Lehtinen, Vargas & Riedi, P.A.*, 980 So.2d 1085
(Fla. App. 2007) ...............................................................................26, 27

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ..................23, 37, 45

*Time Inc. v. Firestone*, 424 U.S. 448 (1976) .....................................39, 40

*U.S. v. Bryan*, 339 U.S. 323 (1950) .........................................................25

*U.S. v. Nixon*, 418 U.S. 683 (1974) .........................................................25

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)......36, 37, 38

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ..............32

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990)...........22, 32, 35

*Wolfson v. Kirk*, 273 So.2d 774 (Fla. Dist. App. 4th Dist. 1973)...........34

*Wolston v. Reader's Digest Ass'n*, 443 U.S. 157 (1979).........................40

## **Statutes**

31 U.S.C. §§ 3729-3733 ...........................................................................34

28 U.S.C. § 1332 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. §1404(a) ....................................................................................4

18 U.S.C. § 793 ..........................................................................................7

18 U.S.C. § 798 ........................................................................................51

18 U.S.C. § 1001 ......................................................................................34

18 U.S.C. § 1924 ........................................................................................7

Federal Rules of Civil Procedure 26. ..................................................6, 46

Federal Rules of Civil Procedure 30. ......................................................29

Florida Statute § 770.01 ...........................................................................31

**Secondary Sources**

James Risen, *Pay Any Price: Greed, Power and Endless*
 *War* .............................................3, 12, 13, 15–20, 23, 27, 28
John C. Martin, Comment, *The Role of Retraction in Defamation Suits*,
1993 U. Chi. Legal F. 293 (1993) ............................................................1
Restatement of Torts (2d) § 578.............................................................30
Restatement of Torts (2d) § 569, cmt. (e) ............................................23
Restatement of Torts (2d) § 581(2) ........................................................30

## JURISDICTIONAL STATEMENT

The basis for the U.S. District Court for the District of Columbia's ("District Court") subject-matter jurisdiction is pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The basis for the U.S. Court of Appeals for the District of Columbia Circuit's subject-matter jurisdiction is pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment that disposes of all parties' claims. After requests for extensions of time, this Court ordered on December 27, 2016 that Plaintiff-Appellant's Initial Brief is due January 27, 2017.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred by not finding that the alleged defamatory statements not directly tied to Plaintiff-Appellant's software are actionable?

2.      Whether the District Court erred when it considered Plaintiff-Appellant a limited public figure?

3.      Whether the District Court erred by not finding that Defendants-Appellees had forfeited their right during discovery to analyze the software?

4.      Whether the District Court erred by holding that Plaintiff-Appellant had to produce potentially classified software?

5.      Whether the District Court erred by throwing out Plaintiff-Appellant's tort claims when it mistakenly threw out his defamation claims?

## STATEMENT OF THE CASE

***Nature of Case*:** Plaintiff-Appellant, Dennis L. Montgomery, brought this action against Defendants-Appellees James Risen, Houghton Mifflin Harcourt Publishing Company, and Houghton Mifflin Harcourt Company for intentionally defaming him by publishing a book named Pay Any Price: Greed, Power and Endless War ("Pay Any Price")  in which the Defendants-Appellees make false statements of fact about Plaintiff-Appellant with a reckless disregard for their truth, and by providing the same or similar false statements of fact on television and radio interviews.

Defendants-Appellees' defamation is not fair reporting and is not a result of republishing that which was already out in the public domain in publications, such as a low class and discredited Playboy Magazine article. As Defendants-Appellees tout at the beginning of Pay Any Price, the publication is based on new, confidential information from various government sources, which has been distorted and falsified, knowingly and recklessly, and is not a result of a republication of previous articles mentioning Plaintiff-Appellant. Otherwise, there would logically be no reason for Pay Any Price. Certainly, tongue-in-cheek, looking at the previous disreputable Playboy article may be a more "sexy" read, but by publishing new and never before disclosed false and misleading sensational

2

"information," Defendants-Appellees are allowed to draw in readers nationwide to sell books. Defendants-Appellees boast on page ix of <u>Pay Any Price</u>:

> [m]any people have criticized the use of anonymous sources. Yet all reported know that the very best stories – the most important, the most sensitive rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity.

Am. Compl. ¶ 59 [Dkt. #44]. Even where Defendants-Appellees did put their defamation occasionally in the voice of other persons in a previously published material, still they conspicuously reported only a narrow slice of the overall story, massively tilted unfairly and dishonestly. Importantly, when questioned at deposition for the source of their defamatory statements, Defendants-Appellees would and could not identify and link them to the outrageous false and defamatory statements manufactured for the Book. The only logical conclusion is that they made them up to sell books. Inventing out of whole cloth or even drastically distorting the truth about someone intentionally is classic defamation. Defendants-Appellees thought they could get away with this "assassination" of Plaintiff-Appellant, Dennis Montgomery, since they are collectively worth billions of dollars and Montgomery was a mere individual, debilitated with a terminable brain aneurism. How convenient!

*Course of Proceedings*: On February 24, 2015, following the publication of <u>Pay Any Price</u>, Plaintiff-Appellant filed a lawsuit in the U.S. District Court for the

3

Southern District of Florida. The operative, Amended Complaint filed on April 28, 2015 alleged claims for defamation, defamation *per se*, and defamation by implication based on Defendants-Appellees' published, defamatory statements. The Amended Complaint also alleges additional claims of intentional infliction of emotional distress, tortious interference with prospective advantage, and assault.

Strangely, after the case had proceeded to trial and extensive discovery was undertaken, on January 25, 2016, the U.S. District Court for the Southern District of Florida ruled in part on Defendants-Appellees motion to dismiss or transfer. In a brief, cursory order, the court granted in part Defendants-Appellees' motion to dismiss or transfer, without oral argument or status conferences to assist the court with regard to pending motions, belatedly concluding that the convenience of the parties and the interests of justice warranted transfer under 28 U.S.C. §1404(a) to the U.S. District Court for the District of Columbia.

***Disposition Below***: On July 15, 2016, the new District Court below, without the benefit of a requested oral argument or appearance before the court, entered an Order and a Memorandum Opinion granting Defendants-Appellees' Motion for Summary Judgment. The Court entered judgment on the pleadings in favor of Defendants-Appellees. Plaintiff-Appellant now appeals that Order.

///

///

4

## SUMMARY OF THE ARGUMENT

*First*, in an unusual move, the District Court granted summary judgment in favor of Defendants-Appellees and dismissed Plaintiff-Appellant's defamation action on (1) a fundamental ground not legally possible to be satisfied by Plaintiff-Appellant and (2) not relevant to prove to a jury by a preponderance of the evidence that the subject software was necessary to win at trial. The District Court held that Defendants-Appellees' statements in <u>Pay Any Price</u> and various television and radio interviews were not defamatory as a matter of law chiefly because Plaintiff-Appellant allegedly failed to produce classified software and therefore could not prove the falsity of Defendants-Appellees published statements. This central notion that the District Court runs with is a false premise. However, and of crucial importance, several of the defamatory statements published by Defendants-Appellees have virtually nothing to do with whether Plaintiff-Appellant's software existed, worked, or did not work. Moreover, the defamatory statements published by Defendants-Appellees are either demonstrably false statements of fact, which had no basis to be made and published, or mixed statements of fact and opinion, and therefore <u>must go to a jury</u>. Risen's first and longstanding publisher Simon & Schuster refused to publish the book, raising a strong inference that it was because of its defamatory material. Additionally, the alleged classified software, upon which Defendants-Appellees tactically rest their

entire defense, even with regard to their defamatory statements that have little or nothing to do with the software and whether it works, has been designated by the Central Intelligence Agency ("CIA"), the U.S. Department of Justice ("DOJ"), and its Federal Bureau of Investigation ("FBI") to be classified, and thus illegal and criminal for Plaintiff-Appellant to turn it over to the District Court or Defendants-Appellees.   Indeed, when Defendants-Appellees subpoenaed it the government refused to produce it to them as it would compromise national security.

*Second*, Plaintiff-Appellant is neither a general or limited-purpose public figure, and therefore may prevail at trial without pleading or proving that Defendants-Appellees acted with actual malice or a reckless disregard for the truth while defaming him. A limited-purpose public figure is treated as a public figure only limited to certain topics, periods of time, and venues and when he has thrust himself into a particular public controversy and only with regard to that controversy. The District Court erred when it held that Plaintiff-Appellant was a limited-purpose public figure merely because, at the advice of his counsel at the time, he gave an interview to NBC News about the alleged nefarious actions of a former Congressman and then Governor, which had nothing to do with the controversy that surrounds this case.

*Third*, Defendants-Appellees failed to timely submit and then later submitted a grossly insufficient and blatantly defective "expert report" which failed to

comply with Federal Rules of Civil Procedure ("FRCP") 26(a)(2). Thus, even if the classified software were relevant and Defendants-Appellees were entitled to obtain it in civil discovery, they flouted established legal procedures and thus forfeited that "right" by blatantly violating the FRCP, which required a complete and timely "expert report" to put Plaintiff-Appellant on proper notice. Moreover, the so-called expert that Defendants' belatedly and defectively designated did not even have a government security clearance to enable him to inspect and analyze, much more render an opinion, as to the efficacy of the alleged classified software. In short, the entire "software issue" as raised by Defendants-Appellees was simply a frivolous tactical red herring gambit to try to create a Catch 22, however disingenuously, to argue that Plaintiff-Appellant's entire case should be dismissed. The District Court, in its haste to dispose of the entire case, erroneously bought this ruse.

*Fourth*, because the District Court "has serious doubt that the software is, in fact, classified[]" has no bearing on whether potentially classified information should have been or could have been turned over to either the District Court or Defendants-Appellees. There are various state and federal laws which strictly prohibit the transmitting and mishandling of classified information. *See* 18 U.S.C. § 793 (gathering, transmitting or losing defense information), 18 U.S.C. § 798 (disclosure of classified information), 18 U.S.C. § 1924 (unauthorized removal and

7

retention of classified documents or material). Plaintiff-Appellant is a government whistleblower and has long before this case was filed sought to legally turn over documentation to the proper authorities. If he turned over this documentation to Defendants-Appellees, he would be in violation of various federal criminal statutes.

For all of these reasons, Plaintiff-Appellant respectfully requests this honorable Court to vacate and reverse the summary judgment and remand this case for further proceedings, with instructions to the District Court to conduct a thorough review of the pleadings and evidence on the record, and then allow for discovery, and later trial on the merits before a jury of Plaintiff-Appellant's peers. Plaintiff-Appellant also requests oral argument before this Court.[1]

## **STANDARD OF REVIEW**

Whether the District Court properly granted Defendants-Appellees Motion for Summary Judgment and entered judgment on the pleadings in favor of Defendants-Appellees is a question of law, which this Court reviews *de novo*. *Peters v. National R.R. Passenger Corp*., 966 F.2d 1483, 1485 (D.C. Cir. 1992); *see also Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 591 (D.C. 2000) (appellate review of a summary judgment in a defamation action is *de novo*).

---

[1] The Appendix will consist of documents including deposition transcripts of James Risen and the other Defendants-Appellees, as well as Plaintiff-Appellant, and related exhibits and documents provided under subpoena by Simon & Schuster.

## ARGUMENT

I. **THE DISTRICT COURT ERRED WHEN IT BASED ITS RULING ON THE EXISTENCE OF THE ALLEGED CLASSIFIED SOFTWARE AND NOT THE DEFAMATORY STATEMENTS WHOLLY SEPARATE FROM WHETHER THE SOFTWARE DID OR DID NOT WORK.**

Fundamentally, the Defendants-Appellees alleged, but bogus, need for the alleged classified software is only one small part of the multifaceted, defamatory attack on Plaintiff-Appellant and is not crucial to a *prima facie* defense. The District Court erred in determining that it is the only relevant part of Plaintiff-Appellant's claims. In his Amended Complaint, Plaintiff-Appellant sets forth with excruciating detail several passages from Defendants-Appellees' Pay Any Price that have absolutely little to nothing to do with whether the alleged classified software works. Before this is discussed, however, and because this Court reviews the District Court's decision *de novo*, it is necessary to set forth the defamatory publications in addition to the elements of general defamation, defamation *per se*, and defamation by implication.

A. **The Defamatory Publications And a Brief Analysis**

As set forth in the Amended Complaint, Defendants-Appellees published vicious, false, and highly defamatory statements, both in Pay Any Price and on television and radio, which have severely damaged, if not totally destroyed, the reputation and financial earning ability of Plaintiff-Appellant. These defamatory

9

statements went far beyond anything which had been published by sleazy publications such as <u>Playboy</u>, or what even Defendants-Appellees falsely claimed they learned from confidential sources. For example, Defendants-Appellees published:

> Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

Am. Compl. ¶ 36. Defendants-Appellees published that Plaintiff-Appellant was responsible for "one of the most elaborate and dangerous hoaxes in American history" in their own voice and that Plaintiff-Appellant was "the maestro behind" these events – that is acting intentionally with fraudulent intent as well as being the main decision-maker – in which government officials were "taken in by a grand illusion," which the Defendants-Appellees called in their own voice "the whole insane episode." The Defendants-Appellees called in their own voice "a ruse that was so successful . . ." again indicating intentional action and a scheme to defraud the government, a crime – that President George W. Bush blocked airplane flights

10

and considered shooting them down out of the sky. The deposition of Defendant-Appellee Risen showed that no one even told him this extreme recitation of what had occurred. *See Risen Depo* at 83:15-24 (A: "There was never any action taken [to shoot down planes]. And it was just a conversation that I reported on. And so I never alleged that Mr. Montgomery was responsible for shooting down people or anything of the sort."). When pressed by Plaintiff-Appellant's counsel whether Defendant-Appellant Risen set forth President George W. Bush issued orders to shoot down civilian airlines, *see Risen Depo*. at 83:20-23, Defendant-Appellee Risen stated "No, that's not correct." *Id*. at 83:24. Defendant-Appellant Risen admitted that there was no proof and no sources, confidential or otherwise, that led him to publish Plaintiff-Appellant was responsible for a former president issuing orders to shoot down aircraft. He also admitted that those published statements were not based on the software. His testimony, however, is contradicted by his own book which stated that Plaintiff-Appellant committed "a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic." Am. Compl. ¶36.

Thus, the Defendants-Appellees, to make large sales and reap money, knowingly and with reckless disregard for the truth, defamed Plaintiff-Appellant as the "maestro" orchestrating a "ruse" and "one of the most dangerous hoaxes in

American history." But, Plaintiff-Appellant merely provided dis-encryption technology, which experts were intended to interpret in the intelligence agencies. Instead, Defendants-Appellees defamed Plaintiff-Appellant as the "maestro" responsible for allegedly bad but wholly unsubstantiated decisions by intelligence agency analysts and President George W. Bush and other senior government officials. Additionally, Defendants-Appellees had actual knowledge that Warren Trepp ("Trepp"), the President and Chief Executive Officer of his company, eTreppid, negotiated with the government, not Plaintiff-Appellant. Plaintiff-Appellant, a "little" and terminally ill guy, who it was easy for Defendants-Appellees to use as a whipping boy and paint as a villain since he lacked the means and resources to fight back, was surely not the "maestro" of anything.

On page 47 of Pay Any Price, Defendants-Appellees published:

> That meant that Brennan's office was **_responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration_**. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

Am. Compl. ¶ 28. (emphasis added). Defendants-Appellees assert as a fact, in their own voice, that Plaintiff-Appellant's dis-encryption technology was "fabricated." Yet Defendants-Appellees also admit their actual knowledge that there was an entire apparatus of government professionals "in the highest reaches" of government reaching their own conclusions and interpretations of Plaintiff-

Appellant's technology. Thus, Plaintiff-Appellant could not have defrauded or conned the government, with high-level officials drawing their own conclusions from their world-renowned expertise and resources.

On page 50 of <u>Pay Any Price</u>, Defendants-Appellees published: "Edra Blixeth was Dennis Montgomery's latest mark." Am. Compl. ¶ 137. Defendants-Appellees' statement that Blixseth was the latest "mark", an unmistakable assertion of fact, not an opinion, that Plaintiff-Appellant is a con-artist defrauding people and leaving a "mark."

On October 13, 2014, Defendant-Appellee Risen gave a television interview with Judy Woodruff on the Public Broadcasting System ("PBS"):

> JUDY WOODRUFF: In the next chapter, JAMES RISEN, you write about millions of dollars spent on *programs that were completely fraudulent. One was run by a man named Dennis Montgomery*. He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER!
> JAMES RISEN: Right.
> JUDY WOODRUFF: And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.
> JAMES RISEN: It is difficult to tell in some of these cases who is scamming who. *If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing*. . .
> JUDY WOODRUFF: It was a hoax.
> JAMES RISEN: Right. Right.

Am. Compl. ¶ 145 (emphasis added). Defendants-Appellees adopted, without equivocation, the interviewer's understanding of <u>Pay Any Price</u> that Plaintiff-Appellant's program was "completely fraudulent" and a "hoax." Yet also here, Defendant-Appellee Risen does include – but radically distorts – Plaintiff-

13

Appellant's denial. He falsely changes Plaintiff-Appellant's denial into an admission, suggesting that the CIA asked Plaintiff-Appellant to fabricate data and commit one of the biggest hoaxes in American history. Thus, Plaintiff-Appellant's denial is changed in Defendant-Appellee Risen's account into an admission that the information was fabricated, but that the CIA told him to fabricate the data.

Risen also sat for a national interview called "Democracy Now" and published these defamatory statements:

> AMY GOODMAN: Dennis Montgomery?
> JAMES RISEN: ... And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. ***You know, they convinced him to look for this***. You know, it depends on who you talk to. ***But it was one of the great hoaxes of the war on terror,*** where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts . . .
> AMY GOODMAN: How much did the Government give to Dennis Montgomery?
> JAMES RISEN: Millions of dollars.
> JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. ***There was talk at the White House*** even of shooting down planes based on this information.
> AMY GOODMAN: ***Then Dennis Montgomery, revealed as a con man***— JAMES RISEN: ***Yeah, yeah.***
> AMY GOODMAN: ***—in jail for that?***
> JAMES RISEN: ***Well, no, he's not in jail.*** But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

Am. Compl. ¶ 151 (emphasis added). The interviewer recognizes the meaning of Defendants-Appellees' claims is that Plaintiff-Appellant **should be in jail**.

Defendant-Appellee Risen stated in his own voice, as a fact and not opinion, that "it was one of the great hoaxes of the war on terror," and adopts without qualification that Plaintiff-Appellant is a "con man," by answering "yeah, yeah," and states that the government gave Plaintiff-Appellant millions of dollars. However, Defendant-Appellee had actual knowledge that the government paid Trepp, not Plaintiff-Appellant. Plaintiff's Statement of Disputed Material Facts ("PSDMF") ¶ 85-90, 92 [Dkt. #234]. Defendant-Appellee Risen admits knowing that the CIA asked Plaintiff-Appellant to analyze the videos and admits that he played no role in decisions about airplanes, saying: "There was talk at the White House even of shooting down planes . . ." Am. Compl. ¶ 151. Thus, Defendants-Appellees actually knew that government officials made those decisions that they publicly blame on Plaintiff-Appellant about being responsible for shooting down airplanes.

Then, on page 35 of <u>Pay Any Price</u>, Defendants-Appellees published: "Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance." Am. Compl. ¶ 219. Defendants-Appellees had actual knowledge from the court records that Trepp spent years and large legal fees suing to get control of computer technology with Trepp valued at $100 million. PSDMF ¶ 17.

Similarly, Defendant-Appellee Risen gave and published an interview with

"Conversations with Great Minds" with host Thom Hartmann, incredibly of

Russian television, on October 24, 2014:

> JAMES RISEN: Right. Uh, Dennis Montgomery is one of the best stories in the war on terror. I think somebody should make a movie about him. Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television. ***And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA and convince the CIA*** that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.

Am. Compl. ¶ 157. Defendant-Appellee Risen stated on Thom Hartman's show

that the CIA asked Plaintiff-Appellant to analyze the videos, but on Amy

Goodman's show that Plaintiff-Appellant "was able to get to the CIA and convince

the CIA." Defendants-Appellees had actual knowledge that their accusations were

more than reckless. Defendant-Appellee Risen claims that Montgomery

"convinced, through a whole series of contacts and meetings" the government. But

again, the records show that those meetings were with Trepp, not Plaintiff-

Appellant.

Furthermore, on page 32 of <u>Pay Any Price</u>, the Defendants-Appellees

published:

> Consider the example of Dennis Montgomery. He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist ***was able to create a rogue intelligence operation with little or no adult supervision.***

16

Am. Compl. ¶ 109 (emphasis added). Defendants-Appellees had actual knowledge Plaintiff-Appellant did not "create a rogue intelligence operation," with or without supervision. In context, this alleged criminal activity by the Plaintiff, in a "rogue intelligence operation," is published as a fact, not opinion, in Defendants-Appellees' own voice.

On page 33 of <u>Pay Any Price</u>, Defendants-Appellees published:

Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake . . .

Am. Compl. at ¶ 111. The Defendants-Appellees stated in their own voice as a fact and not opinion that "Montgomery was a fake." Where <u>Pay Any Price</u> stated that "Dennis Montgomery almost singlehandedly prompted President Bush to ground" flights and if not shoot down civilian airlines killing hundred of passengers, Defendant-Appellee Risen admitted in his deposition that the Plaintiff had no role whatsoever in prompting President Bush. Defendant-Appellee Risen denied that <u>Pay Any Price</u> claimed this. There is no source or record that Plaintiff-Appellant ever spoke to President Bush or ever suggested that any commercial flights should be grounded or shot down. Others may have done so, but Plaintiff-Appellant did not. These are perhaps the most actionable and defamatory of all of Defendants-

Appellees' false and misleading statements. The District Court ignored them however in granting summary judgment.

Further, on page 37 of <u>Pay Any Price</u>, Defendants-Appellees published: "Montgomery was able to win over the government in part by offering field tests of his technology – tests that former employees say were fixed to impress visiting officials." Am. Compl. ¶ 121. Defendants-Appellees had actual knowledge that Trepp won over the government, not Plaintiff-Appellant, and that the employees worked for Trepp, who was suing to get ownership of the valuable technology.

Similarly, on page 40, Defendants-Appellees published: "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks . . . the CIA – more credulous than Hollywood or Las Vegas – fell for Montgomery's claims." Am. Compl. ¶ 25.

Defendants-Appellees' published statements that the CIA "fell for" Plaintiff-Appellant's claims and he sold the CIA on a "fantasy" are statements of falsifiable fact asserted in Defendants-Appellees own voice, not reporting what others said. Defendants-Appellees had actual knowledge that Trepp "sold" the CIA as the Chief Executive Officer of eTreppid and contact with the government. Trepp received the payments.

On page 46 of <u>Pay Any Price</u>, Defendants-Appellees went further and published:

> It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

Am. Compl. ¶ 130. While this is arguably a report of what a French firm claimed, Defendants-Appellees cannot rely upon this for fair reporting or any other privilege because they had actual knowledge that the Bush Administration was in a heated foreign policy dispute with the French (primarily because of French firms' commercial relationships with Iraq) and it is not credible to believe an unspecified French firm's claim that "the supposed intelligence was a fabrication." *Id.* Importantly, Defendants-Appellees at a minimum acted with reckless disregard for the truth relying on a French firm's beliefs which were not based on its analysis of the actual technology. PSDMF ¶ 33. Additionally, Defendant-Appellee Risen admitted in his deposition that he did not even speak to the French about the software or technology.

> Q: . . . Did you seek – did you speak with anyone in France, any of the French intelligence services or otherwise to verify what he said, that you claimed that he said, that Mr. Montgomery's software was a hoax?
> A: Not the – not the French. But we have talked to other people in the U.S. government who also believed the same thing.
> Q: But you never went to the French?
> A: I didn't talk to the French intelligence service. They don't – they're not very cooperative with American reporters.
> Q: But you didn't even attempt to contact them?
> A: I can't remember if I did or not, frankly.

Risen Depo. 333:5-18.

> Then, on page 49 of <u>Pay Any Price</u>, Defendants-Appellees published:

> Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real.

Am. Compl. at ¶ 168. Defendants-Appellees had actual knowledge that Trepp was in court fighting to get control and ownership of the software at the time, that he valued at $100 million in the lawsuit.

Finally, admitting that Defendants-Appellees had no basis for their defamation of Plaintiff-Appellee, in his interview posted on October 24, 2014 called "Inside the New York Times Book Review: James Risen's 'Pay Any Price: This week, James Risen and Lucy Worsley," Defendant-Appellant Risen admits that ". . . it is very difficult to tell what is actually true." Am. Compl ¶ 71.

The bottom line is this: Defendants-Appellees published false and defamatory statements of fact about Plaintiff-Appellant, not dependent on whether the alleged software worked. In any event, the government, not Plaintiff-Appellant, was responsible for determining whether it worked and to write that it did not, given the expertise of the intelligence community, and without having any confidential source information, as advertised at the beginning of the Book, as uncovered during the deposition of Appellee Risen, rises to the level of maliciously

false or at a minimum reckless behavior which is actionable and must be put before the jury to decide. *See* Risen Depo. at 40:5-11. In its haste to grant summary judgment, having refused to even hold oral argument to assist the judge given the voluminous pleadings and discovery that has been amassed since the case was filed, the District Court failed to analyze each alleged defamatory statement one by one, and simply used the classified software red herring issue as an excuse to hastily throw the proverbial baby out with the bathwater. This is neither fair nor does it serve the interests of justice, particularly since incredibly the entire case was taken away from the jury.

### B.     General Defamation.

To succeed on a claim for defamation, a plaintiff need only prove: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement [met the requisite standard]; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (internal quotations omitted).

### 1.     False and Defamatory Statements

A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the

community." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (internal quotations omitted). A publication may convey a defamatory meaning if it "tends to lower the plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or [of the] plaintiff's associates." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (internal quotations omitted).

Defendants-Appellees' defamatory statements – that Plaintiff-Appellant perpetrated "one of the most elaborate and dangerous hoaxes in American history" and committing "a ruse [] so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic[,] to name only a few – could only diminish Plaintiff-Appellant's reputation and esteem in the community generally and certainly in the segment comprised of his friends, colleagues, associates, and potential employers. The defamatory statements would generate negative humiliation and attitudes toward Plaintiff-Appellant.

A jury could find that the statements Defendants-Appellees published accused Plaintiff-Appellant of lying to the government, which is a crime, and thus conveyed a defamatory meaning, because "to constitute a libel it is enough that the defamatory utterance imputes any misconduct whatever in the conduct of the [plaintiff's] calling." *Guilford Transp. Indus.*, 750 A.2d at 600 (quoting

Restatement (second) of Torts § 569, cmt. (e)); *see Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C. Cir .1987) (en banc) (holding that statement that "a father set up his son in business" accuses father of nepotism and is defamatory because it "might 'tend[] to injure [him] in his trade, profession or community standing, or lower him in the estimation of the community.'"))

Here, there were publications which contained several factual falsities about Plaintiff-Appellant, as set forth above. For example, on page 32 of Pay Any Price, Defendants-Appellees published ". . . Dennis Montgomery was a man who understood how best to profit from America's decade of fear . . . a time to make money . . . lawyers fanned out across the country to try to block any information about Montgomery and his schemes . . ." Am. Compl. ¶ 106. Yet in 2012, before Defendants-Appellees published Pay Any Price, Plaintiff-Appellant himself told Defendant-Appellee Risen (via an email chain back and forth between the two) "Why have you [Risen] not chased the money, and contacted Warren Trepp who kept all the money. I don't get that?" Am. Compl., Exhibit 8. Further, on November 1, 2012, Plaintiff-Appellant wrote to Defendant-Appellee Risen, "His [Warren Trepp's] role? He is the CEO of eTreppid. **He got all the money**. Why was he not in your story?" (emphasis added). *Id*. Then again, on November 14, 2012, Plaintiff-Appellant wrote to Defendant-Appellee Risen, "What is it you really want from DM [Dennis Montgomery]? You don't bother to pressure the

people that got the money, Trepp. You don't bother the people that were there from the CIA, NSA, DIA, Big Safari, Fort Washington, Air Force, etc. You don't bother Tenet, Brennan, Clapper, Salvatori, Secretary Roche, or any of the other people that were involved in the projects . . . Why DM [Dennis Montgomery]?" *See* Initial Disclosure Documents at Exhibit O.

Since 2012, Defendant-Appellee Risen had been in contact with Plaintiff-Appellant and knew, specifically, that he did not benefit financially from his technologies, yet falsely published his defamatory statements anyway. Plaintiff-Appellant pleaded with Defendant-Appellee Risen to contact the person who truly benefitted from the "War on Terror," Warren Trepp. Defendant-Appellee was fully aware yet published anyway, with malice or reckless disregard for the truth, that Plaintiff-Appellant "was a man who understood how best to profit from America's decade of fear . . . a time to make money." Am. Compl. ¶ 106.

### 2.    Defendants-Appellees Published Without Privilege And Went Far Beyond What Was Published Previously

The Defendants-Appellees cannot shield themselves from liability because of the so-called Fair Reporter's Privilege. This privilege was not intended to grant the press "special immunity from the application of general laws." *Associated Press v. NLRB*, 301 U.S. 103, 132 (1937). As *Branzburg v. Hayes* made clear, the privilege does not permit a newsman or newswoman to undermine society's

interest in the fair administration of justice. *Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972).

The Fair Reporter's Privilege intends to safeguard democracy through ensuring "uninhibited, robust, and wide-open debate on public issues." *Gertz v. Robert Welch, Inc*., 418, U.S. 323, 340 (1974) (internal quotations omitted). But, as the U.S. Supreme Court has made clear, such is not furthered by "the intentional lie or the careless error," which is what is at issue here. *Id*. "[T]he public . . . has a right to every man's evidence." *U.S. v. Bryan*, 339 U.S. 323, 331 (1950); *U.S. v. Nixon*, 418 U.S. 683, 710 (1974).

Here, the Defendants-Appellees defamation dramatically misrepresents the court records, past news reporting, and government records which they claim to rely upon. Pay Any Price does violence to the overall content of the records and the sources, by taking some details cherry-picked out of context and ignoring others. It is a not "fair reporting."

As one example, Pay Any Price report's Trepp's self-serving claims in the middle of a heated litigation that Plaintiff-Appellant's work was fraudulent, but fails to report that Trepp at that very time was fighting in court to get control over Plaintiff-Appellant's software, which he valued in court at $100 million in the same court records that Defendants-Appellees claim to report from. Pay Any Price reports disparaging remarks by Michael Flynn without reporting that Flynn was

also trying to nab the software himself in a bankruptcy adversary proceeding and was angry because Plaintiff-Appellant ironically had not paid his fraudulently inflated legal fees. (Later Flynn would turn over to Defendants-Appellees Montgomery's attorney client and work product information, subjecting himself to potential disbarment.) Thus, the Defendants-Appellees fail to report that Trepp's and Flynn's comments were made to gain leverage in litigation and sharply contradicted their actions in court. PSDMF at ¶ 17 ("Trepp's allegations were made to gain leverage in litigation and could not be believed as an unbiased or credible source."); 28, 29; *see also* Montgomery Depo. at 104:7-19 ("Q: He [Flynn] had made statements to the effect that: You were a fraud and a con man; is that correct? A: After I fired him in 2007."). Not surprisingly, when the undersigned counsel sought to depose Flynn, he hid from the process servers who were attempted to serve the subpoena.

Meanwhile, it is not enough for the Defendants to merely claim that they reviewed official records. The District Court, through a jury at trial, must evaluate those records:

> Second, without consideration of the bankruptcy court's order, the trial court could not apply the "fair reporting privilege." Thus, it could not have been a basis for the dismissal of the second amended complaint. *Heekin v. CBS Broad. Inc.*, 789 So.2d 355 (Fla. 2nd DCA 2001). ... For these reasons, we reverse the dismissal and remand the case to the trial court for reinstatement of the plaintiff's second amended complaint.

*Straub v. Lehtinen, Vargas & Riedi, P.A.*, 980 So.2d 1085, 1087 (Fla. App., 2007).

> Our comparison of the defamatory information with the official documents or press releases issued by the sheriff's office leads us to conclude that there are no material differences. Accordingly, the trial court was correct in disposing of these claims.

*Stewart v. Sun Sentinel Co.*, 695 So.2d 360, 362 (Fla. App. 4 Dist., 1997)   A true "fair report" on national security threats and decisions would explore how government officials carried out their duties and how well or ill the systems of government worked. In contrast to what journalistic reporting would look like, Chapter 2 of <u>Pay Any Price</u> does not attempt to report on different points of view about what happened and why, with two or more sides to the story. Instead, Defendants-Appellees merely engage in a politically defamatory hatchet job of the Plaintiff-Appellant by presenting one-sided conclusions, taken out of context, as being absolute fact.

Here, Defendants-Appellees had first-hand knowledge that sources within the government attempted to shift responsibility for their own actions and inactions to a private citizen. Fair reporting would include the Defendants-Appellees reporting on the far larger and infinitely more interesting story that government officials were seeking to avoid responsibility for their official decisions by shifting it to a private citizen. Chapter 2 of <u>Pay Any Price</u> presents the astonishing accusation that the President of the United States George W. Bush and his foreign policy leadership team are not responsible for government decisions – a seriously

ill private individual is. That is actually a seriously newsworthy story.

Fair reporting would also have to directly report and explain the motivations of Defendants' sources to lie and cover for their own mistakes and shortcomings by trying to pass the hot potato to Plaintiff-Appellant. Without reporting, disclosing, and explaining the biases and lack of credibility of Defendants-Appellees' sources, Chapter 2 of <u>Pay Any Price</u> cannot quality for the fair reporting privilege.

Fair reporting would demand also reporting that Plaintiff-Appellant never negotiated with the government – Warren Trepp did – nor received payment from the government, Warren Trepp did.

Fair reporting would require reporting that the government has never demanded a refund, return, or repayment of any funds paid to eTreppid or BLIXWARE, officially complained, nor sought to debar or black list any company for allegedly defrauding the government, as well as sought to remove Plaintiff-Appellant's top secret security clearance. *See* Risen Depo. at 281:2-12   And Defendant-Appellee Risen was forced to admit that Plaintiff-Appellant was never charged with perpetrating a fraud, a crime which Risen conveniently to sell books defamed Plaintiff-Appellant for.

Moreover, a simple review of the deposition transcripts of Defendants-Appellees James Risen and Harcourt Mifflin Harcourt Publishing Company's and

Harcourt Mifflin Harcourt Company's Federal Rule of Civil Procedure 30(b)(6) witness, Bruce Nichols, as well as the cited publications of Defendants-Appellees, shows that no one ever claimed that Plaintiff-Appellant had committed one of the biggest hoaxes in American history and that because Plaintiff-Appellant, President George W. Bush ordered the shoot-down of civilian airliners if necessary. *See* Risen Depo. at 249:14-25; 250:1-4; *see also* 206:16-25; 207:1-2) (Defendant-Appellee testifying that what he wrote was simply a rehash of what others wrote. However, at the beginning of the book he touts his use of confidential sources as a means to sell books and titillate the reader with so called newly obtained inside information. In fact, it is clear based on conflicting testimony of Defendant-Appellee Risen that neither is true. He manufactured defamatory statements about Plaintiff-Appellant and fed it to the publisher who did not bother to fact check what he had written as if he and Houghton Mifflin practiced the "hear no evil, see no evil and do not evil" approach to publishing for "fun and profit." A simple review of Defendant-Appellee Risen's deposition showed unequivocally that he had no basis to write Plaintiff-Appellant had committed one of the biggest hoaxes of American history and was responsible for President George W. Bush issuing orders to shoot down airliners during the holiday period of 2003, as no one and no source ever told him that Plaintiff-Appellant was responsible for this, assuming it ever happened. *See* Risen Depo. at 383:3-15.

Defendants-Appellees had a legal and ethical duty to fact-check the accuracy of prior publications, which they did not do, and can be liable for defamation even if they solely republished what someone else published first – which they did not. See Restatement of Torts (2d) § 581(2) ("One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher"); see also Restatement of Torts (2d) § 578 (" . . . one who repeats or otherwise republished defamatory matter is subject to liability as if he had originally published it," if he or she had reason to know of its defamatory character.). Here, Defendant-Appellee James Risen was on notice well before his publication of <u>Pay Any Price</u> that Plaintiff-Appellant contested Defendant-Appellee Risen's prior <u>New York Times</u> article as being largely false. In a series of emails, Plaintiff-Appellant seeks a correction from Defendant-Appellee Risen because the information that Risen claims he relied on for <u>Pay Any Price</u> is false. PSDMF a ¶¶ 103, 107, 111.

One cannot simply as a matter of logic and law, regurgitate what others have falsely and misleadingly written as what in today vernacular are "Fake News" – particularly from the likes of an unprofessional, low class and degenerate sex rag like <u>Playboy</u> – and then, if sued for defamation, hide behind these prior false statements.

> The republisher must [] make sure there are no inconsistencies; the article must not be republished if there are unexplained

> inconsistencies or if the news organization republishing the article knows the article is false; and if a reasonable jury could disagree as to whether something in the article should put the newspaper on notice of a possible inaccuracy, the defense is not available and summary judgment is not appropriate.

*Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738, 740-42 (Mich. Ct. App. 1996).

Importantly, Defendant-Appellee relied on his own prior largely false publication in the New York Times, effectively bootstrapping one libel on another and then conveniently claiming "immunity" from liability. That is what Defendants-Appellees attempt to do here. And when confronted when the defamation pursuant to Florida Statute § 770.01 – according to where the original case was filed in the U.S. District Court for the Southern District of Florida – and asked to do a due diligence and retract the defamatory publications, Defendants-Appellees again turned a blind eye to the truth and arrogantly blew Plaintiff-Appellant and his counsel off. Am. Compl., Exhibit 16. ("We deny your allegations . . . also decline your invitation to meet to discuss HMH's manuscript review processes.").

### 3. Defendants-Appellees Acted With Actual Malice Or Reckless Disregard For the Truth.

Defendants-Appellees are liable for their actionable defamation of Plaintiff-Appellant even if Plaintiff were a public figure – which he is not – discussed below, because the defamation was made with actual malice or reckless disregard for the truth.

Moreover, when a plaintiff requests a jury trial, it is not for the District Court to decide whether a statement is defamatory or not. "It is only when the court can say that the publication is not reasonable capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Levy v. American Mut. Ins. Co*., 196 A.2d 475, 476 (D.C. 1964); *Weyrich v. New Republic, Inc*., 235 F.3d 617, 627 (D.C. Cir. 2001). "[I]f the language is capable of two meanings, one actionable and the other not, it is for the jury to determine which of the two meanings would be attributed to it by persons of ordinary understanding under the circumstances." *Levy*, 196 A.2d at 476. "[A] jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice." *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990); *see also Dunn v. Gannett New York Newspapers, Inc*., 833 F.2d 446, 449 (3d Cir. 1987) ("if the language at issue is capable of both a defamatory and nondefamatory meaning, there exists a question of fact for the jury.").

Indeed, recognizing the role of the jury in determining constitutional malice, the U.S. Court of Appeals for the Ninth Circuit held:

> We must attempt to discharge our constitutional responsibility to protect First Amendment values without unduly trenching on the fact-finding role of the jury and trial judge. We are mindful that in New York Times, Bose, and Harte-Hands, the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due

deference to the fact-finding role of juries, and particularly the jury's opportunity to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.*, 930 F.2d 662, 672 (9th Cir. 1990). A jury should determine whether Defendants-Appellees are credible.

Moreover, even if actual malice is not shown, defamation will occur where there is reckless disregard for the truth, which at a minimum is clearly present here.

### 4.    The Statements Were Actionable As a Matter of Law

*See* Section I(C), (D), below.

### C.    Defamation *Per Se*.

Statements actionable as a matter of law, or *per se* defamatory statements, do not require proof of pecuniary injury, because existence of injury is presumed from fact of publication. *Moss v. Stockard*, 580 A.2d 1011, 1033 n.40 (D.C. 1990) "[T]he false imputation of criminal conduct is inherently defamatory." *Fleming v. AT&T Information Servs., Inc.*, 878 F.2d 1472, 1475 (D.C. Cir. 1989). To accuse someone of a crime is libel *per se*. *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. 1970); *see also Paul v. Davis*, 424 U.S. 693, 697 (1976) ("imputing criminal behavior to an individual is generally considered defamatory per se, and actionable without proof of special damages."). Any statement that a person or business is a criminal, even one expressed as an opinion, can amount to actionable defamation not protected by the First Amendment. *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1209 (D.C. 1991).

"The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk*, 273 So.2d 774, 777 (Fla. Dist. App. 4th Dist. 1973); *see also Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953) (proof of general or special damages is unnecessary where the words are actionable *per se*). "Such a presumption is not an ordinary presumption of fact, but is a presumption of law and is not, therefore, dispelled by the production of evidence." *Wolfson*, 273 So.2d at 777.

Here, Defendants-Appellees published nationwide – based on knowingly false and misleading facts – that Plaintiff-Appellant is a con-artist, a fraud, a hoax, and dishonest. Among other defamatory statements, Defendants-Appellees published that Plaintiff-Appellant defrauded CIA Director George Tenet and the U.S. government generally with regard to contracts with the government, which accused Plaintiff-Appellant of committing crimes under the False Claims Act, 31 U.S.C. §§ 3729-3733, and also common law statutory fraud. Defendants-Appellees further knowingly falsely published that Plaintiff-Appellant lied to the U.S. government which is a criminal violation of 18 U.S.C. § 1001. This is classic

34

defamation *per se*, as it relates to Plaintiff-Appellant's profession and it says that he committed crimes.

### D. __Defamation by Implication.__

A statement can be defamatory either because of what is expressly stated or because of an implied meaning. Defamation by implication "stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). "[A]s a defamatory statement may be made in indirect terms or by insinuation, the publication thereof must be construed as a whole. In doing so, the courts will not hunt for a strained construction in order to hold the words used as being defamatory." *S. Business Machs v. Norwest Fin. Leasing*, 390 S.E.2d 402, 409 (Ga. Ct. App. 1990).

Here, Defendants-Appellees committed defamation by implication when, as one example, they accused Plaintiff-Appellant of being motivated by greed. This is not an opinion, as it is coupled with Defendants-Appellees' publications that Plaintiff-Appellant received millions of dollars when indeed it was Trepp who received government money. Greed is one of the themes of Pay Any Price and is a part of the title of the book. Defendants-Appellees published that Plaintiff-Appellant defrauded the government to make money out of greed. Am. Compl. ¶ 44, 47. Yet, Defendants-Appellees omit facts and thereby create a defamatory statement. Defendants-Appellees knew that Warren Trepp received nearly all of

the money from the government contracts while Plaintiff-Appellant did not receive any distribution of company profits and was paid a relatively small salary. Am. Compl. ¶ 47. Defendants-Appellees also omit that the company eTreppid gave up private sector opportunities of equal financial value. Those omissions create the defamatory implication that Plaintiff-Appellant defrauded the U.S. government – a crime – for greed. Since Plaintiff-Appellant did not receive any profits from eTreppid, he would not benefit from defrauding the U.S. government. Furthermore, eTreppid was not paid for results but for computer and technical analysis of videos supplied to it.[2]

## II.    THE DISTRICT COURT ERRED WHEN IT TREATED PLAINTIFF-APPELLANT AS A LIMITED-PURPOSE PUBLIC FIGURE.

### A.    Public Figure Analysis.

First Amendment protection is only afforded to defendants when the object of an alleged defamatory statement is about a public figure. *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). There are two types of public figures: (1) general public figures who maintain status for all purposes and (2) limited-purpose public figures "'(who) voluntarily inject[] [themselves] or [are] drawn into a

---

[2] Defendants-Appellees also make the false claim that Plaintiff-Appellant's software does not work, and that he defrauded the government, a crime. Defendants-Appellees intentionally omit that the government wanted to continue to use Plaintiff-Appellant's software and technology. Am. Comp. ¶ 49. *Montgomery Depo* 297: 9-10. Plaintiff-Appellant testifies that in 2012, the government came to him to continue to use his technology, but he decided to pass, showing that that the government continued to value his technology for national security purposes.  By omitting this fact, the reader is led to believe that Plaintiff-Appellant's software was indeed a hoax, and not an integral part of the government's software capabilities. Am. Compl. ¶¶ 207-08.

particular public controversy and therefore become [] . . . public figure[s] for a limited range of issues.'" *Waldbaum v. Fairchild Publ'ns, Inc*., 627 F.2d 1287, 1292 (D.C. Cir. 1980) (quoting *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 351 (1974)). "A person becomes a general purpose public figure only if he or she is 'a well-known celebrity,' his name a 'household word.'" *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc). "Few people," however, "attain the general notoriety that would make them public figures for all purposes." *Waldbaum*, 627 F.2d at 1296.

For limited-purpose public figures, the Court of Appeals for the District of Columbia Circuit has formulated a three-prong test to determine whether an individual is a limited-purpose public figure. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (citing *Waldbaum*, 627 F.2d at 1294). First, the Court must determine whether a public controversy existed. *See Waldbaum*, 627 F.2d at 1296. This requires the Court to determine whether there was "a dispute that in fact ha[d] received public attention because its ramifications w[ould] be felt by persons who [we]re not direct participants." *Id*. at 1296. Second, the Court must analyze the plaintiff's role in that controversy. *Id*. at 1297. "Trivial or tangential participation is not enough . . . [To be considered a limited[-]purpose public figure, a plaintiff] must have achieved a 'special prominence' in the debate." *Id*. To satisfy the "special prominence" requirement, "[t]he plaintiff either must have been purposely

trying to influence that outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Id*. Finally, the Court must assess whether the "alleged defamation [was] germane to the plaintiff's participation in the controversy." *Id*. at 1298. As applied here, the District Court clearly erred when it considered Plaintiff-Appellant a limited-purpose public figure because, *inter alia*, Plaintiff-Appellant did not thrust himself into the forefront of a public controversy, *see generally, Gertz v. Robert Welch Inc*., 418 U.S. 323 (1974), which is a necessary condition for finding limited-purpose public figure status.

## 1.     Plaintiff-Appellant's Role in the Public Controversy.

The U.S. Supreme Court provided the appropriate framework to properly make an analysis on a case-by-case basis in *Gertz*. There, the Court conducted a fact intensive analysis based on the individual's actions. In *Gertz*, the Court stated that "those classified as public figures have thrust themselves into the forefront of particular public controversies in order to influence the resolution of the issues involved . . . they invite attention and comment." *Id*. at 345.

*Gertz* involved a defamation suit brought by a prominent attorney whose reputation was attacked and slandered by a John Birch Society publication during his time representing the family of a young man that was killed by a police officer. *Id.* at 325. Robert *Gertz*, the plaintiff, was ruled to be a private citizen even though

he was at the center of a highly publicized trial because "he plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id*. at 352. Plaintiff-Appellant did neither of these. Working on secret programs under contract to the CIA, Plaintiff-Appellant had not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *Gertz*.

Similarly, in *Time Inc. v. Firestone*, the wife of a wealth socialite, Mrs. Firestone, was held to be a private citizen during the middle of her not-so-private divorce proceeding. *Time Inc. v. Firestone*, 424 U.S. 448 (1976). This woman was frequently in the newspapers and even had a team assembled to keep track of her publicity. Even still, the U.S. Supreme Court ruled that Mrs. Firestone "did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Id*. at 453.

Unlike Mrs. Firestone, Plaintiff-Appellant even took steps to stay out of the public eye. Mrs. Firestone even had people keeping track of her publicity. *Id*. at 485. Just as her divorce became a public spectacle, the allegations against Plaintiff-

Appellant became a punching bag for news and other pundits. This was neither Mrs. Firestone's or Plaintiff-Appellant's choice.

In *Wolston v. Reader's Digest Ass'n*, a man convicted of contempt because he refused to testify before a grand jury investigating espionage by the Soviet Union was deemed a private citizen. *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157 (1979). This received extensive publicity on a national level. *Id*. at 163, 170-71. The Court refrained from deeming Wolston a public figure because he did not "voluntarily thrust" or "inject . . . himself into the forefront." *Id*. at 166. The Court further stated "the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Id*. at 167.

## 2.    The Relevance of Defendants-Appellees' Defamatory Statements to the Plaintiff-Appellant's Role in the Public Controversy.

A limited-purpose public figure treated as a public figure is only limited to certain topics, periods of time, and venues and only with regard to that particular public controversy:

> Although *Gertz* made it clear that the actual malice standard should apply when the plaintiff is a limited public figure, it provided little guidance for determining when a person has achieved that status. As the parties agree, the issue involves a mixed question of law and fact which was properly presented for the trial court's determination prior to the jury trial. Basically, two factors must be present before a person

40

may be considered a limited public figure. First, the circumstances in which a person achieves public figure status must rise to the level of a public controversy and may not be a matter of mere public interest. Second, the person must have voluntarily thrust himself into the vortex of that controversy.

*Arnold v. Taco Properties, Inc*., 427 So.2d 216 (Fla. App. 1 Dist. 1983).

Here, Plaintiff-Appellant is not even a limited-purpose public figure with regard to the topics of Defendants-Appellees' defamation of him at issue. Defendants-Appellees' defamation of Plaintiff-Appellant is not "germane" to his prior revelations about Congressman and later Governor Gibbons. Put another way, the topics of Defendants-Appellees' defamation fall outside of the "limited" aspect of a "limited-purpose public figure."

In 2005, Plaintiff-Appellant quietly filed a whistleblower complaint with the Defense Intelligence Agency ("DIA") and CIA. Then in 2006, he filed a False Claims Act ("FCA") in court, *under seal*, concerning Gibbons. Eventually the court unsealed that complaint. When the court unsealed the complaint in the court's file, this resulted in news coverage, with Plaintiff-Appellant did not seek. Eventually, and on the advice of counsel at the time, and the business owner Edra Blixseth, Plaintiff-Appellant finally relented to requests for comment and granted (as he recalls) only one interview with NBC News, which he recalls lasting about 45 seconds to a minute on air time.

**Q:** Did you give an exclusive interview to NBC News regarding this?
**A:** I don't know about exclusive, but I gave an interview, I believe. **Q:**

41

And did you appear on television?  **A**: I don't remember when, a year later or something there was some blurb, that was it. **Q**: A year later, what, from when you gave your interview? **A:** Whenever I think it happened -- you asked me if I gave an interview, and I think it was a year later or something there was a blurb, a short blurb, that's all I know. Montgomery Depo. at 149-150:23-2:1-10. "**Q**: Why did you agree to give this interview? **A:** I believe it was my legal advice from my attorney at the time."

Montgomery Depo. 151:5-7.

By contrast, the District Court referenced news coverage arising from Warren Trepp's allegations in court filings in litigation. Plaintiff-Appellant sought to get paid his full share of the income of eTreppid. Trepp responded to Plaintiff-Appellant's demand for payment by hurling accusations against Plaintiff-Appellant in court. Accusations trying to avoid paying Plaintiff-Appellant cannot be trusted as reliable. Trepp raised the controversy concerning Plaintiff-Appellant, not Plaintiff-Appellant himself.

The District Court also points to other defamatory news coverage of Plaintiff-Appellant. However, a private person cannot be transformed into a limited-purpose public figure by defamation. *Rety v. Green*, 546 So.2d 410 (Fla. App. 3 Dist. 1989) highlights that "a defendant in a defamation action cannot by his defamation make the plaintiff a limited-purpose public figure for First Amendment purposes." *Id.* at 425*; see also Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d 87, 89 (Fla. App. 2 Dist. 1992) ("WBBH created a public controversy, not Transmission Kingdom. The facts do not support a conclusion that

Transmission Kingdom thrust itself into that controversy as a central figure and brought attention upon itself. Further, the facts are certainly not beyond dispute for the purpose of summary judgment; when viewed in the light most favorable to Transmission Kingdom, the facts show Transmission Kingdom was dragged into a limelight it least desired.").

Plaintiff-Appellant never at any time sought out U.S. government contracts involving national security. Warren Trepp and Edra Blixseth sought out contracts – not Plaintiff-Appellant. Am. Compl. ¶ 88. Plaintiff-Appellant did not deal with the U.S. government. Trepp did. Defendants-Appellees actual malice and defamation comes sharply into focus upon recognizing that Defendants-Appellees blame Plaintiff-Appellant for "greed" and for "conning" the government when it wasn't Plaintiff-Appellant who negotiated or contracted with the government.

Furthermore, eTreppid already had contracts lined up with private sector clients. The U.S. government sought out eTreppid and Plaintiff-Appellant, not the other way around. So, Plaintiff-Appellant did not "con" the government out of "greed" when the U.S. government approached eTreppid. Compl. ¶ 11-15.

### B.     Defendants-Appellees Acted With Actual Malice Or Reckless Disregard for the Truth In Any Event

First, in demonstrating constitutional malice, a plaintiff may use evidence of all of a defendant's acts in order to establish that constitutional malice existed. *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969) ("[T]he court properly

instructed the jury that they should consider all the evidence concerning appellants' acts and conduct in publishing fact in deliberating upon whether defendants published with actual malice."); *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 668 (1989). In *Harte-Hanks Communications*, the U.S. Supreme Court held that "it is clear that the conclusion concerning the newspaper's departure from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record demonstrated a reckless disregard as to the truth or falsity of [defendant]'s allegations and thus provided clear and convincing proof of actual malice as found by the jury. A plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Id.* at 668.

Second, relying on circumstantial evidence to prove constitutional malice has become the proper method. *See e.g., Khawar v. Global Int'l, Inc*., 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards.") State and federal courts have undoubtedly recognized that:

> It would . . . be rare for a defendant . . . to admit to having had serious, unresolved doubts . . . requiring proof of recklessness 'without being able to adduce proof of the underlying facts from which a jury could

infer recklessness . . . would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact.'

*Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious doubts about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives."); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("The plaintiff need not obtain any admission of fault from the defendant."

Third, "most authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993); *accord, e.g., Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (refusal to retract can be evidence of actual malice). Defendants-Appellees failed to retract their defamatory statements when asked by Plaintiff-Appellant and his counsel. After sending the required letter of retraction under Florida law, Defendants-Appellants answered by responding: "We deny your allegations . . . also decline your invitation to meet to discuss HMH's manuscript review processes." Am. Compl., Exhibit 16.

///

///

## III.   THE DISTRICT COURT ERRED WHEN IT RULED THAT DEFENDANTS-APPELLEES DID NOT FORFEIT THEIR RIGHT TO ANALYZE THE SOFTWARE

After many months of discovery, Defendants-Appellees provided nothing more to Plaintiff-Appellant and to the Court than the name of their purported expert witness on the absolute last day of the deadline to designate an expert which was August 3, 2015. The twelfth-hour action underscores how Defendants-Appellees allowed time to tick off for many months – again confirming that their demand for the potentially classified software is simply a "clever" litigation tactic.

Federal Rule of Civil Procedure 26(a)(2) provides, in pertinent part:

(i)   a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii)   the facts or data considered by the witness in forming them;
(iii)   any exhibits that will be used to summarize or support them;
**(iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;**
**(v)   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and**
**(vi)   a statement of the compensation to be paid for the study and testimony in the case.**

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Defendants-Appellees stated in an email that they were providing only the name of the expert witness. However, Defendants-Appellees materially failed to provide information as required by FRCP 26.1 Defendants-Appellees failed to include (1) the purported expert's qualifications; (2) a list of all other cases within which the expert provided expert testimony; and (3) a statement of the compensation to be paid for the study and

testimony in the case. These criteria were not met by the deadline of August 3, 2015.

Importantly, the expert which Defendants-Appellees belatedly designated, however improperly and defectively, did not even have a government security clearance. Thus, he could and would not have had a government national security clearance to inspect, analyze and render an expert opinion about the alleged classified software even if he had been timely and properly designated under FRCP 26. Thus, the entire issue of the alleged software, which the government, when subpoenaed by Defendants-Appellees counsel confirmed was classified in any event, was simply a red herring; a stunt designed by Defendants-Appellees' legal counsel to try to justify dismissal before a new judge who, when offered the opportunity to hold oral argument to ask questions about a complex case that had just recently been transferred to him with a mountain of pleadings by a judge of the U.S. District Court for the Southern District of Florida, declined. Instead, obviously overwhelmed and confused about the allegations of the Amended Complaint, and the evidence uncovered during discovery, he later, in a virtual vacuum, "exited stage left" by issuing a flawed memorandum opinion summarily dismissing a case that had a very developed and deep record. In straining to summarily dismiss the case, and prevent it from being tried and going to the jury, at a minimum he sidestepped defamatory statements which did not hinge on

whether the alleged and classified software worked. Moreover, the District Court judge ignored the hard fact that Defendants-Appellees marketed <u>Pay Any Price</u> on published statements that it was based on new confidential source information, but then when put under oath they could not cite any, showing that at a minimum they published recklessly without regard to the truth, in order to sensationalize and sell books. Indeed, Plaintiff-Appellant, Dennis Montgomery, became the sensational linchpin focus of the Book and in fact whipping boy villain, as underscored by Chapter Two being titled "The Emperor of the War on Terror," to sell books. Montgomery is an individual who Defendants-Appellees knew was a mere individual, and one with a fatal brain aneurism to boot, and one they obviously thought could not be expected to defend himself. It was thus convenient and easy for Defendants-Appellees to "assassinate" by making and casting him as the evil scapegoat villain to sell books. In so doing, they cruelly destroyed Plaintiff-Appellant for profit. Plaintiff-Appellant became so radioactive that he cannot find employment and now lives in poverty as a disabled person whose health is precarious at best.

## IV.    THE DISTRICT COURT ERRED WHEN IT OVERLOOKED THAT THE SOFTWARE COULD NOT HAVE BEEN PRODUCED TO THE COURT OR TO THE OPPOSING PARTY DUE TO ITS POTENTIAL CLASSIFICATION

The District Court erred when it ruled in favor of Defendants-Appellees' couched and misleading pleadings regarding the necessity of the software and

whether it should or could be turned over to the District Court and Defendants-Appellees. A plain reading of the letter of November 13, 2015 from the CIA states: "[T]he CIA is a clandestine intelligence service and most of our information is classified. Even if the CIA were to devote Agency resources to searching for the records that might pertain to your private lawsuit, responsive records (if there were any) would almost certainly be classified . . ." *See* Plaintiff's Opposition to Defendants' Memorandum of Law in Support of Their Motion for Sanctions [Dkt. #178], Exhibit 3.  Similarly, just weeks before this letter, a Justice Department legal counsel, Raphael Gomez writes:

> You have not satisfied your burden of establishing that the requested information is relevant to [your clients'] defenses. For example, you assert that the testimony sought is needed to support your clients' defenses in this action, including "information essential to answering questions that are central to the element of falsity in Montgomery's libel claim." Ratner Declaration at 3. The validity of these defenses turns, however, on what the defendants knew or should have known at the time of the challenged statements, not on what the government knew. See, Don King Prods. v. Walt Disney Co., 40 So. 3d 40, 43 (Fla. Dist. Ct. App. 4th Dist. 2010) (in the context of defamation, actual malice is defined as knowledge that the statement was false or reckless disregard of whether it was false or not. [citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, (1964)]); in assessing "reckless disregard," the court found that a showing of "reckless disregard" requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id. (quoting the Supreme Court in St. Amant v. Thompson, 390 U.S. 727, 731 (1968). As a result, your requests are also not "reasonably calculated to lead to the discovery of admissible evidence," and the burden and expense of providing the requested testimony would outweigh its likely benefit in the underlying action. See Fed. R. Civ. P. 26(b)(1), (b)(2)(C)(iii).

*Id*. at Exhibit 2. Importantly, these were letters written to Defendants-Appellees after they attempted to subpoena the CIA and Justice Department.

No one – other than the proper government contractors and authorities – has the legal right to seek or obtain classified information; not defense counsel, not this honorable Court, and not Plaintiff-Appellant's counsel. The District Court, which looked for reasons to summarily dismiss the case,[3] seemed bent on ignoring this fact entirely, instead erroneously resting on a nine-year-old Protective Order in Nevada, which only states that the parties are not precluded from "serving or taking any discovery from other Parties or third parties relating to, or questioning . . . [t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties." (Dkt. #94-2). Importantly, even this does not explicitly determine that the software is not classified or that it can – in it's entirety – be turned over to the parties. Attempting to bolster its false presumption, the District Court also cites to an Order in May of 2008 which states that the "clear understanding in drafting and issuing th[e] protective order was that the parties would be discussing the nature and capabilities

---

[3] That the District Court Judge wrote that Plaintiff-Appellant may be subject to sanctions if his ruling is overturned by this Court may underscore the District Court's desire to lessen the docket and summarily get rid of the case at all costs. This defied all logic, as how can Plaintiff-Appellant be subject to sanctions if he prevails before this Court? The District Court was obviously attempting to coerce Plaintiff-Appellant not to appeal. This wholly improper statement creates the appearance of the District Court having a predisposition, for whatever reason, about the merits of this case.

of the technology, and the type of work each party performed for the government."

(Dkt. #94-3). Taking this Order by its words, as the District Court does, discussing

the nature and capabilities of the technology and the work performed for the

government is a far cry from having to produce it to parties with no security

clearance.

18 U.S.C. § 798 provides:

Whoever knowingly and willfully communicates, furnishes, transmits, or otherwise makes available to an unauthorized person, or published, or uses in any manner prejudicial to the safety or interest of the United States or for the benefit of any foreign government to the detriment of the United States any classified information . . . shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 798.

18 U.S.C. § 798(a), (a)(4).

## V.    THE DISTRICT COURT ERRED WHEN IT TOSSED PLAINTIFF-APPELLANT'S TORT CLAIMS BECAUSE HIS DEFAMATION CLAIMS SHOULD STILL STAND

The District Court notes that where a plaintiff's "defamation claim[s] fail[],

so do [his] other tort claims based upon the same allegedly defamatory speech."

*Farah v. Esquire Magazine*, 736, F.3d 528, 540 (D.C. Cir. 2013). While arguable

in theory, this case must be reversed and remanded back to the District Court

because a jury is capable of interpreting these statements as defamation *per se* or

defamation by implication and therefore the tort claims must remain.

///

## CONCLUSION

For the foregoing reasons, the District Court's decision should be reversed, and Plaintiff-Appellant awarded costs.  The District Court erred, at a minimum, by summarily dismissing *per se* and other defamatory statements, which in any event did not hinge on the alleged classified software, and were published with actual malice or at a minimum reckless disregard for the truth. Regrettably, it is telling that in its haste to apparently reduce its docket, the District Court would not even allow for the oral argument or even a status conference Plaintiff-Appellant had reasonably requested on a newly transferred case, with thousands of pages of dispositive and other related motions, discovery evidence and deposition transcripts, which comprised a voluminous record. If held, Plaintiff-Appellant could have focused the District Court on the relevant issues at bar, and answered any questions the judge might have had. This underscores why justice must now be done by remanding this case back to the lower court with instructions to conduct a full and fair analysis of Plaintiff-Appellant's allegations and the evidence uncovered during discovery. This evidence, as placed on the record, shows that Defendants-Appellees callously published defamatory statements at a minimum with reckless disregard for the truth to sell books, thereby destroying Plaintiff-Appellee, a seriously disabled man with a terminable brain aneurism they obviously thought could not defend himself. While "convenient," this legally

actionable outrage cannot be so easily and summarily dismissed and Plaintiff-Appellant Dennis Montgomery deserves his day in court before a jury of his peers. Ironically, it was not Plaintiff-Appellant who perpetrated one of the biggest hoaxes in American history, but Defendants-Appellees themselves, whose Book in and of itself was a fraud – claiming to readers that it was written with new confidential source information, when in fact at deposition they were forced to admit that it was largely rehashed <u>Playboy</u> Magazine garbage.

Plaintiff-Appellant respectfully requests oral argument.

Dated: January 27, 2017                     Respectfully Submitted,


                                            /s/ Larry Klayman_____

                                            Larry Klayman, Esq.
                                            Klayman Law Group
                                            2020 Pennsylvania Ave. N.W.
                                            Suite 800
                                            Washington, D.C. 20006
                                            Tel: (310) 595-0800
                                            Email: leklayman@gmail.com

                                            *Attorney for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,648 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 15.28 in 14-point Times New Roman.

Dated: January 27, 2017                    /s/ Larry Klayman_____

                                                            *Attorney for Plaintiff-Appellant*

54

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

electronically and served through the court's ECF system to all counsel of record

or parties listed below on January 27, 2017.

Laura Rose Handman
Direct: 202-973-4200
Email: laurahandman@dwt.com
Fax: 202-973-4499
[COR LD NTC Retained]
Davis Wright Tremaine LLP
Firm: 202-973-4200
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-3401

Lisa Beth Zycherman
Direct: 202-973-4280
Email: lisazycherman@dwt.com
Fax: 202-973-4499
[COR NTC Retained]
Davis Wright Tremaine LLP
Firm: 202-973-4200
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-3401

/s/ Larry Klayman
*Attorney for Plaintiff-Appellant*