No. 16-7096

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

_____

DENNIS L. MONTGOMERY,

*Plaintiff-Appellant*,

*v.*

JAMES RISEN, HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY, AND HOUGHTON MIFFLIN HARCOURT COMPANY,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for District of Columbia
Honorable Rudolph Contreras
Civ. No. 16-0126 (RC)

_____

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 35 MEDIA ORGANIZATIONS IN
SUPPORT OF DEFENDANTS-APPELLEES**

_____

Bruce D. Brown
*Counsel for Amici Curiae*
Gregg P. Leslie
D. Victoria Baranetsky
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St., NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

RULE 29(C)(5) CERTIFICATION ...................................................... iv

CORPORATE DISCLOSURE STATEMENTS .................................... iv

ARGUMENT ......................................................................................... 2

    I.    An individual who willfully agrees to perform military contracts
        involving national security is a "limited purpose public figure" whose
        libel claims will fail without clear and convincing proof of actual
        malice. ......................................................................................... 2

    II.   First Amendment protections for opinion are at their height when
        journalists discuss national security in the context of political
        criticism. ..................................................................................... 8

CONCLUSION ................................................................................... 13

APPENDIX A: STATEMENTS OF INTEREST ................................ 14

APPENDIX B: ADDITIONAL COUNSEL ........................................ 27

CERTIFICATE OF COMPLIANCE ................................................... 32

Certificate of Service ........................................................................ 33

# TABLE OF AUTHORITIES

## Cases

*Buchanan v. Associated Press*, 398 F. Supp. 1196 (D.D.C. 1975).............................3

*CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008)................3, 4, 6

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) .......................................2

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .................................2, 3

*Gleichenhaus v. Carlyle*, 3 Kan. App.2d 146 (Kan. Ct. App. 1979), *aff'd in relevant part*, 226 Kan. 167 (1979) .........................................................4

*Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir. 2008) ..........................3, 4, 6

*Hodges v. Okla. Journ. Publ'g Co.*, 617 P.2d 191 (Okla. 1980) ..............................4

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ...................................2

*Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997)....................................................9, 12

*Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947 (D.D.C. 1976) ........................................................................................................3

*Matusevitch v. Telnikoff*, 877 F. Supp. 1 (D.D.C. 1995) ...........................................9

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016).................1, 5, 7, 11, 13

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)...........................................8, 9

*Miller v. Bakersfield News-Bulletin, Inc.*, 44 Cal. App. 3d 899 (1975).................11

*Moldea v. N.Y. Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994) ("*Moldea I*") .................8

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ("*Moldea II*")..............8, 9

*Mosesian v. McClatchy Newspapers*, 233 Cal. App.3d 1685 (Cal. Ct. App. 1991).4

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).....................................2, 7, 8

*Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999) ..................................10

*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir. 1992)....10

*Silvester v. American Broad. Co. Inc.*, 839 F.2d 1491 (11th Cir. 1988)...............2–3

*Spelson v. CBS, Inc.*, 581 F. Supp. 1195 (N.D. Ill. 1984)......................................10

*Uhler v. Galesi Management Corp.*, No. Civ.A.3:98–CV–0005–L, 1999 WL 20949 (N.D. Tex. 1999)............................................................................. 10–11, 13

*Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir. 1995) ....................... 10

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) .................. 3

*Weyrich v. New Republic Inc.*, 235 F.3d 617 (2001) ........................................ 9, 12

**Other Authorities**

Adam Roston, *The Man Who Conned the Pentagon*, PLAYBOY, 2010.................... 5

All Things Considered, *The Man Who Conned the Pentagon*, NPR.ORG, Dec. 19, 2009 ................................................................................................ 5

Anthony Effinger, *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*, BLOOMBERG NEWS, Aug. 29, 2008 ............................................... 5

Chris McGreal, *The Nevada gambler, al-Qaida, the CIA and the mother of all cons*, THE GUARDIAN, Dec. 23, 2009 ................................................... 5

Eric Lichtblau and James Risen, *Hiding Details of Dubious Deal, U.S. Invokes National Security*, N.Y. TIMES, Feb. 19, 2011 ...................................... 5

Eric Lichtblau and James Risen, *'Terrorist-catcher' deals land government in hot seat*, SEATTLE TIMES, Feb. 19, 2011 .................................................. 5

Kim Zetter, *Report: Programmer Conned CIA, Pentagon Into Buying Bogus Anti-Terror Code*, WIRED, Dec. 28, 2009 .................................................... 5

Mark Hosenball, *The Con Man Who Scared the Nation*, THE NATION, Dec. 18, 2009 ................................................................................................ 5

Molly Dunigan, Op-Ed., *A Lesson from Iraq War: How to Outsource War to Private Contractors*, CHRISTIAN SCIENCE MONITOR, Mar. 19, 2013.................... 7

Restatement (Second) of Torts § 566................................................................. 8

Sean McFate, *America's Addiction to Mercenaries*, THE ATLANTIC, Aug. 12, 2016 ................................................................................................ 6

Tim Shorrock, *How Private Contractors Have Created a Shadow NSA*, THE NATION, May 27, 2015................................................................................ 6

## RULE 29(C)(5) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amici* state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person—other than *amici*, their members or their counsel—contributed money intended to fund the preparation or submission of this brief.

## CORPORATE DISCLOSURE STATEMENTS

The parties to this *amici curiae* brief are The Reporters Committee for Freedom of the Press, American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, Association of American Publishers, Inc., Bloomberg L.P., Cable News Network, Inc., Dow Jones & Company, Inc., The E.W. Scripps Company, First Amendment Coalition, Fox News Network LLC, Freedom of the Press Foundation, Gannett Co., Inc., Hachette Book Group, Inc., Hearst Corporation, International Documentary Assn., Investigative Reporting Program, Investigative Reporting Workshop at American University, Macmillan Publishers, The McClatchy Company, MPA – The Association of Magazine Media, The National Press Club, National Press Photographers Association, The New York Times Company, News Media Alliance, Online News Association, PEN America, Penguin Random House, Radio Television Digital News Association, Reporters Without Borders, The Seattle Times Company, Society of Professional

Journalists, Tully Center for Free Speech, Univision Interactive Media, Inc. d/b/a/ Fusion Media Group, W.W. Norton & Company, Inc., and The Washington Post.

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* make the following disclosures:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

Bloomberg L.P.'s parent corporation is Bloomberg Inc., which is privately held, and no publicly held corporation owns 10% or more of its stock.

Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which itself is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

Dow Jones is a Delaware corporation with its principal place of business in New York.  News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones.  Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones.  No publicly held company directly owns 10% or more of the stock of Dow Jones.

The E.W. Scripps Company is a publicly traded company with no parent company.  No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

Fox News Network, LLC is wholly owned by Fox Television Stations, Inc., which is wholly owned by the publicly traded Twenty-First Century Fox, Inc.  No other publicly held corporation owns ten percent or more of Fox News.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company holds 10% or more of its stock.

Hachette Book Group, Inc. is a wholly-owned subsidiary of Hachette Livre USA, Inc.; Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc.; Lagardère North America Inc. is a wholly-owned subsidiary

of Lagardère Media; and Lagardère Media is a wholly-owned subsidiary of Lagardère SCA, which is traded on the Paris stock exchange.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

The International Documentary Association is an non-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Program is a project of the University of California, Berkeley.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington.  It issues no stock.

Macmillan Publishers is privately owned.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI.  Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

PEN America has no parent or affiliate corporation.

Penguin Random House LLC (a private non-governmental party) certifies that it is a limited liability company in which membership interests are owned 53 percent by Bertelsmann SE & CO KGaA (a private entity), and 47 percent by Pearson PLC. Pearson PLC is a publicly traded company.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reporters Without Borders is a nonprofit association with no parent corporation.

The Seattle Times Company: The McClatchy Company owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

Univision Interactive Media, Inc. d/b/a/ Fusion Media Group, is a wholly-owned subsidiary of Univision Communications Inc.

W.W. Norton & Company, Inc. is a privately held New York corporation. 100% of the company's stock is held by current employees.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The Reporters Committee and other *amici* are publishers, journalism groups, and news media organizations that have a strong interest in supporting constitutional protections against libel actions.  Defamation claims tend to chill the speech of journalists, publishers, and others in the news media.  Publishers and news organizations depend on the protections of the First Amendment when they venture into the thick of government controversies to inform the public.  The

outcome of this case will impact the ability of the media to discuss information robustly and freely for the benefit of their readers, viewers, and listeners.

      The Reporters Committee for Freedom of the Press is joined in this brief by 35 organizations.  Descriptions of all parties to this brief are given more fully in Appendix A.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At issue in this case is the basic protection for open and rigorous political commentary about national security under the First Amendment.  Defendant-Appellee James Risen, a Pulitzer Prize-winning journalist, is the author of *Pay Any Price: Greed, Power, And Endless War*, a detailed political criticism about the United States government's response to the terrorist attacks that occurred on September 11, 2001.  Defendant-Appellee Houghton Mifflin Harcourt Publishing Company is the publisher of *Pay Any Price*.  The book explains how government officials came to believe that Plaintiff-Appellant Dennis Montgomery, who helped develop government software to track terrorists, engaged in "one of the most elaborate and dangerous hoaxes in American history."  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 228 (D.D.C. 2016).

First, *amici* write to underscore that this Court should affirm the District Court's decision finding Plaintiff-Appellant to be a limited-purpose public figure because of his substantial role in a high-level military contract.  Montgomery's decision to conduct business with the government shows that he chose to play a significant part in an important public controversy.  Application of the public figure doctrine is especially important where an individual has taken on vital responsibilities over government activities involving national security.

Second, *amici* assert that the statements that Plaintiff-Appellant takes issue

1

with are opinions that are not actionable under the First Amendment.

Montgomery's claims are mostly centered on the characterizations of him as a

"con artist" or "maestro" who deployed a large "ruse" on the government. These

statements, both on their own and within the larger context of the stylized political

criticism in the book, deserve protection as opinion.

For these reasons, this Court should affirm the District Court's order.

## ARGUMENT

I.    **An individual who willfully agrees to perform military contracts
      involving national security is a "limited purpose public figure" whose
      libel claims will fail without clear and convincing proof of actual
      malice.**

Military and national security contractors voluntarily put themselves in a

central—and increasingly dominant—role in setting and implementing one of the

most vital and sensitive areas of government policy. Unlike speech involving

private persons, speech commenting on public figures enjoys greater protections

under the First Amendment. *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584

(D.C. Cir. 2016) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270

(1964)); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Curtis Publ'g

Co. v. Butts*, 388 U.S. 130, 154 (1967).

To determine if an individual attains a limited-purpose public figure status, a

court must "(1) isolate the public controversy, (2) examine the plaintiffs'

involvement in the controversy, and (3) determine whether 'the alleged defamation

2

[was] germane to the plaintiffs' participation in the controversy.'" *Silvester v. American Broad. Co. Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). Ultimately, private individuals qualify as "limited-purpose public figures" if they "have thrust themselves to the forefront of particular public controversies." *Gertz*, 418 U.S. at 345.

Applying these principles, courts uniformly find government contractors qualify as limited public figures because willfully participating in a government activity inherently thrusts contractors to the forefront of a public controversy. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 294 (4th Cir. 2008) (finding government contractor for the military was a public figure subject to the actual malice standard); *McDowell v. Paiewonsky*, 769 F.2d 942, 947–51 (3d Cir. 1985) (holding that an architect criticized for his public projects was a limited-purpose public figure when he accepted a government contract); *Hatfill v. New York Times Co.*, 532 F.3d 312, 318 (4th Cir. 2008) (holding research scientist who had worked on other security-related contract was a public figure with respect to controversy over bioterrorism); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 954 (D.D.C. 1976) (holding plaintiff, a government contractor engaged with military officials, was a public figure); *Buchanan v. Associated Press*, 398 F. Supp. 1196, 1203 (D.D.C. 1975) (deciding plaintiff who performed accounting

3

services for the Finance Committee to Re-Elect the President was a public figure);

*Hodges v. Okla. Journ. Publ'g Co.*, 617 P.2d 191, 194 (Okla. 1980) (finding a

government contractor to be a public official because of the appearance of

substantial responsibility for government affairs); *Mosesian v. McClatchy*

*Newspapers*, 233 Cal. App.3d 1685, 1700 (Cal. Ct. App. 1991) (president of

company awarded a public contract was a limited-purpose public figure);

*Gleichenhaus v. Carlyle*, 3 Kan. App.2d 146, 153 (Kan. Ct. App. 1979) (person

who obtained government contract after contributing to a campaign was a limited-

purpose public figure), *aff'd in relevant part*, 226 Kan. 167, 167–68 (1979).

Applying the public figure doctrine to a government contractor is of the

utmost importance when the contract is with the military and involves national

security:

> The conduct of the military and its designated civilian surrogates during
> wartime is a matter of the highest public concern, and speech critical of
> those responsible for military operations is well within 'the constitutionally
> protected area of free discussion.' . . .  The actual malice standard thus offers
> broad protection for the media commentator who is critical of public
> officials or public figures responsible for war-related activities.

*CACI Premier Tech., Inc.*, 536 F.3d at 294 (citing *Rosenblatt v. Baer*, 383 U.S. 75,

85 (1966)); *see also Hatfill*, 532 F.3d at 318 (finding private scientist was a public

figure where journalist's columns discussed "a debate about national security, the

nation's lack of preparedness for bioterrorism, and the example provided by the

FBI's investigation of the anthrax attacks in light of the evidence appearing against [Plaintiff]").

As the District Court explained, Appellant satisfies all three prongs of the limited-purpose public figure analysis. Appellant was involved in "several angles" of a public controversy surrounding government military contracts following the events of September 11. *See Montgomery*, 197 F. Supp. 3d at 256. Appellant "achieved a 'special prominence' in the debate" around "the government contracts eTreppid had secured," and "the government's use of the technology more generally." *Id.* Indeed, Appellant admits to "[w]orking on secret programs under contract to the CIA." Appellant's Br. at 39. Most of all "'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *See Montgomery*, 197 F. Supp. 3d at 256.[1]

---

[1] In fact, Risen's book relied on multiple news outlets around the world that had reported on Montgomery and his role in the government's contracts. *See* Brief for Defendant at 26, Doc. No. 201, *Montgomery*, 197 F. Supp. 3d at 231 (citing Anthony Effinger, *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*, BLOOMBERG NEWS, Aug. 29, 2008; Chris McGreal, *The Nevada gambler, al-Qaida, the CIA and the mother of all cons*, THE GUARDIAN, Dec. 23, 2009; Adam Roston, *The Man Who Conned the Pentagon*, PLAYBOY, 2010; and Eric Lichtblau and James Risen, *Hiding Details of Dubious Deal, U.S. Invokes National Security*, N.Y. TIMES, Feb. 19, 2011); *see also Montgomery*, 197 F. Supp. 3d at 231 (citing news articles Risen relied on). Several news outlets not mentioned in the District Court's opinion also covered this story. *See* All Things Considered, *The Man Who Conned the Pentagon*, NPR.ORG, Dec. 19, 2009, http://n.pr/2nsGMUr; Mark Hosenball, *The Con Man Who Scared the Nation*, THE NATION, Dec. 18, 2009, http://bit.ly/2nG34mo; Kim Zetter, *Report: Programmer Conned CIA, Pentagon Into Buying Bogus Anti-Terror Code*, WIRED, Dec. 28, 2009, http://bit.ly/2ol75zP;

Moreover, Appellant's limited public figure status is inescapable given his substantial responsibility for and involvement in a government military contract. Montgomery played a primary role in an important aspect of national security following September 11, 2001. His actions mirror those of the plaintiffs in *CACI Premier Tech., Inc.* and *Hatfill* whom courts found to be limited purpose public figures because of their involvement with government military work. *See CACI Premier Tech., Inc.*, 536 F.3d at 295 ("CACI surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism—criticism that could be emboldened by the actual malice standard"); *Hatfill*, 532 F.3d at 324 (stating Hatfill through his work "voluntarily assumed a role of special prominence" and did so "to influence the resolution of the controversy"). Plaintiff-Appellant himself acknowledges that his technology was "an integral part of the government's software capabilities." Appellant's Br. at 36, n.2.

To hold that such an individual is not a limited-purpose public figure would likely chill speech about private contractors who are increasingly responsible for governmental affairs. *See* Sean McFate, *America's Addiction to Mercenaries*, THE ATLANTIC, Aug. 12, 2016 (reporting the Pentagon paid $285 billion to contractors

_____

and Eric Lichtblau and James Risen, *'Terrorist-catcher' deals land government in hot seat*, SEATTLE TIMES, Feb. 19, 2011, http://bit.ly/2nG1S2t.

which is more "than all government agencies received"); Tim Shorrock, *How Private Contractors Have Created a Shadow NSA*, THE NATION, May 27, 2015, (discussing the increasing power of private contractors in national security); Molly Dunigan, Op-Ed., *A Lesson from Iraq War: How to Outsource War to Private Contractors*, CHRISTIAN SCIENCE MONITOR, Mar. 19, 2013 (referring to the Iraq War as "America's most privatized military engagement to date" and noting that contractors outnumbered troops in both Afghanistan and Iraq).  It would also disrupt longstanding precedent by this Court and the Supreme Court that government activities should be subject to uninhibited, robust, and wide-open debate, even if it leads to "vehement, caustic, and sometimes unpleasantly sharp attacks." *Sullivan*, 376 U.S. at 270.

Thus, cases like this one, where a journalist discusses central figures involved in matters of national security, present the greatest justification for requiring the higher burden of proof.  As a limited-purpose public figure, Montgomery must demonstrate that Risen acted with actual malice in his reporting. He cannot meet this daunting standard.  *See Montgomery*, 197 F. Supp. 3d at 247 (finding Montgomery "fails to point the Court to sufficient evidence from which a rational jury could conclude by clear and convincing evidence that Defendants published the Chapter with actual malice; in fact, the record contains overwhelming evidence to the contrary").

7

**II.    First Amendment protections for opinion are at their height when journalists discuss national security in the context of political criticism.**

The Supreme Court and this Court have long held that while not all statements labeled as opinions are immunized from liability, pure opinion that contains no provably false factual statements are not actionable.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 25 (1990) (distinguishing opinion from "actual facts"); *Moldea v. N.Y. Times Co*., 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*") (stating "nonverifiable statements which [do] not imply provable facts" are nonactionable) (citation and quotations omitted); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("*Moldea II*") (delineating when opinion is actionable).  *See also* Restatement (Second) of Torts § 566, comment (c) ("A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.").  Because this protection of pure opinion is firmly grounded in the Supreme Court's line of cases designed to "ensure that debate on public issues remains 'uninhibited, robust, and wide-open,'" *Milkovich*, 497 U.S. at 20 (quoting *Sullivan*, 376 U.S. at 270), the need to apply this protection is at its greatest in the context of political commentary on national security.

To distinguish fact from opinion, courts "must [first] consider the statement in context" to "decid[e] whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact." *Weyrich v. New Republic Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001); *see also Milkovich*, 497 U.S. at 21 (stating the "general tenor" of a work is key to distinguish opinion); *Moldea II*, 22 F.3d at 315 (stating that looking "to the context" is "settled principle"). Afterwards, courts must analyze each of the statements at issue to determine whether, individually or collectively, the statements contain express or implied verifiably false facts. *Weyrich*, 235 F.3d at 623.

Many courts have found statements qualify as opinion based on their context within political nonfiction. *See Weyrich*, 235 F.3d at 623 (holding statements were opinion when published in *The New Republic*, which is "well-understood" to be a "magazine of political commentary"); *Moldea II*, 22 F.3d at 314 (reversing the decision in *Moldea I* involving a book review "because it is in part the *settings* of the speech in question that makes [its] hyperbolic nature apparent") (emphasis in original); *Matusevitch v. Telnikoff*, 877 F. Supp. 1, 5 (D.D.C. 1995) (given the "location of the statements in the newspaper . . . a reader would reasonably be alerted to the statements' function as opinion and not as an assertion of fact"); *Levin v. McPhee*, 119 F.3d 189, 195, 197 (2d Cir. 1997) (stating defendant's statements in a "nonfiction work" describing "factual and historical accounts of

9

real events" are readily understood in context as "conjecture," hypothesis, "speculation," and "rumor" signaling to the reader that what is said is opinion, and not fact).

In addition to looking at the context, courts have repeatedly found some individual statements standing alone, such as "con artist" or "fake," are nonactionable opinion. *See, e.g.*, *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992) (stating "a rip-off, a fraud, a scandal, a snake-oil job was mere hyperbole and thus protected opinion"); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) (holding that use of "scam" was protected opinion); *Spelson v. CBS, Inc.*, 581 F. Supp. 1195 (N.D. Ill. 1984) (expressions such as "unethical," "con-artists," "quacks," and "fraud" were constitutionally protected statements of opinion).

Similarly, comments about personality traits, state of mind, and motivation are regularly found to be non-actionable opinion. *See, e.g.*, *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (statement that plaintiff was "intrinsically evil" was opinion regarding plaintiff's motivation and personality and thus not capable of verification); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1106 (N.D. Cal. 1999) (claim dismissed in part because calling plaintiff manipulative "refers to subjective motivations and personality traits, which are not provable as true or false"); *Uhler v. Galesi Management Corp.*, No. Civ.A.3:98–

10

CV–0005–L, 1999 WL 20949, at *8 (N.D. Tex. 1999) (statement that someone "intentionally 'faked' an accident in order to 'scam'" pertains to "state of mind" and is not objectively verifiable); *Miller v. Bakersfield News-Bulletin, Inc.*, 44 Cal. App. 3d 899, 902 (1975) (finding no support for the claim that "an opinion with respect to a characterization of a personality trait of a public official" can be defamatory).

Plaintiff-Appellant takes issue with one particular passage in *Pay Any Price* which depicts Montgomery:

> Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic.  Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it.  The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery.  Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

Appellant's Br. at 10 (citing Am. ¶ Compl. 36); *see also Montgomery*, 197 F. Supp. 3d at 249 (citing passage).  Analyzing these statements, both on their own and in their broader context, the District Court held them to be nonverifiable opinions.  *See Montgomery*, 197 F. Supp. 3d at 250 (stating that "it is difficult to prove false the assertion that someone *thought or believed* a particular thing, as

11

opposed to an assertion that an individual affirmatively said or expressed a particular viewpoint") (emphasis in original).

Looking at the broader context of Risen's book reveals that labels like "maestro," "hoax," and "con artist" are opinions because they were part of political commentary on national security issues. In *Pay Any Price*, Risen depicts the dramatic aftermath of September 11th and the fierce political debate over the government's response to the terrorist attacks. Like the article published in *The New Republic* at issue in *Weyrich*, Risen's book is "well-understood" to be a "political commentary" on the government's response to the September 11th attacks. *See Weyrich*, 235 F.3d. at 625. Risen's statements about Montgomery were clearly made to illustrate the overall frantic climate around Washington at that time and the controversy over the government's careless expenditures. While Risen's statements were made in a "nonfiction work" describing "factual and historical accounts of real events," as in *Levin*, 119 F.3d at 197, read in context his comments that Montgomery was a "con artist" and "maestro" in the eyes of others are readily understood as "conjecture" and "speculation" about Montgomery in the post-September 11 climate. *Id.*

Some of Risen's statements can also be viewed as opinion on their own, without context, because they are incapable of being verified. As the District Court found, statements "that Montgomery was motivated out of greed or ambition

12

is a subjective judgment that is not verifiable." *Montgomery*, 197 F. Supp. at 248. Just as the statements in *Uhler* that the plaintiff "intentionally 'faked' an accident in order to 'scam'" pertains to "state of mind," *Uhler*, No. Civ.A.3:98–CV–0005–L, 1999 WL 20949, at *8, the statements here involving Montgomery's motivations are similarly not actionable.  In addition, "there is a plethora of evidence showing that officials and others who worked with Montgomery do believe his work to have been a hoax." *Montgomery*, 197 F. Supp. 3d at 250.

Viewed alone or in context, Risen's political critique of Montgomery – which employed terms such as "maestro," "con artist," "elaborate and dangerous hoaxes," and "ruse" – is a classic example of protected hyperbole, commentary, and opinion based on disclosed facts.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully request that this Court uphold the District Court's order granting summary judgment in favor of Defendants-Appellees.

Respectfully submitted,

/s/ Bruce D. Brown_____
Bruce D. Brown
*Counsel for Amici Curiae*
THE REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St., NW, Suite 1250
Washington, D.C. 20005
Dated: April 3, 2017          Telephone: (202) 795-9300

# APPENDIX A: STATEMENTS OF INTEREST

**The Reporters Committee for Freedom of the Press** is a voluntary, unincorporated association of reporters and editors which works to defend the First Amendment rights and freedom of information interests of the news media.  The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

**American Society of News Editors ("ASNE")**, with some 500 members, is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders.  Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press ("AP")** is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers.  The AP operates from 300 locations in more than 100 countries.  On any given day, AP's content can reach more than half of the world's population.

14

**Association of Alternative Newsmedia ("AAN")** is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**The Association of American Publishers, Inc. ("AAP")** is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

**Bloomberg L.P.** operates Bloomberg News, a 24-hour global news service based in New York with more than 2,400 journalists in more than 150 bureaus around the world. Bloomberg supplies real-time business, financial, and legal news to the more than 319,000 subscribers to the Bloomberg Professional service world-wide and is syndicated to more than 1000 media outlets across more than 60

15

countries.  Bloomberg television is available in more than 340 million homes

worldwide and Bloomberg radio is syndicated to 200 radio affiliates nationally.  In

addition, Bloomberg publishes Bloomberg Businessweek, Bloomberg Markets and

Bloomberg Pursuits magazines with a combined circulation of 1.4 million readers

and Bloomberg.com and Businessweek.com receive more than 24 million visitors

each month.  In total, Bloomberg distributes news, information, and commentary to

millions of readers and listeners each day, and has published more than one

hundred million stories.

     **Cable News Network, Inc. ("CNN")**, a division of Turner Broadcasting

System, Inc., a Time Warner Company, is the most trusted source for news and

information.  Its reach extends to the following: nine cable and satellite television

networks; one private place-based network; two radio networks; wireless devices

around the world; CNN Digital Network, the No. 1 network of news websites in

the United States; CNN Newsource, the world's most extensively syndicated news

service; and strategic international partnerships within both television and the

digital media.

     **Dow Jones & Company, Inc.**, is a global provider of news and business

information, delivering content to consumers and organizations around the world

across multiple formats, including print, digital, mobile and live events.  Dow

Jones has produced unrivaled quality content for more than 130 years and today

has one of the world's largest newsgathering operations globally. It produces leading publications and products including the flagship Wall Street Journal; Factiva; Barron's; MarketWatch; Financial News; Dow Jones Risk & Compliance; Dow Jones Newswires; and Dow Jones VentureSource.

**The E.W. Scripps Company** serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets. Scripps also owns 34 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere. Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C. and serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

17

**Fox News Network LLC ("Fox News")** owns and operates the Fox News Channel, the top rated 24/7 all news national cable channel, and the Fox Business Network, as well as Foxnews.com, Foxbusiness.com, and the Fox News Radio Network.

**Freedom of the Press Foundation** is a non-profit organization that supports and defends public-interest journalism focused on transparency and accountability. The organization works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including public advocacy, legal advocacy, the promotion of digital security tools, and crowd-funding.

**Gannett Co., Inc.** is an international news and information company that publishes 109 daily newspapers in the United States and Guam, including USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of more than 8 million readers and the digital and mobile products associated with the company's publications serve online content to more than 100 million unique visitors each month.

**Hachette Book Group, Inc.** is a leading publisher of books on a wide range of non-fiction and fiction subjects, including books about the U.S. government. Hachette Book Group, Inc. is a leading trade publisher based in New York and a division of Hachette Livre.

18

**Hearst** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership in cable television networks such as A&E, HISTORY, Lifetime and ESPN; majority ownership of global ratings agency Fitch Group; Hearst Health, a group of medical information and services businesses; 30 television stations such as WCVB-TV in Boston and KCRA-TV in Sacramento, Calif., which reach a combined 19 percent of U.S. viewers; newspapers such as the Houston Chronicle, San Francisco Chronicle and Albany Times Union, more than 300 magazines around the world including Cosmopolitan, ELLE, Harper's BAZAAR and Car and Driver; digital services businesses such as iCrossing and KUBRA; and investments in emerging digital and video companies such as Complex, BuzzFeed, VICE and AwesomenessTV.

**The International Documentary Association ("IDA")** is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Program ("IRP")** at U.C. Berkeley's Graduate School of Journalism is dedicated to promoting and protecting the practice of investigative reporting. Evolving from a single seminar, the IRP now encompasses a nonprofit newsroom, a seminar for undergraduate reporters and a

19

post-graduate fellowship program, among other initiatives.  Through its various

projects, students have opportunities to gain mentorship and practical experience in

breaking major stories for some of the nation's foremost print and broadcast

outlets.  The IRP also works closely with students to develop and publish their own

investigative pieces.  The IRP's work has appeared on PBS Frontline, Univision,

Frontline/WORLD, NPR and PBS NewsHour and in publications such as Mother

Jones, The New York Times, Los Angeles Times, Time magazine and the San

Francisco Chronicle, among others.

**The Investigative Reporting Workshop**, a project of the School of

Communication (SOC) at American University, is a nonprofit, professional

newsroom.  The Workshop publishes in-depth stories at

investigativereportingworkshop.org about government and corporate

accountability, ranging widely from the environment and health to national

security and the economy.

**Macmillan Publishers** is a global trade book publishing company with

prominent imprints around the world.  Macmillan publishes a broad range of

award-winning books for children and adults in all categories and formats.

Macmillan Publishers is a division of the Holtzbrinck Publishing Group, a large

family-owned media company headquartered in Stuttgart, Germany.

**The McClatchy Company** is a 21st century news and information leader, publisher of iconic brands such as the Miami Herald, The Kansas City Star, The Sacramento Bee, The Charlotte Observer, The (Raleigh) News and Observer, and the (Fort Worth) Star-Telegram. McClatchy operates media companies in 28 U.S. markets in 14 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, Calif., and listed on the New York Stock Exchange under the symbol MNI.

**MPA – The Association of Magazine Media, ("MPA")** is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year,

21

the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Photographers Association ("NPPA")** is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**The New York Times Company** is the publisher of *The New York Times* and *The International Times*, and operates the news website nytimes.com.

**The News Media Alliance** is a nonprofit organization representing the interests of online, mobile and print news publishers in the United States and Canada. Alliance members account for nearly 90% of the daily newspaper circulation in the United States, as well as a wide range of online, mobile and non-daily print publications.  The Alliance focuses on the major issues that affect today's news publishing industry, including protecting the ability of a free and

22

independent media to provide the public with news and information on matters of public concern.

**Online News Association ("ONA")** is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**PEN American Center ("PEN America")** is a non-profit association of writers that includes novelists, journalists, editors, poets, essayists, playwrights, publishers, translators, agents, and other professionals. PEN America stands at the intersection of literature and human rights to protect open expression in the United States and worldwide. We champion the freedom to write, recognizing the power of the word to transform the world. Our mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible, working to ensure that people everywhere have the freedom to create literature, to

23

convey information and ideas, to express their views, and to make it possible for everyone to access the views, ideas, and literatures of others. PEN America has approximately 5,000 members and is affiliated with PEN International, the global writers' organization with over 100 Centers in Europe, Asia, Africa, Australia, and the Americas.

**Penguin Random House LLC** publishes adult and children's fiction and nonfiction in print and digital trade book form and employs more than 10,000 people globally across almost 250 editorially and creatively independent imprints and publishing houses that collectively publish more than 15,000 new titles annually. Its publishing lists include more than 60 Nobel Prize laureates and hundreds of the world's most widely read authors, among whom are many investigative journalists covering domestic politics and international affairs.

**Radio Television Digital News Association ("RTDNA")** is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

**Society of Professional Journalists ("SPJ")** is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

**Univision Interactive Media, Inc. d/b/a Fusion Media Group ("FMG")**
is the publisher of some of the web's best-loved digital media brands and
communities, including Gizmodo, Jezebel, Deadspin, and Fusion.  Collectively, the
sites reach over 60 million readers in the United States a month. FMG also owns
the Fusion TV cable and OTT television network that produces impact journalism
targeted at the diverse millennial population in the U.S. Fusion TV is distributed in
millions of households in the U.S.

**W. W. Norton & Company** is the nation's largest independent, employee-
owned book publishing firm. Founded by William Warder Norton in 1923, the
firm now publishes approximately 450 books annually in its combined divisions
and continues to adhere to its original motto, "Books that Live," striving to publish
works of enduring distinction in the areas of nonfiction, fiction, poetry, and
textbooks.

**WP Company LLC (d/b/a The Washington Post)** publishes one of the
nation's most prominent daily newspapers, as well as a website,
www.washingtonpost.com, that is read by an average of more than 20 million
unique visitors per month.

26

## APPENDIX B: ADDITIONAL COUNSEL

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*

Karen Kaiser
General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for Association of Alternative Newsmedia*

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of American Publishers, Inc.*

Randy L. Shapiro
Global Media Counsel
Bloomberg LP
731 Lexington Avenue
New York, NY 10022

David C. Vigilante
Johnita P. Due
Cable News Network, Inc.
1 CNN Center
Atlanta, GA 30303

Jason P. Conti
Jacob P. Goldstein
Dow Jones & Company, Inc.
1211 Avenue of the Americas
New York, NY 10036
*Counsel for Dow Jones & Company, Inc.*

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Dianne Brandi
Executive Vice President
Legal and Business Affairs
Fox News / Fox Business
1211 Avenue of the Americas, 15th Floor
New York, New York 10036

Marcia Hofmann
*Counsel for Freedom of the Press Foundation*
25 Taylor Street
San Francisco, CA 94012

Barbara W. Wall
Senior Vice President & Chief Legal Officer
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
(703) 854-6951

Carol Fein Ross
EVP, Business Affairs & General Counsel
Hachette Book Group
1290 Ave. of the Americas
New York, NY 10104

Jonathan Donnellan
Kristina Findikyan
Hearst Corporation
Office of General Counsel
300 W. 57th St., 40th Floor
New York, NY 10019

Paul J. Sleven
General Counsel
Macmillan Publishers
175 Fifth Avenue
New York, NY 10010

Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

James Cregan
Executive Vice President
MPA – The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Charles D. Tobin
Holland & Knight LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

David McCraw
V.P./Assistant General Counsel
The New York Times Company
620 Eighth Avenue
New York, NY 10018

Kurt Wimmer
Covington & Burling LLP
850 10th Street NW
Washington, DC 20001
*Counsel for the News Media Alliance*

Katherine Glenn Bass
588 Broadway, Suite 303
New York, NY 10012

Anke E. Steinecke
General Counsel
Carolyn K. Foley, Esq.
Vice President & Associate General Counsel
Penguin Random House LLC
1745 Broadway, 14th Floor
New York, NY 10019

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

30

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

Eric Lieberman
Senior Vice President, General Counsel
Fusion Media Network, LLC
8551 NW 30th Terrace
Doral, FL 33122

Lynn Oberlander
Senior V.P. and General Counsel
Gizmodo Media Group, LLC
114 Fifth Avenue, 2nd Floor
New York, NY 10011
*Counsel for Univision Interactive Media, Inc. d/b/a Fusion Media Group*

Laura Goldin
VP & General Counsel
W.W. Norton & Company, Inc.
500 5th Avenue
New York, NY 10110
(212) 790-9434

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1301 K St. NW
Washington, DC 20071

## CERTIFICATE OF COMPLIANCE

I, Bruce D. Brown, do hereby certify: (1) Brief of *Amici Curiae* complies with the type-volume limitation Fed. R. App. P. 32(a)(7)(B) because it contains 3,070 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); (2) Brief of *Amici Curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman; and (3) Brief of *Amici Curiae* as submitted has been scanned for viruses and is virus-free.

Dated: April 3, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Bruce D. Brown, hereby certify that on April 3, 2017, I electronically filed the foregoing document with United States Court of Appeals for the District of Columbia by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF filers and that they will be served through the CM/ECF system.

Dated: April 3, 2017

/s/ Bruce D. Brown_____
*Counsel for Amici Curiae*