**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 16-7096**
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**DENNIS L. MONTGOMERY,**

*Plaintiff-Appellant,*

v.

**JAMES RISEN, HOUGHTON MIFFLIN HARCOURT PUBLISHING**
**COMPANY, and HOUGHTON MIFFLIN HARCOURT COMPANY**

*Defendants-Appellees.*

_____

Appeal From an Order by the U.S. District Court for the District of Columbia
The Honorable Rudolph Contreras, Judge Presiding
(Case No. 1:16-cv-00126-RC)

_____

**FINAL APPELLEES' BRIEF**

_____

DAVIS WRIGHT TREMAINE LLP
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
Telephone: (202) 973-4200
Facsimile:  (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com

*Attorneys for Defendants-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

The sole Plaintiff below, and Appellant here, is Dennis L. Montgomery ("Montgomery").  The Defendants below and Appellees here are James Risen, Houghton Mifflin Harcourt Publishing Company ("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc. (together "HMH Companies") (collectively, "Risen/HMH").  The parent corporation of HMH is Houghton Mifflin Harcourt Publishers Inc.  The parent corporation of Houghton Mifflin Harcourt Publishers Inc. is HMH Publishing Company.  The parent corporation of HMH Publishing Company is Appellee HMHC (improperly named as HMH Holdings, Inc.), a publicly-held corporation.  No other publicly-held corporation owns 10% or more of the HMH Companies' stock.

There were no amici in the district court.

### B.    Rulings

Montgomery appeals from the district court's Order resolving all pending motions and granting Appellees' motion for summary judgment, App.2177-78, and Memorandum Opinion in support thereof, App.2185-258, as well as unspecified "other orders and ruling averse to the Plaintiff in this case."  App.2179.

### C.    Related Cases

Appellees are unaware of any related cases.

Dated: May 1, 2017                      */s/ Laura R. Handman*

                                        Laura R. Handman

i

# TABLE OF CONTENTS

Page(s)

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY .................................................................................... xii

COUNTER STATEMENT OF ISSUES ...................................................1

COUNTER STATEMENT OF THE CASE...............................................2

    A.   Media Coverage Before Publication of *Pay Any Price* ...........................4

    B.   Risen/HMH's Reliance on FBI Reports, Court Documents, and Congressional Records...........................................................8

        1.   Allegations of Fake Software ................................................8

        2.   Allegations of Rigged Demonstrations to Government Officials.......11

    C.   Risen/HMH's Reliance on Interviews and Documents .............................12

    D.   Montgomery's Failure to Produce the Software........................................14

    E.   Proceedings Below...................................................................17

SUMMARY OF THE ARGUMENT ......................................................20

ARGUMENT ..................................................................................22

    A.   Standard of Review and Choice of Law ...................................................22

    B.   The District Court Correctly Overruled Montgomery's Objections to the Magistrate's Discovery Orders .........................................................23

        1.   The District Court Correctly Held Montgomery Had to Produce the Software.................................................................23

        2.   The District Court Correctly Held Risen/HMH Did Not Forfeit Their Right to Analyze the Software .................................27

C.  The District Court Correctly Held Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole ..........................28

D.  The District Court Correctly Held Montgomery Did Not, and Cannot, Meet His Burden to Prove Substantial Falsity ...........................................32

E.  The District Court Correctly Held, As a Matter of Law, Montgomery Did Not, and Cannot, Prove By Clear and Convincing Evidence, that Risen/HMG Acted With Actual Malice or Any Other Applicable Fault ...37

    1.  The District Court Correctly Held Montgomery Is a Limited-Purpose Public Figure .........................................................................38

    2.  The District Court Correctly Held Montgomery Cannot Prove Actual Malice by Clear and Convincing Evidence, or Any Other Applicable Standard of Fault..............................................................43

F.  The Fair Report Privilege Provides a Separate Basis For Summary Judgment on Disputed Statements ...............................................................51

G.  The District Court Correctly Held Montgomery's Other Tort Claims Fail......................................................................................................................56

CONCLUSION ....................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acosta Orellana v. CropLife Int'l*,
  711 F.Supp.2d 81 (D.D.C. 2010).........................................................................57

*Adventure Outdoors v. Bloomberg*,
  519 F.Supp.2d 1258 (N.D. Ga. 2007), *rev'd on other grounds*,
  552 F.3d 1290 (11th Cir. 2008) .........................................................................30

*\*Air Wisconsin Airlines v. Hoeper*,
  134 S.Ct. 852 (2014)...........................................................................33, 35, 44

*\*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)...................................................................................21, 43

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015) .........................................................................49, 50

*Biro v. Condé Nast*,
  963 F.Supp.2d 255 (S.D.N.Y. 2013) .................................................................50

*Bustos v. A&E Television*,
  646 F.3d 762 (10th Cir. 2011) .........................................................................34

*CACI v. Rhodes*,
  536 F.3d 280 (4th Cir. 2008) .......................................................................42, 44

*Chaiken v. VV Publ'g*,
  119 F.3d 1018 (2d Cir. 1997) ...........................................................................50

*Chapin v. Knight-Ridder*,
  993 F.2d 1087 (4th Cir. 1993) .........................................................................53

*Clarke v. WMATA*,
  904 F.Supp.2d 11 (D.D.C. 2012), *aff'd*, 540 F. App'x 3
  (D.C. Cir. 2013) ...............................................................................................36

*Clyburn v. News World Commc'ns*,
  903 F.2d 29 (D.C. Cir. 1990)...........................................................................41

*Cobb v. Time*,
    278 F.3d 629 (6th Cir. 2002) .........................................................47

*Cohen v. Cowles Media*,
    501 U.S. 663 (1991).......................................................................56

*\*Coles v. Washington Free Weekly*,
    881 F.Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278
    (D.C. Cir. 1996) ...................................................................52, 54

*Cook-Benjamin v. MHM Corr. Servs.*,
    571 F. App'x 944 (11th Cir. 2014) .................................................32

*Covad Commc'ns v. Bell Atl.*,
    407 F.3d 1220 (D.C. Cir. 2005) ......................................................4

*Crane v. Ariz. Republic*,
    972 F.2d 1511 (9th Cir. 1992) .......................................................53

*Dameron v. Washington Mag.*,
    779 F.2d 736 (D.C. Cir. 1985) .................................................42, 53

*Ditton v. Legal Times*,
    947 F.Supp. 227 (E.D. Va. 1996), *aff'd*, 129 F.3d 116
    (4th Cir. 1997)...............................................................................53

*Dorsey v. Nat'l Enquirer*,
    973 F.2d 1431 (9th Cir. 1992) .......................................................55

*Dowd v. Calabrese*,
    589 F.Supp. 1206 (D.D.C. 1984)...................................................52

*Edwards v. Nat'l Audubon Soc'y*,
    556 F.2d 113 (2d Cir. 1977) ..........................................................49

*\*Farah v. Esquire*,
    736 F.3d 528 (D.C. Cir. 2013)...................................................4, 56

*Foretich v. Chung*,
    1995 WL 224558 (D.D.C. Jan. 25, 1995).......................................54

*Forras v. Rauf*,
39 F.Supp.3d 45, 56 (D.D.C. 2014), *aff'd on other grounds*,
812 F.3d 1102 (D.C. Cir.), *cert. denied*, 137 S.Ct. 375 (2016) .........................56

*\*Gertz v. Robert Welch*,
418 U.S. 323 (1974).........................................................................23, 38, 39

*Global Relief Found. v. N.Y. Times*,
390 F.3d 973 (7th Cir. 2004) ...............................................................52

*Harper v. Walters*,
822 F.Supp. 817 (D.D.C. 1993), *aff'd*, 40 F.3d 474
(D.C. Cir. 1994) ...................................................................................52

*Harte-Hanks Communications v. Connaughton*,
491 U.S. 657 (1989)......................................................................48, 49

*Harvey v. D.C.*,
949 F.Supp. 874 (D.D.C. 1996)............................................................28

*Hatfill v. N.Y. Times*,
532 F.3d 312 (4th Cir. 2008) ...............................................................41

*Haynes v. Alfred A. Knopf, Inc.*,
8 F.3d 1222 (7th Cir. 1993) .................................................30, 34, 35

*Hustler v. Falwell*,
485 U.S. 46 (1988)...............................................................................56

*Jankovic v. Int'l Crisis Grp.*,
593 F.3d 22 (D.C. Cir. 2010)...............................................................28

*\*Jankovic v. Int'l Crisis Grp.*,
822 F.3d 576 (D.C. Cir. 2016)...................................... 22, 39, 40, 41, 42, 44, 45

*Johnson v. Holway*,
2005 WL 3307296 (D.D.C. Dec. 6, 2005) .........................................38

*Lavin v. N.Y. News*,
757 F.2d 1416 (3d Cir. 1985) ..............................................................52

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys.*,
844 F.2d 955 (2d Cir. 1988) ................................................................52

*Levan v. Capital Cities/ABC*,
   190 F.3d 1230 (11th Cir. 1999) ........................................................47

*Levin v. McPhee*,
   119 F.3d 189 (2d Cir. 1997) .............................................................30

*Liberty Lobby v. Anderson*,
   1991 WL 186998 (D.D.C. 1991). ......................................................47

*\*Liberty Lobby v. Dow Jones*,
   838 F.2d 1287 (D.C. Cir. 1988)..........................................33, 35, 50

*Lohrenz v. Donnelly*,
   223 F.Supp.2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272
   (D.C. Cir. 2003) ................................................................................50

*\*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003)................................22, 44, 47, 48, 49

*\*Masson v. New Yorker*,
   501 U.S. 496 (1991)....................................................................23, 33

*McDowell v. Paiewonsky*,
   769 F.2d 942 (3d Cir. 1985) .............................................................42

*\*McFarlane v. Sheridan Square Press*,
   91 F.3d 1501 (D.C. Cir. 1996)..................................44, 45, 47, 49, 50

*Medico v. Time*,
   643 F.2d 134 (3d Cir. 1981) .............................................................52

*Miami Herald v. Tornillo*,
   418 U.S. 241 (1974).........................................................................54

*Milkovich v. Lorain Journal*,
   497 U.S. 1 (1990).............................................................................23

*Mirafuentes v. Estevez*,
   2015 WL 8177935 (E.D. Va. Nov. 30, 2015) ...................................30

*Mitchell v. United States*,
   526 U.S. 314 (1999).........................................................................47

*Moldea v. N.Y. Times,
  22 F.3d 310 (D.C. Cir. 1994) .....................................................19, 28, 33, 44, 56

Montgomery v. Risen,
  197 F.Supp.3d 219 (D.D.C. 2016) .................... 2, 3, 4, 5, 6, 8, 14, 15, 16, 17, 18,
  ......................................................... 19, 20, 21, 22, 23, 24, 25, 26, 27,
  ......................................................... 28, 30, 32, 33, 34, 35, 36, 37, 40
  ......................................................... 41, 42, 43, 45, 46, 49, 51, 53, 56

Morrison v. Int'l Programs Consortium,
  253 F.3d 5 (D.C. Cir. 2001) ....................................................................22

*N.Y. Times v. Sullivan,
  376 U.S. 254 (1964) .......................................................................38, 50

OAO Alfa Bank v. Center for Public Integrity,
  387 F.Supp.2d 20 (D.D.C. 2005) ..............................................................48

Parisi v. Sinclair,
  845 F.Supp.2d 215 (D.D.C. 2012) .............................................................49

Partington v. Bugliosi,
  56 F.3d 1147 (9th Cir. 1995) ...................................................................31

*Philadelphia Newspapers v. Hepps,
  475 U.S. 767 (1986) .......................................................................23, 33, 35

Projects Mgmt. v. Dyncorp Int'l,
  734 F.3d 366 (4th Cir. 2013) ...................................................................26

Q Int'l Courier v. Seagraves,
  1999 WL 1027034 (D.D.C. Feb. 26, 1999) ...............................................52, 54

Reeves v. ABC,
  719 F.2d 602 (2d Cir. 1983) ....................................................................55

Restis v. Am. Coal. Against Nuclear Iran,
  2015 WL 1344479 (S.D.N.Y. Mar. 23, 2015) ...............................................26

Seaton v. TripAdvisor,
  728 F.3d 592 (6th Cir. 2013) ...................................................................30

*Silvester v. ABC,*
    839 F.2d 1491 (11th Cir. 1988) ....................................................47

*Spelson v. CBS,*
    581 F.Supp. 1195 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1292
    (7th Cir. 1985)...........................................................................32

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)...................................................................48

*\*Tavoulareas v. Piro,*
    817 F.2d 762 (D.C. Cir. 1987) (*en banc*)......................35, 36, 37, 38, 39, 48, 50

*Time v. Firestone,*
    424 U.S. 448 (1976)...................................................................42

*Time v. Pape,*
    401 U.S. 279 (1971)...................................................................45

*Trulock v. Lee,*
    66 F. App'x 472 (4th Cir. 2003) (*per curiam*)..................................26

*Underwager v. Channel 9 Austrl.,*
    69 F.3d 361 (9th Cir. 1995) .......................................................30

*\*Waldbaum v. Fairchild Publications,*
    627 F.2d 1287 (D.C. Cir. 1980)................................39, 40, 41, 42, 43

*\*Washington Post v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966)..............................................44, 47

*Weyrich v. New Republic,*
    235 F.3d 617 (D.C. Cir. 2001).....................................................32

*\*White v. Fraternal Order of Police,*
    909 F.2d 512 (D.C. Cir. 1990).............................22, 35, 52, 53, 54

*Wolston v. Reader's Digest,*
    443 U.S. 157 (1979)...................................................................42

*Yohe v. Nugent,*
    321 F.3d 35 (1st Cir. 2003).................................................52, 54

*Zeran v. Diamond Broad.*,
203 F.3d 714 (10th Cir. 2000) ..........................................................47

**State Cases**

*Gross v. N.Y. Times*,
623 N.E.2d 1163 (N.Y. 1993)...........................................................31

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times*,
399 N.E.2d 1185 (N.Y. 1979)...........................................................54

*Jackson v. D.C.*,
412 A.2d 948 (D.C. 1980) .................................................................57

*Jung v. Jung*,
791 A.2d 46 (D.C. 2002) ...................................................................57

*Quinn v. Jewel Food Stores*,
276 Ill. App. 3d 861 (1995) ...............................................................32

*Sipple v. Found. for Nat'l Progress*,
83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999)..........................................52

*Solers, Inc. v. Doe*,
977 A.2d 941 (D.C. 2009) .................................................................57

*Stewart v. Sun Sentinal*,
695 So.2d 360 (Fla. App. 1997) .........................................................54

*Straub v. Lehtinen, Vargas & Riedi, P.A.*,
980 So.2d 1085 (Fla. App. 2007) .......................................................54

*Yancey v. Hamilton*,
786 S.W.2d 854 (Ky. 1989)...............................................................32

**Constitutional Provisions**

U.S. Const. amend. I ................................................................20, 33, 56

U.S. Const. amend. V..................................................................7, 47

**Federal Statutes**

28 U.S.C. § 1404(a) .........................................................................17

x

**Rules**

Fed. R. Civ. P. 37(b)(2)(A)(ii) ................................................................36

Fed. R. of Evid. 1002-04 .........................................................................36

Fed. R. of Evid. 1004(a) ..........................................................................36

**Other Authorities**

Aram Roston, "*The Man Who Conned The Pentagon,*" Playboy
   (2010) .............................................................................................5, 7, 8

Eric Lichtblau and James Risen, "*Hiding Details of Dubious Deal,
   U.S. Invokes National Security*", N.Y. Times (2011) ...............................6, 8, 50

James Risen, *Pay Any Price: Greed, Power, and Endless War* ........2, 31, 35, 42, 44

Restatement (Second) of Torts § 581A cmt. h (1977) ...........................................34

\* Authorities upon which Appellees chiefly rely are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| CIA | Central Intelligence Agency |
| FBI | Federal Bureau of Investigation |
| HMH | Houghton Mifflin Harcourt Publishing Company |
| HMHC | Houghton Mifflin Harcourt Company |
| NSC | National Security Council |
| SOCOM | United States Special Operations Command |

## COUNTER STATEMENT OF ISSUES

1.  Whether the district court correctly overruled Appellant's objections to the Magistrate's discovery orders and required Appellant to produce his software?

2.  Whether the district court correctly held many challenged statements are non-actionable expressions of opinion?

3.  Whether the district court correctly held that without record evidence demonstrating Appellant's technology worked, Appellant failed to produce sufficient evidence from which a reasonable jury could conclude the Chapter's factual assertions were substantially false.

4.  Whether the district court correctly held Appellant is a limited-purpose public figure?

5.  Whether the district court correctly held even if Appellant could show falsity, he failed to produce sufficient evidence from which a reasonable jury could conclude by clear and convincing evidence that Appellees published the Chapter with actual malice?

6.  Whether the fair report privilege provides Appellees with a separate defense in support of summary judgment?

7.  Whether the district court correctly dismissed Appellant's other tort claims when it dismissed his defamation claims?

## COUNTER STATEMENT OF THE CASE[1]

*Pay Any Price: Greed, Power, and Endless War* ("Book"), authored by

Pulitzer Prize-winning journalist James Risen, describes how the war on terror led

to waste, fraud, and abuse by U.S. government officials and the contractors who

stood to gain from it.  Op. 226-27; SUMF ¶¶1, 5 (App.1183-84).  Chapter 2, titled

"The Emperor of the War on Terror" ("Chapter"), discusses how, after the terrorist

attacks of September 11, 2001, government officials accepted intelligence – no

matter how suspect – to avoid another attack.  *Id*.  Risen recounts allegations,

widely published since 2007, that Montgomery defrauded the federal government.

Montgomery claimed to have developed several software technologies,

including one that allegedly decrypted coded letters and numbers on Al Jazeera

broadcasts, which U.S. government officials concluded were flight numbers and

coordinates instructing Al-Qaeda where to attack next and led President Bush to

ban planes coming from Europe.   The Chapter discusses government

investigations, judicial proceedings, and Congressional testimony, all concluding

that Montgomery's software was "not as billed."   Government officials,

---

[1]    Risen/HMH submit a counter statement of the case in part because
Montgomery relies exclusively on his Amended Complaint, which does not
accurately reflect the record.  Appellees' counter statement relies on the district
court's conclusions drawn from the parties' statements of facts, *Montgomery v.
Risen*, 197 F.Supp.3d 219 (D.D.C. 2016) ("Op."), as well as Risen/HMH's
Statement of Undisputed Material Facts ("SUMF") (App.1182-202), ECF 202, and
Risen/HMH's Reply to Plaintiff's Additional Material Disputed Facts ("Reply
SUMF") (App.2158-76).

Montgomery's former partner and co-workers, and even his former lawyer concluded Montgomery was a con man and his software a hoax.

Montgomery attacks the district court as "obviously overwhelmed and confused," and that "in a virtual vacuum, [the court] 'exited stage left' by issuing a flawed memorandum opinion summarily dismissing" the case.  Br. 47.  To the contrary, the 73-page opinion is a meticulous review of "[t]he twists and turns of this case."  Op. 225.  The comprehensive decision granting summary judgment concluded Montgomery did not carry his burden of showing the Chapter's factual assertions were substantially false because he failed to produce critical evidence – his software – and verify that it worked.  Even if false, the court further concluded that in contrast to the "plethora" of evidence that Risen had to support what he wrote, Montgomery failed to come forward with sufficient evidence that would allow a reasonable jury to find, by clear and convincing evidence, that Risen/HMH published with knowledge of falsity or actually entertained serious doubts as to the truth.  To the extent the Chapter offered conclusions of the author or others based on these facts, they were protected as non-actionable opinion.  This thoughtful decision, which Montgomery dismisses as the court's "desire to lessen the docket," Br. 50 n.3, should be affirmed.

3

### A.     Media Coverage Before Publication of *Pay Any Price*

It is undisputed that Montgomery was subject to extensive media coverage years before the Chapter, and Risen, relied on that coverage. SUMF ¶10 (App.1185).[2]  On June 27, 2005, NBC News reported that, around Christmas 2003, the U.S. government raised the terror alert level and canceled flights based on what Tom Ridge, former Secretary of the Department of Homeland Security, confirmed were non-existent Al Qaeda codes allegedly embedded in Al Jazeera broadcasts. *Id*. ¶11 (App.1185); Op. 230.

On November 1, 2006, Montgomery became the subject of extensive media coverage when the *Wall Street Journal* ran a front-page story revealing Montgomery had accused then-Congressman, later Nevada Governor, Jim Gibbons, of taking bribes from Warren Trepp, Montgomery's former business partner at eTreppid Technologies ("eTreppid"), in connection with government contracts for Montgomery's software. SUMF ¶12 (App.1185-86).  In a follow-up article, Trepp accused Montgomery of giving "false testimony" in their litigation over Montgomery's software. *Id*. ¶13 (App.1186); *see also* Op. 230-31. Montgomery exploited the media spotlight, giving an "exclusive" interview to NBC on May 11, 2007, where he repeated the "explosive charge" against Trepp

---

[2] The news articles and court and congressional records are admissible under judicial notice. *Farah v. Esquire*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Covad Commc'ns v. Bell Atl.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

and Gibbons, which was ultimately discredited.  SUMF ¶¶14, 15 (App.1186); Op. 229.

By creating the controversy over whether Trepp bribed a public official to steer government contracts to eTreppid, Montgomery invited media scrutiny of his litigation with eTreppid, where public records disclosed his once secret work for the U.S. government.  An August 4, 2007 article in the *Reno Gazette-Journal* publicized Montgomery's sworn statement that his technology warned of and thwarted terrorist attacks around the world.  SUMF ¶16 (App.1186).  Montgomery was identified as the contractor who allegedly provided bogus Al Jazeera intelligence to the government in an August 2008 *Bloomberg News* report.  *Id.* ¶17 (App.1186-87).  The article summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts" from Al-Jazeera and "find embedded messages to terrorists," and quoted Montgomery's former attorney's charge that his "software was a sham." *Id*.  The Bloomberg article also revealed, based on public FBI reports, that eTreppid employees said Montgomery made them rig demonstrations of his object recognition software to sell to visiting government officials.  *Id*.

In 2010, a lengthy *Playboy* magazine article, "*The Man Who Conned The Pentagon*" ("Playboy Article") revealed the central allegations Montgomery now challenges.  Op. 231; SUMF ¶5 (App.1183-84).  The Playboy Article claimed

Montgomery rigged software demonstrations and sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to ground international flights around Christmas 2003.  SUMF ¶18 (App.1187).  Soon after, a French contractor determined that not enough pixels existed in Al Jazeera broadcasts to include hidden messages and the CIA and the White House soon concluded that they had been hoodwinked.  The article quoted Sloan Venables, Montgomery's co-worker, who doubted Montgomery's software existed.  *Id*.

Risen and Eric Lichtblau's 2011 article in the New York Times, "*Hiding Details of Dubious Deal, U.S. Invokes National Security*" ("Times Article"), covered much of the same material, but, based on government sources, added that the White House considered shooting down transatlantic flights based on Montgomery's intelligence.  SUMF ¶¶5, 19 (App.1184, 1187-88); *see also* Op. 231.  The article quoted Joseph Liberatore, a former Air Force official, who said in 2008 that he supported Montgomery but realized others in the government did not think Montgomery was credible.  SUMF ¶19 (App.1188).  The article also quoted Steve Crisman, Montgomery's co-worker at Blxware (the company where Montgomery worked after eTreppid), who said he believed Montgomery's technology was not real.  *Id*.  Notably, the Times Article reported that, in a deposition given by Montgomery in November 2010, "when asked if his software

was a 'complete fraud', he answered, 'I'm going to assert my right under the Fifth Amendment." *Id*.

In a 2012 article in *Defense News*, the then-head of the CIA's Counterterrorism Center, Jose A. Rodriguez, Jr., said the Counterterrorism Center was "very skeptical" of Montgomery's intelligence and viewed it as "crazy." SUMF ¶20 (App.1188). Tommy Vietor, former spokesperson for the NSC, echoed these views, stating that, although John Brennan passed along the information to the White House, "[i]t is absolutely wrong to say Mr. Brennan believed in the veracity of the information" from Montgomery. *Id*.

Montgomery's actions and media coverage made him notorious before the Book. A Wikipedia page about him describes allegations that he defrauded the federal government, and the title page of the Playboy Article, *The Man Who Conned the Pentagon*, was posted on Montgomery's Twitter page. SUMF ¶22 (App.1188-89). He continued to seek media attention into 2014, even while hospitalized, when he sought to publicize to Fox News his whistleblower allegation that he had conducted illegal surveillance for the NSA – which Risen addressed in the Chapter. *Id*. ¶23 (App.1189). Fox News, however, rejected Montgomery's efforts to obtain publicity because the reporter said he lied to him. *Id*.

Risen relied on these and other reputable media outlets, *id.* ¶21 (App.1188), and expressly acknowledges in the Book that he relied on the Playboy and Times Articles.    Op. 231; SUMF ¶24 (App.1189).    The articles, which were never retracted or subject to suit, all support what Risen wrote in the Chapter.    The Chapter added Montgomery's denials to the narrative, obtained after Risen interviewed him for the Book.    *Id.* ¶¶7, 31, 44 (App.1184, 1193, 1197). Montgomery sued to challenge publication of these facts after nearly ten years in circulation.

### B.    Risen/HMH's Reliance on FBI Reports, Court Documents, and Congressional Records

### 1.    Allegations of Fake Software

As with the Times Article and prior media accounts, Risen based the Chapter on court records and other official documents.    The Chapter expressly states that, "***according to court documents that include his statements to the FBI***," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills."    SUMF ¶25 (App.1189-90) (emphasis added).    Similarly, the Chapter accurately quotes statements in FBI reports in which eTreppid employee Sloan Venables "***told the FBI*** that another employee, Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing' and added ***in his statement to the FBI*** that he knew that

'Montgomery promised products to customers that had not been completed or even assigned to programmers.'" *Id*. ¶26 (App.1190) (emphasis added).

Then, the Chapter states: "Over the Christmas holidays [of 2005], Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, ***according to court documents***." SUMF ¶27 (App.1190-91) (emphasis added). Later, ***"[a]ccording to court documents***, [Trepp] ***told the FBI*** that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but "[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real." *Id*. (emphasis added). The Chapter correctly summarizes FBI reports contained in court records showing that the technology "wasn't real." *Id*.

The Chapter recounts how Montgomery's later benefactor and business partner at Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery became caught up in their legal battles." SUMF ¶28 (App.1191). "Mysteriously, government lawyers sometimes sought to intervene in their court cases … to keep classified information stemming from Montgomery's work with the intelligence community out of the public records." *Id*. In those public court records, Edra's ex-husband, Tim Blixseth, alleged  fraud in an affidavit, and Michael Flynn, Montgomery's former attorney, stated in an affidavit: "Blxware

possesses no marketable technology, the technology as represented does not exist[.]" *Id*.

The Chapter recounts that Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks. SUMF ¶29 (App.1191-92). In that bankruptcy proceeding, Flynn told Montgomery in a deposition: "I know you conned me and you conned the U.S. Government…. You're a computer hacker and you're a fraud, Mr. Montgomery." *Id*.

The Chapter also expressly relies on congressional records to confirm that Montgomery's software was fake. The Chapter explains that, "[a]t the time of the Christmas 2003 scare, John Brennan was the head of the … Terrorist Threat Integration Center," responsible "for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration." SUMF ¶30 (App.1192). The Chapter recounts during Brennan's confirmation proceedings Senator Saxby Chambliss submitted a written question to Brennan titled "Bogus Intelligence," stating "[m]edia reports indicate that when you led the Terrorist Threat Integration Center (TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera." *Id*. The written questions confirm in congressional records that not only "[t]he media" but "documents we have reviewed show, that CIA officials derided the contractor's

information, but nonetheless, you passed it to the White House and alert levels ended up being raised unnecessarily." *Id.*  Relying on congressional records of this exchange, the Chapter states that, "[i]n response" Brennan confirmed that Montgomery's purported software "'was determined ***not to be a source of accurate information***.'" *Id.* (emphasis added).

## 2. Allegations of Rigged Demonstrations to Government Officials

The Chapter also explicitly relies on court records and FBI reports in which "Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit."  SUMF ¶31 (App.1993).   Indeed, "Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone." *Id.*  Then "[a]fter he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents." *Id.*  Thus, "[t]he military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands." *Id.*  The Chapter again includes Montgomery's denials.  *Id.*  And, once

11

again, the Chapter accurately describes the FBI report contained in court documents. *Id*. (citing Risen Decl. Ex. 15, App.1421-1560).

### C.      Risen/HMH's Reliance on Interviews and Documents

Undisputed facts show Risen relied on extensive interviews with well-placed government sources and documentation to support the statements he wrote in the Chapter. Risen interviewed and relied on William D. Murray, CIA Paris Station Chief in 2003, described as a "former CIA official," who confirmed that French intelligence had a technology company conduct a study showing insufficient pixels in the Al Jazeera broadcasts to encode Al Qaeda messages and the CIA concluded that Montgomery's intelligence was fake. SUMF ¶34 (App.1194-95). Murray said that Frances Townsend, a former White House counterterrorism official on the NSC, discussed the president's authority to shoot down airplanes believed to be terrorist threats with an NSC lawyer in late 2003 based on Montgomery's intelligence. Risen also interviewed another "former senior CIA official," Tyler Drumheller, the CIA European Division Chief in late 2003, who corroborated Murray's statements. *Id*.

Risen obtained comment from CIA Office of Public Affairs officials, who said the CIA did not have a contract with Montgomery and that his "threat detection tools weren't exactly as billed." SUMF ¶35 (App.1195). Risen interviewed Melvin Dubee, a former staff member on the U.S. Senate Select

Committee on Intelligence, who said that committee staff contacted the CIA about Montgomery's technology and the CIA was "very skeptical of it at the time." *Id*. ¶36 (App.1195).

Risen interviewed former White House officials, including Townsend, and as the Chapter reflects, she denied considering shooting down planes, but Murray reaffirmed his statements when Risen told him Townsend's denial. SUMF ¶37 (App.1195-96). Townsend, however, did tell Risen she believed Montgomery's was probably the biggest hoax that reached the president: "We may have been played," she said. *Id*. Risen interviewed Samantha Ravich, former advisor to Vice President Dick Cheney, who confirmed she met with Montgomery in the White House, but refused the technology absent proof it worked, which she said was never forthcoming. *Id*. ¶38 (App.1196).

Risen obtained comment from current and former officials from other agencies with which Montgomery worked, who said that Montgomery's technology did not meet SOCOM's requirements, and an Air Force spokesman confirmed that "the contractor did not perform in accordance with the terms of the contract" awarded in 2009. SUMF ¶¶39, 40 (App.1196).

Risen also interviewed individuals close to Montgomery. Tim Blixseth described a demonstration of the Al Jazeera software Montgomery gave to him in California in 2010. SUMF ¶42 (App.1196-97). In interviews, Montgomery's

13

former lawyer, Michael Flynn, repeated his statements accusing Montgomery of being a "fraud" and having "conned" him and others. *Id*. ¶41 (App.1196).

### D.     Montgomery's Failure to Produce the Software

To defend against Montgomery's claim that statements in the Book are false because the software works, Risen/HMH requested a copy and the locations of the software referred to in the Amended Complaint.   Op. 232-33; SUMF ¶48 (App.1198-99).   Montgomery objected to the request to produce the software as, "burdensome," and the request to disclose the locations "largely irrelevant."   *Id*.; *see also* Op. 235.   In revised objections, Montgomery again refused to disclose "the location of the relevant software."   SUMF ¶48 (App.1198-99).   He also refused "to produce a copy of any software," asserting it is "secret" classified information. *Id*.

But orders in Montgomery's prior cases showed that his software is not classified, yet he has repeatedly refused to produce it.  (App.793-931.)  In a case in which Montgomery's former employer, eTreppid, sued Montgomery for allegedly misappropriating the subject software, the U.S. government obtained a protective order under the state secrets privilege to protect certain classified information from discovery but specifically ***excluded*** Montgomery's software from its scope ("U.S. Protective Order").  SUMF ¶49 (App.1199).  Still, Montgomery refused to produce the software in both the Nevada litigation and his bankruptcy proceedings.  Op.

14

236-37; SUMF ¶50 (App.1199-1200). The district judge held him in contempt, imposing a penalty of $2,500 per day until he produced the software. *Id*. Instead of producing it, he settled the action and signed confessions of judgment for over $25 million. *Id*. Then, he declared bankruptcy, refused to produce the software, and was denied discharge. *Id*.

Montgomery repeated this pattern in this case. In his August 20, 2015 deposition, Montgomery testified that he searched for the software in response to Risen/HMH's discovery requests and gave his only copy to the FBI the day before. Op. 232-33, 236; SUMF ¶51 (App.1200). Montgomery's counsel confirmed Montgomery's testimony in a hearing the next day before the magistrate. SUMF ¶51 (App.1200). The magistrate found "the software is highly relevant," crediting the Nevada court's finding that the software was not classified, *id.*, and on August 22, 2015, entered an order requiring Montgomery to "use his self-described right of continued access to non-classified information" from the FBI "and produce the software" by September 4. Op. 232-33, 236; SUMF ¶52 (App.1200).

On September 3, 2015, the magistrate denied Montgomery's motion for a stay, finding "[Montgomery's] burden to prove falsity does not hinge on whether he [Risen] ever had a copy of the software" but rather "the critical fact issue is whether in fact the software worked." *Id.* at 236; SUMF ¶53 (App.1200). He concluded the software is "highly relevant" and "critical" evidence Montgomery

15

must produce, and that Montgomery intended "to sequester what could be the most important evidence in the entire case." *Id*.

On September 4, 2015, Montgomery failed to produce the software. Op. 236-37; SUMF ¶54 (App.1200-01). On September 8, the FBI General Counsel explained that Montgomery gave the FBI "hard drives contain[ing] 51.6 million files amounting to 600 million pages," and concluded "there is no reasonable way for the Government to locate and provide the alleged software, absent specific instructions from" Montgomery. *Id.* at 237; SUMF ¶54 (App.1200-01).

On October 19, 2015, the magistrate again ordered Montgomery to give the FBI comprehensive instructions to locate the software or state that he cannot by October 21, and produce the software by October 26. *Id.* at 237; SUMF ¶55 (App.1201). The order permitted Risen/HMH to file a motion for dismissal or adverse inference sanctions if Montgomery failed to comply. SUMF ¶55 (App.1201).

In an about-face, on October 21, 2015, Montgomery filed a declaration contradicting his prior deposition testimony, and his counsel's August 21 representation to the magistrate. Op. 237. He stated: "Based on my personal knowledge and belief, upon searching my memory, I do not believe that I have had access to any of the subject software, nor did I provide it to the [FBI] when I turned over the drives ...." SUMF ¶56 (App.1201).

16

On October 23, 2015, the FBI Assistant General Counsel, Ted Schwartz, emailed Montgomery's counsel that, given Montgomery's declaration, "the FBI will not search the drives to locate software requested in the *Risen* litigation."  Op. 238; SUMF ¶57 (App.1201).   On October 26, Montgomery did not produce the software.  He filed an objection and stay request which was denied.  *Id.*; SUMF ¶58 (App.1201-02).

On October 28, Risen/HMH filed their motion for dismissal sanctions on grounds that Montgomery spoliated the software and violated multiple court orders to produce it.  *Id.*; SUMF ¶57 (App.1201).

### E.    Proceedings Below

Montgomery brought this libel action in the Southern District of Florida in February 2015.  ECF 1; *see also* App.1-271.  Risen/HMH moved to dismiss or transfer.  ECF 25, 52 (App.272-781).  Without a ruling from the district court on these threshold issues, Risen/HMH sought a stay of discovery.  (App.782-92).  The district court denied the stay and discovery commenced and closed November 19, 2015.  Min. Entry, ECF 130; Jan. 5, 2016 Hr'g Tr. (App.1778-1992).

In the midst of briefing on Risen/HMH's motion for summary judgment, the court granted Risen/HMH's motion for transfer pursuant to 28 U.S.C. §1404(a), and transferred this case to the District of Columbia.  (App.2154-57.)  Montgomery does not challenge this order.

17

The district court in the District of Columbia issued a detailed, 73-page opinion and order on July 15, 2016 deciding the twelve outstanding motions or objections and granting Risen/HMH's motion for summary judgment. (App.2185-2258.) The court reviewed the extensive discovery-related proceedings and held the magistrate judge's order requiring Montgomery to produce his software was not clearly erroneous. Op. 239. The court further held that, "in light of the Court's entry of summary judgment in favor of [Risen/HMH]," although "substantially troubled by Montgomery's and his counsel's conduct in this case," it would deny the motion for spoliation sanctions insofar as Risen/HMH already obtained "in practical terms much of the result they seek in their spoliation motion." *Id*. at 246. The court noted that, if the judgment were ever reversed, "thereby removing the basis for the Court's denial of [Risen/HMH's] motion for spoliation sanctions, the Court would entertain a renewed motion."[3] *Id*. n.20.

On the motion for summary judgment, the district court concluded statements that Montgomery was "accused of being a con artist," the "maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American

---

[3] The district court expressed concern Mr. Klayman may have "filed this lawsuit without a rigorous attempt to verify the claims that the software did in fact work," raising Rule 11 questions. Op. 243 n.16. Rather than an effort to "coerce" Montgomery "not to appeal," Br. 50 n.3, the court conserved judicial resources and spared Montgomery and his counsel possible sanctions, at least for now.

history" and motivated by "greed" were non-actionable opinion. *Id*. at 247-50. The court concluded that other than Appellant's counsel "Mr. Klayman's unsubstantiated say so," there was no evidence that the software was classified and even if it was, in its absence, there was no evidence that statements the technology was a "hoax" were false. *Id*. at 251-55. Finally, because Montgomery was a limited-purpose public figure, *id*. at 255-58, it was incumbent on him to come forward with evidence that Risen/HMH published the challenged statements with actual malice – a standard that he had failed to meet. Given the "abundance of evidence" – court and government records, uncontradicted prior publications, statements of government officials and people closely associated with Montgomery – Montgomery had not come forward with evidence of sufficient "caliber or quantity" to allow a "rational finder of fact to find actual malice by clear and convincing evidence." *Id*. at 258-66. In view of this finding, the court did not decide whether the publication was also protected by the fair report privilege but noted that some statements clearly were. *Id*. at 266 n.41. Finally, the court granted summary judgment on Montgomery's remaining tort claims for tortious interference, intentional infliction of emotional distress and assault, concluding "it is hornbook law that 'a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim.'" *Id*. at 267 (quoting *Moldea v. N.Y. Times*, 22 F.3d 310, 319-20 (D.C. Cir. 1994)).

## SUMMARY OF THE ARGUMENT

The Court should affirm the decision below for the following reasons:

***First***, the district court correctly held many of the statements Montgomery challenges are non-actionable expressions of opinion and rhetorical hyperbole – not verifiable statements of fact.  That the hoax Montgomery allegedly perpetuated was "one of the most elaborate and dangerous hoaxes in American history," that Montgomery was "the maestro" and "crazy was the new normal," that he was motivated by "greed" and accused of being a "con artist," are all subjective opinions protected by the First Amendment, based on disclosed facts, expressed in some instances in loose, figurative language.  Op. 247-50.

***Second***, the district court correctly held Montgomery's deliberate failure to produce "the critical evidence in the case" – the software at the heart of his claim – compels the conclusion that he cannot meet his burden to prove falsity as a matter of law.  Without his software, Montgomery cannot prove – and Risen/HMH cannot test – that his software works and the allegations that it was a fraud are false.  Montgomery's self-serving claims standing alone do not suffice.  *Id.* at 251-54.  Montgomery attempts to excuse his failure to produce the evidence claiming it is classified.  The court below correctly found, as had the district court in Nevada, that the software was not classified.  But even if it was, dismissal would still be

20

required because Montgomery would remain unable to carry his burden of proving falsity.

**Third**, the district court correctly concluded Montgomery is a limited-purpose public figure and that, even if he could carry his burden on falsity, he has not and cannot put forth "concrete," "affirmative evidence" that would allow a reasonable jury to find, by clear and convincing evidence, that Risen/HMH published with actual malice, or indeed, any other applicable standard of fault. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  Instead, there is an "abundance of evidence … tending to show that neither Risen nor his publisher knew nor had reason to suspect that the Chapter's assertions regarding Montgomery, his technology, and the surrounding circumstances were false."  Op. 260.  The "plethora of other news articles, court documents, and government records, predating the Chapter," "align with and corroborate the Chapter's general thrust: that Montgomery's technology did not work as billed."  *Id*.

The district court correctly held Montgomery is a limited-purpose public figure given his own statements to the press, the extensive prior press coverage and the nature of his work that invites public scrutiny over the efficacy of the government's efforts to combat terrorism.

**Fourth**, given its other grounds for summary judgment, the district court did not need to "definitively resolve" whether the fair report privilege applies to the

Chapter's report on official records and did not enter summary judgment on that basis. *Id.* at 266 n.41. Conceding that Risen reported on statements in court records, congressional records, and government investigative reports, Montgomery now complains that Risen/HMH did not report on all statements that Montgomery would have liked. But, Montgomery's version of the facts does not divest Risen/HMH of the fair report privilege, which is liberally applied, and provides a separate ground to affirm the district court's decision. *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990).

**Fifth**, the district court correctly held Montgomery's other tort claims are barred for the same reasons as the libel claims and because he cannot prove the elements of those claims.

## ARGUMENT

### A.    Standard of Review and Choice of Law

The Court's review of rulings on motions for summary judgment is *de novo*, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1274 (D.C. Cir. 2003), and evidentiary and discovery rulings are examined for abuse of discretion. *Jankovic*, 822 F.3d at 584; *Morrison v. Int'l Programs Consortium*, 253 F.3d 5, 9 (D.C. Cir. 2001).

The district court correctly concluded "[a]ll but one of [Risen/HMH's] arguments for granting summary judgment in their favor depend upon the

application of a federal constitutional limitation on state defamation claims," including "a plaintiff's inability to assert defamation based on a statement of opinion, a plaintiff's burden to demonstrate falsity (at least in circumstances like these), and the requirement that a limited-purpose public figure show actual malice."  Op. 234-35 (citing *Masson v. New Yorker*, 501 U.S. 496, 510 (1991); *Milkovich v. Lorain Journal*, 497 U.S. 1, 20-21 (1990); *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 776 (1986); *Gertz v. Robert Welch*, 418 U.S. 323, 342 (1974)).  As the court found, "[t]hese limitations apply with equal force to causes of action arising under D.C. as well as Florida law," and there is "no meaningful difference among those jurisdictions' law in faithfully applying those principles." *Id*. at 235.  The only exception is the common law privilege for fair reporting of official reports, however "the law in each state on this question is substantially similar." *Id*. n.8.

### B.   The District Court Correctly Overruled Montgomery's Objections to the Magistrate's Discovery Orders

#### 1.   The District Court Correctly Held Montgomery Had to Produce the Software

To date, Montgomery has violated three court orders and failed to produce "what could be the most important evidence in the entire case," the software central to his burden to prove falsity.  Stay Order 6 (App.1049).  Risen/HMH fully briefed a motion for the sanction of dismissal because, in spoliating the software,

23

Montgomery deprived them of a fair defense.  (App.1054-172.)  On appeal, Montgomery repeatedly contends he could not have produced his software because it is "classified information," and neither Risen/HMH nor the Court itself has the "legal right to seek or obtain" it.  Br. 50.  Neither of these arguments relieves Montgomery of his obligation to produce the software to establish falsity.  The district court's conclusions that Montgomery must produce his software, and failing to do so, must suffer dismissal of his suit, should be affirmed.

The district court concluded that it "has serious reason to doubt that the software is, in fact, classified," Op. 244.  The U.S. Protective Order entered in the Nevada case specifically ***excluded*** Montgomery's software from its scope.  *See id.* The magistrate judge credited the Nevada court's finding, and, like the Nevada court, ordered its production.[4]  At a January 5, 2016 hearing on Risen/HMH's sanctions motion, the court rejected Montgomery's contention that the CIA had determined the software was classified,[5] and the district court found, "[o]ther than Mr. Klayman's unsubstantiated say-so, the Court perceives no reason to doubt the Nevada court's conclusion and find that the software is classified."  Op. 244.

---

[4] Aug. 21, 2015 Hr'g Tr. 30:18-23; 40:7-47:1; 79:24-80:1 (App.965, 975-82, 1014-15) (relying on Montgomery's counsel's representation that Montgomery the software to the FBI, and "order[ing] Mr. Montgomery to turn over that software and to take advantage of his right of continued access to non-classified information.").

[5] Jan. 5, 2016 Hr'g Tr. 72:3-73:4 (App.1849-50).

On appeal, Montgomery offers no further evidence or support for his contention that the software is classified and cannot be produced. Citing correspondence from the CIA noting "most of our information is classified," Br. 49, Montgomery fails to acknowledge that the CIA's response to Risen/HMH's *Touhy* requests indicated that they affirmatively searched for a copy of Montgomery's software and represented they were unable to locate it. SUMF ¶59 (App.1202). As the district court found, "[t]he CIA explicitly did *not* decline to conduct a search at all on the ground that the material was likely to be classified, as the agency did with respect to other documents requested." Op. 244. The privilege "belongs to the Government and must be asserted by it," but "[t]he Government has not attempted to intervene in this case, despite the fact that it is well aware of the ongoing dispute over the software." *Id.* 244 (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)). Accordingly, the district court's determination compelling Montgomery to produce the software should be affirmed.

Montgomery's contention that neither Risen/HMH nor the court could review the software due to its "classified" status, Br. 50-51, serves as an ***admission*** that Montgomery is unable to demonstrate substantial falsity. If the software was

25

indeed classified (although uncontroverted evidence suggests otherwise) – the case would still have to be dismissed, as the district court noted.[6]

The district court further found "[n]early *all* of Montgomery's claims that the asserted statements are defamatory involve contesting [Risen/HMH's] statements that his work is a hoax or fabrication, the implication that the CIA had been conned by Montgomery, or the assertion that the technology was worthless." Op. 242.  Production and review of the software is essential to those claims, and Risen/HMH must have "an opportunity to probe the issue of truth during discovery." *Id*. 241.  While Montgomery contends there are other statements in suit that do not turn on the software, he fails to point to any and does not contest others. *Id*. n.29.

As discussed in greater detail, *infra* §D, by failing to come forward with sufficient evidence of substantial falsity, Montgomery failed to meet his burden on summary judgment and the district court's order granting Risen/HMH summary judgment must be affirmed.

---

[6] Op. 251-52.  *See also, e.g.*, *Trulock v. Lee*, 66 F. App'x 472, 476-77 (4th Cir. 2003) (*per curiam*); *Projects Mgmt. v. Dyncorp Int'l*, 734 F.3d 366, 374 (4th Cir. 2013); *Restis v. Am. Coal. Against Nuclear Iran*, 2015 WL 1344479, *5-8 (S.D.N.Y. Mar. 23, 2015).

### 2.    The District Court Correctly Held Risen/HMH Did Not Forfeit Their Right to Analyze the Software

Montgomery's argument that, because Risen/HMH designated an expert without an expert report, they "forfeit[ed] their right to analyze the software," Br. 46, borders on frivolous.   Risen/HMH identified an expert witness on their deadline to do so but told Montgomery they could not provide a report analyzing the software because Montgomery objected to producing it.[7]   In other words, because the expert had nothing to test, he could offer no opinions without the software itself.  As the magistrate observed, Montgomery's argument on this point "is circular and unconvincing," citing "the overall equities" "where he … secretly, turned over the software to the FBI – without keeping a copy, without advising Defendants of his plan to do so, without advising the Court of his strategy and without seeking leave of Court to, in effect, seek to sequester what could be the most important evidence in the entire case."   Order Denying Mot. Stay 5-6 (App.1048-49).   The district court agreed, concluding Risen/HMH "could not produce an expert report without the underlying software the expert was to analyze," and overruled Montgomery's objections.  Op. 242.

---

[7] Mot. Stay Ex. 1 (App.1038-39).  Montgomery never designated his own expert witness.

27

Critically, any error from Risen/HMH's identification of their expert without an accompanying report and a belated list of the expert's qualifications[8] is clearly harmless. The remedy would not have been to exclude Risen/HMH's expert from testifying at trial, *Harvey v. D.C.*, 949 F.Supp. 874, 877 (D.D.C. 1996), and certainly not waiver of their request to produce the software needed to confirm the truth or falsity of the allegations in suit.

### C. The District Court Correctly Held Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole

Montgomery complains the district court "erred in determining" Risen/HMH's "need for the alleged classified software" is "the only relevant part of Plaintiff-Appellant's claims" and not the "defamatory statements" themselves. Br. 9. To the contrary, in addition to holding that Montgomery failed to produce the evidence critical to proving the challenged statements were false, *see infra* §D, the district court *further held* that "[s]everal of the Chapter's statements are non-actionable statements of opinion or hyperbole." Op. 248. The district court's ruling on this issue of law provides adequate grounds to find summary judgment for these statements based on disclosed facts in the Chapter and should be affirmed. *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 28 (D.C. Cir. 2010); *Moldea*, 15 F.3d at 1144-45.

---

[8] List of Risen/HMH's expert's qualifications produced September 3, 2015.

Risen's conclusion that "Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history" is hardly "an extreme recitation of what occurred" as Montgomery charges.  Br. 11.  Rather, it is an opinion formed by Risen, expressed in his own language, based on the opinions relayed to him by numerous sources, all set forth in the Chapter.  Among other evidence, Risen reviewed published reporting on Montgomery's false claims, SUMF ¶¶10-23 (App.1185-89), court documents wherein eTreppid employees stated Montgomery had them "participate in falsifying tests for the military," Handman Decl. Ex. 1, Risen Dep. Tr. 285:8-288:14 (App.1709), numerous sources who said there were no coded messages in Al Jazeera broadcasts, *e.g.*, *id.*, at 340:8-342:10 (App.1722-23), confirmation from the CIA that the software did not perform as promised, Risen Dep. Tr. 383:3-385:13 (App.2276-77), Congressional testimony about the "Bogus Intelligence," Risen Decl. ¶25 (App.1211), a CIA Director's acknowledgment that the software "was determined not to be a source of accurate information," Risen Decl. Ex. 19 (App.1654), and a White House official who said "we may have been 'played,'" and "it's fair to say it's the biggest one [false intelligence] that makes it all the way through the system."  Risen Decl. ¶30 (App.1213-14).  *See also supra* 8-13.  And the very words Montgomery contends are Risen's own defamatory statements were used in previous,

widespread reports on Montgomery's con. *Supra* 4-8. As the district court noted, "an assertion that officials perceived Montgomery a particular way depends [] entirely upon those officials' particular viewpoints," and "it is difficult to prove false the assertion that someone *thought or believed* a particular thing." Op. 250.

Risen's description of Montgomery as engaged in "one of the most elaborate hoaxes in American history" is a non-verifiable, subjective ranking, expressed in the author's language, that depends on the author's viewpoint and viewpoints of the officials Risen describes later in the Chapter. *See Adventure Outdoors v. Bloomberg*, 519 F.Supp.2d 1258 (N.D. Ga. 2007) ("worst of the worst," "scourge on our society," "rogue," "immoral and corrupt"), *rev'd on other grounds*, 552 F.3d 1290 (11th Cir. 2008); *Mirafuentes v. Estevez*, 2015 WL 8177935, *3 (E.D. Va. Nov. 30, 2015) ("most corrupt Mexicans in 2013" ); *Seaton v. TripAdvisor*, 728 F.3d 592, 600 (6th Cir. 2013) (ranked first  "2011 Dirtiest Hotels list"). And, the assertion that Montgomery was an example of greed is a subjective, non-verifiable judgment about motives. *See* Op. 248 (citing, *e.g.*, *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 367 (9th Cir. 1995)).

To the extent the challenged statements indicate Risen was engaging in conjecture about how Montgomery was able to "play" first the CIA, the White House, and then the Pentagon, that also is protected opinion. *See, e.g.*, *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d

1222, 1227 (7th Cir. 1993); *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995); *Gross v. N.Y. Times*, 623 N.E.2d 1163, 1168 (N.Y. 1993).  Indeed, the Chapter is written in the language of hypothesis, *e.g.*: "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages."  (App.76.)  Risen's thesis that the fog of war post 9/11 made the government accept anything without vetting and then hide their gullibility is protected hypothesis and explains how Montgomery got away without suffering more serious consequences.  The Chapter includes at various points Montgomery's counterpoints, *e.g.*: "Montgomery strongly denies that he peddled fraudulent technology";  "he insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees"; Montgomery "insists that he did not offer the CIA his own conclusions about what the data meant."  (App.64, 73.)  Thus, the Chapter's characterization of the controversy also signals that its conclusions are statements of opinion, and therefore not actionable.

That the software either did not exist or did not work "as billed" are facts that are fully disclosed and not rebutted, *see supra* 8-13,  undergirding the characterizations of a "fraud," "hoax," and "con."  Montgomery contends Risen/HMH published various challenged statements "in their own voice," Br. 10, but Montgomery's own lawyer called him a "con artist" and his software a "fraud,"

and a White House official said they were "played."  *Supra* 13.  In any event, as
the district court found, "Risen's own subjective opinion that Montgomery is a con
artist is also a non-actionable opinion, particularly given the surrounding context of
the Chapter and the information disclosed therein."  Op. 249.  *See also Spelson v.
CBS*, 581 F.Supp. 1195, 1203 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1292 (7th Cir. 1985)
("cancer con-artists" "practitioners of fraud"); *Yancey v. Hamilton*, 786 S.W.2d
854 (Ky. 1989) ("con artist"); *Quinn v. Jewel Food Stores*, 276 Ill. App. 3d 861,
866-67 (1995) (same).  The Chapter's depiction of Montgomery at the helm of a
"rogue" intelligence operation, and that "crazy became the new normal in the war
on terror" are similarly non-verifiable statements of subjective opinion and
rhetorical hyperbole that are non-actionable.  *Cook-Benjamin v. MHM Corr.
Servs.*, 571 F. App'x 944, 947 (11th Cir. 2014) ("crazy"); *Weyrich v. New
Republic*, 235 F.3d 617, 624 (D.C. Cir. 2001) ("paranoid"); *see also* SUMF ¶46
(App.1197-98).

     In sum, the district court's conclusion that most of the statements in suit are
non-actionable opinion and rhetorical hyperbole should be affirmed.

## D.     The District Court Correctly Held Montgomery Did Not, and Cannot, Meet His Burden to Prove Substantial Falsity

     The crux of the Chapter reported that Montgomery's software did not work
as he claimed, but Montgomery has not come forward with the "critical evidence"
about "whether in fact the software worked" – or indeed any evidence to suggest

substantial falsity.  Rather than attempt to meet his constitutional burden of proving the statements were materially false, Montgomery claims that it is "not legally possible" to demonstrate falsity and "not relevant" to his claim.  Br. 5.  The First Amendment requires a plaintiff to bear the burden of proving the speech at issue, which, as here, indisputably addresses a matter of public concern, was indeed false.  *Hepps*, 475 U.S. at 776-77.  The district court properly entered summary judgment for Risen/HMH when Montgomery failed to come forward with evidence sufficient for a reasonable jury to conclude the defamatory sting of the publication is untrue.  *Liberty Lobby v. Dow Jones*, 838 F.2d 1287, 1294 (D.C. Cir. 1988).  Montgomery did not meet his burden of demonstrating material falsity,[9] whether by a preponderance or clear and convincing evidence.[10]

This Circuit has not hesitated to enter summary judgment for defamation defendants where, as here, the undisputed record evidence corroborates the gist of the alleged defamation and the libel plaintiff failed to present sufficient evidence to permit a jury to find otherwise.  *See Dow Jones*, 838 F.2d at 1295-96; *Moldea*, 22

---

[9] "[T]he falsity must be 'material,'" *Air Wisconsin Airlines v. Hoeper*, 134 S.Ct. 852, 861 (2014), meaning that errors "effect[ing] no material change in meaning" cannot give rise to liability, *Masson*, 501 U.S. at 516.  Thus, "so long as the substance, the gist, the sting of the libelous charge [was] justified," the publication must be deemed substantially true, even if the defendant "cannot justify every word of the alleged defamatory matter." *Id.* at 516-17 (citations and internal quotation marks omitted).

[10] *See* Op. 251 n.24 (standard of proof).

F.3d at 318-19.  The heart of Montgomery's claim is that the Chapter made false statements that Montgomery's software did not work or did not exist.  SUMF ¶45 (App.1197).  But no reasonable juror could conclude the software worked or even existed, because Montgomery has not produced the software itself, nor rebutted the contrary evidence from his former colleagues or the government.

Contrary to Montgomery's arguments, the court below, after reviewing the lengthy discovery proceedings and repeated rejection of his claim that the software is irrelevant, Op. 239-42; SUMF ¶¶51, 55 (App.1200-01), confirmed the magistrate's rulings, explaining the "absence [of the software] is fatal to any claim Montgomery's complaint asserts based on [Risen/HMH's] statements or statements by implication that the software did not work or did not exist."  Op. 252.  In sum, Montgomery "does not have a legally protected right to a reputation based on the concealment of the truth."  *Haynes*, 8 F.3d at 1228[11]

To excuse his failure to produce the software, Montgomery now contends it is unobtainable because it is classified, and because he lacks access to his own software.  The consequences of this lack of verifiability, for whatever reason, must fall entirely on Montgomery as the party carrying the burden to establish falsity.

---

[11] "[I]t makes no difference [if] the true facts were unknown" at the time of publication, because "truth – not just known truth – is a complete defense to defamation."  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (citations omitted); *Bustos v. A&E Television*, 646 F.3d 762, 764 (10th Cir. 2011); Restatement (Second) of Torts § 581A cmt. h (1977) ("[I]f the defamatory matter is true … it is enough that it turns out to be true.").

Indeed, in *Hepps*, the Supreme Court emphasized that the allocation of the burden of proof will be dispositive in cases where the truth or falsity of a statement is, at bottom, unknowable. The Court recognized this rule will "insulate from liability some speech that is false, but unprovably so." 475 U.S. at 778. *Accord Dow Jones*, 838 F.2d at 1292 ("Where the question of truth or falsity is a close one, a court should err on the side of nonactionability.").

In any event, the record here "precludes any reasonable inference that the central allegation of the challenged [publication] was false." *Tavoulareas v. Piro*, 817 F.2d 762, 783-84 (D.C. Cir. 1987) (*en banc*). Far from placing Montgomery in "a worse light than a bare recitation of the uncontested facts" would have, *Haynes*, 8 F.3d at 1228, it is now clear the software either does not work, is unobtainable, or does not exist. Thus, Montgomery cannot meet his burden to prove material falsity, compelling summary judgment for Risen/HMH.

A defamation plaintiff must show falsity, regardless of whether recklessness is demonstrated or defamation by implication has been asserted. *Hoeper*, 134 S.Ct. at 861 ("[W]e have long held … that actual malice entails falsity."); *Hepps*, 475 U.S. at 775. This requirement applies whether or not Montgomery's claim is viewed as defamation by implication. *White*, 909 F.2d at 520. *See also* Op. 251.[12]

---

[12] Montgomery contends the Chapter states or implies that he spoke to President Bush and was thus responsible for shooting down planes. Br. 11, 15, 17. No planes were shot down and the Chapter makes that clear that it was his "super-

*Tavoulareas*, 817 F.2d at 794 ("[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement.").

Absent the software, Montgomery cannot testify "My software and technology did work, does work, and is still being used successfully by the U.S. Government today." Montgomery's 1st Decl. ¶7f (App.2007). Such evidence would be inadmissible under the best evidence rule. Fed. R. Evid. 1002-04. Moreover, the court could properly exclude secondary evidence through Montgomery's testimony because he lost, sequestered, or destroyed the original software in bad faith.[13] He has offered only his bare assertions without the software, without tests,[14] without the alleged videos, and witnesses he claims will testify that the "software and technology does indeed work." Montgomery 1st Decl. ¶¶28, 34 (App.2017, 2018). As the district court found, Montgomery offered nothing to rebut the conclusions of government officials that the software did not

---

secret computer software" that prompted the White House to consider exercising that authority. App.64-65 ("***nearly*** convinced the Bush Administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic") (emphasis added).

[13] Fed. R. Civ. P. 37(b)(2)(A)(ii); Fed. R. Evid. 1004(a). *See also Clarke v. WMATA*, 904 F.Supp.2d 11, 20 (D.D.C. 2012), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013).

[14] As the court noted, the Air Force, in response to Risen/HMH's *Touhy* request, stated that tests validating Montgomery's software do not exist. Op. 253-54.

work, employees that tests were rigged, and former partner and former lawyer who came to believe that he was a con and his software does not exist – statements taken from court or government documents.   Op. 254.   The district court thus properly granted Risen/HMH's motion for summary judgment, on Montgomery's failure to carry his burden on falsity.

**E.    The District Court Correctly Held, As a Matter of Law, Montgomery Did Not, and Cannot, Prove By Clear and Convincing Evidence, that Risen/HMG Acted With Actual Malice or Any Other Applicable Fault**

Montgomery also attempts to obtain reversal of the district court's decision by maintaining, incorrectly, that he is merely a private citizen and not a limited-purpose public figure subject to the formidable actual malice fault standard.  Br. 6, 36-43.   Montgomery's arguments must fail, however, because Montgomery has "inject[ed]" himself and been "drawn into a particular public controversy" centered on widely-publicized allegations that he committed fraud in contracting work he performed for the government involving national security.  *Tavoulareas*, 817 F.2d at 772.   Montgomery is thus a limited-purpose public figure, and consequently must establish sufficient evidence with clear and convincing clarity, as a matter of

law, for a reasonable jury to find Risen/HMH acted with actual malice. *Gertz*, 418 U.S. at 331-32. He has failed to carry his burden on this, too.[15]

### 1.    The District Court Correctly Held Montgomery Is a Limited-Purpose Public Figure

The public figure doctrine reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). Under this approach, those who, like Montgomery, have chosen to participate in public debate or taken action that invites public scrutiny, must accept a substantially greater risk of public comment. Despite Montgomery's insistence that no public controversy existed over his dealings as a contractor with the U.S. military and intelligence agencies, Montgomery is a quintessential limited-purpose public figure, as the district court correctly found.

The determination whether a plaintiff is a public figure is informed by two "touchstones" first identified in *Gertz*. First, the public figure plaintiff is an individual who has pursued a course of conduct that foreseeably "'invite[s] attention and comment.'" *Tavoulareas*, 817 F.2d at 773 (quoting *Gertz*, 418 U.S. at 345). Second, the public figure plaintiff enjoys "'access to the channels of

---

[15] Montgomery's contention that some statements were defamatory *per se* (Br. 33-35) does not excuse him from showing actual malice. *Johnson v. Holway*, 2005 WL 3307296, *28 (D.D.C. Dec. 6, 2005).

effective communication'" and thus has the ability to respond to falsehoods and mitigate harm. *Id*. at 772 (quoting *Gertz* at 344).

With these principles in mind, this Court in *Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980), established a three-part limited-purpose public figure inquiry that (1) determines whether there was a pre-existing public controversy; (2) analyzes plaintiff's role in the controversy; and (3) assesses whether the alleged defamation is germane to plaintiff's participation in the controversy. Having "voluntarily exposed [himself] to increased risk" of public comments, *Gertz*, 418 U.S. at 345, Montgomery easily satisfies each of the three factors for defining a public figure and the district court's decision should therefore be affirmed.

*First*, Montgomery is the subject of nearly ten years of national media predating the Book reporting about his software fraud, thus there is no question that "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment" sufficient to establish a controversy indeed existed. *Waldbaum*, 627 F.2d at 1297; *see also Jankovic*, 822 F.3d at 585. As this Court instructed, the definition of the controversy can be "broader than the narrower discussion contained in the defamatory document." *Jankovic*, 822 F.3d at 586. The district court found, "the relevant public controversy in this case encompasses all of the circumstances

39

surrounding eTreppid and Montgomery's creation and testing of the noise filtering and object recognition software, the government's subsequent use of that technology, and the company's attainment of government contracts for that technology."  Op. 256.  The controversy further includes "the software at issue" and "whether that software worked, and whether government actions were taken in reliance on it."  *Id*.  There is no dispute the controversy at issue "received public attention because its ramifications will be felt by persons who are not direct participants," *Waldbaum*, 627 F.2d at 1296, whether the contracting parties themselves, the government agencies and officials who dealt with Montgomery or relied on his software, or U.S. citizens generally affected by national security issues raised by the controversy.

Notwithstanding Montgomery's attempt to downplay the cumulative evidence in numerous published reports that he was the contractor whose software provided inaccurate intelligence about Al Qaeda codes on Al Jazeera broadcasts and rigged tests of his software to the government, SUMF ¶¶10-22 (App.1185-89), this is the same controversy that is the subject of in-depth reporting in the Book. As this Court recognized in *Jankovic*, "[n]ews sources can play a central non-hearsay role in this part of the inquiry."  822 F.3d at 588.  The Playboy Article even appears on Montgomery's Wikipedia page to this day and the cover image was on his Twitter page until cited in this litigation.  SUMF ¶22 (App.1188-89).

40

Thus, the first prong of the limited-purpose public figure test – the existence of a public controversy – is easily met.

**Second**, Montgomery voluntarily sought out the media, going on NBC News in 2007 to make explosive – and ultimately discredited – charges that his former partner tried to bribe a government official to obtain contracts involving his software. Montgomery cannot disclaim his decision to seek the media spotlight by asserting he did so "at the advice of his counsel." Br. 6.[16] Even as recently as 2014, he was trying to appear on Fox News. SUMF ¶23 (App.1189). Where, as here, the plaintiff "is shaping or is trying to shape the outcome of a specific public controversy, he is a public figure for that controversy." *Waldbaum*, 627 F.2d at 1298 n.32. By voluntarily creating a public controversy and engaging in a course of conduct designed to "purposely try[] to influence" the public's view of his government contracts in the government's response to 9/11, *Jankovic*, 822 F.3d at 587, Montgomery became a public figure. *See Hatfill v. N.Y. Times*, 532 F.3d 312, 322-24 (4th Cir. 2008); *Clyburn v. News World Commc'ns*, 903 F.2d 29, 32 (D.C. Cir. 1990).

Thus, Montgomery was not improperly found to be a limited-purpose public figure merely because he was involved in a matter that "attract[ed] public

---

[16] The court below correctly concluded the controversy over Montgomery's bribery charges against Congressman Gibbons involving contracts for Montgomery's software, was not a separate controversy. Op. 256-57.

attention," *Wolston v. Reader's Digest*, 443 U.S. 157, 167 (1979), or because he was "drawn into a public forum largely against [his] will," *Time v. Firestone*, 424 U.S. 448, 457 (1976), as Montgomery contends.    Br. 39-40.    Although Montgomery maintains he was merely "[w]orking on secret programs," and did not seek the spotlight, Br. 39, he certainly had more than a "[t]rivial or tangential participation," *Waldbaum*, 627 F.2d at 1297, in the controversy regarding wasteful spending in the war on terror.  More so than the air traffic controller in *Dameron*, whose role was "relatively passive" but nonetheless rendered him a limited-purpose public figure, Montgomery "was at the center of a controversy" in a "widely publicized" interaction with "an arm of the government."    *Dameron v. Washington Mag.*, 779 F.2d 736, 741-42 (D.C. Cir. 1985).    In this regard, Montgomery "invited comment" and "voluntarily thrust himself," *Jankovic*, 822 F.3d at 587, into the media attention by seeking government contracts involving national security, *Waldbaum*, 627 F.2d at 1298; *CACI v. Rhodes*, 536 F.3d 280, 304 (4th Cir. 2008); *McDowell v. Paiewonsky*, 769 F.2d 942, 949-51 (3d Cir. 1985), knowing that such work invites public scrutiny of the expenditure of taxpayers' money.[17]

---

[17] The district court questioned whether Montgomery sought contracts after the controversy was known.  Op. 258 n.31.  The record establishes he was awarded an Air Force contract in 2009 and claimed to warn of possible terrorist attacks at President Obama's inauguration in January 2009, after the press attention began in 2005.  SUMF ¶19 (App.1187-88); (App.84).

*Third*, the alleged defamatory statements are clearly germane to Montgomery's participation in the controversy.  The statements at issue involve Montgomery seeking government contracts for his software and whether or not he was engaged in a fraudulent scheme resulting in wasteful expenditure of taxpayer dollars, and unnecessarily raising the terror alert and grounding planes from overseas.  *See* Op. 258.

Upon an assessment of the *Waldbaum* factors, the district court correctly concluded that Montgomery is a limited-purpose public figure who ultimately must demonstrate actual malice to prevail in this action.  Op. 255-58.  That conclusion should be affirmed by this Court.

> **2.   The District Court Correctly Held Montgomery Cannot Prove Actual Malice by Clear and Convincing Evidence, or Any Other Applicable Standard of Fault**

Even if Montgomery had met his burden on falsity – and he has not – the undisputed facts conclusively demonstrate the absence of actual malice, as a matter of law, compelling summary judgment on this ground as well.  The Chapter relies on previously published articles in reputable publications, statements in official court records, FBI reports, congressional documents, interviews with government officials and Montgomery's own former lawyer, and includes throughout Montgomery's denials.  Montgomery has attempted, and failed, to come forward with "concrete" "affirmative" evidence that would allow a reasonable jury to

conclude "with convincing clarity" that Risen/HMH actually entertained serious doubts as to the truth of the statements or published them with a high degree of awareness of their falsity. *Anderson v. Liberty Lobby*, 477 U.S. at 256-57.

Actual malice cannot be proved in the abstract. Where the plaintiff focuses on several specific statements, he must demonstrate actual malice as to each statement separately. This is why, given the high level of proof necessary to show actual malice by clear and convincing evidence, courts routinely grant – and this Court affirms – summary judgment dismissing libel claims that fail to meet this "daunting" standard.[18] Here, Montgomery's failure to come forward with evidence the software worked leads to the conclusion that he cannot meet his burden of coming forward with clear and convincing evidence to allow a jury to find Risen/HMH knew at the time of publication that claims that the software did not work, were false, or had serious doubts as to its truth. *See Hoeper*, 134 S.Ct. at 861.

If Risen's conclusion that the software did not work was "rational," then the fact that Risen reached that conclusion could hardly amount to a knowing falsehood. *See Time v. Pape*, 401 U.S. 279, 289, 291 (1971); *CACI*, 536 F.3d at 304; *Moldea*, 22 F.3d at 315. Similarly, Risen's thesis for how Montgomery kept

---

[18] *E.g.*, *Jankovic*, 822 F.3d 576; *Lohrenz*, 350 F.3d 1272; *McFarlane v. Sheridan Square Press*, 91 F.3d 1501 (D.C. Cir. 1996); *Moldea*, 22 F.3d 310; *Washington Post v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966).

getting contracts, avoiding jail or having to pay back the government despite his fraud – namely the "secrecy that surrounded [Montgomery's] work" and the CIA's "reluctance to tell their Pentagon counterparts," Chapter 47, was "'one of a number of possible rational interpretations'" "particularly absent warning signs which would have led Risen to doubt his account." Op. 264 (citing *Pape*).

"What is relevant to malice is the information 'that was available to and considered by [Risen/HMH] prior to publication.'" *Jankovic*, 822 F.3d at 594 (quoting *McFarlane*, 91 F.3d at 1508). At summary judgment, Montgomery effectively conceded neither Risen nor any of the editorial staff at HMH, either in depositions or documents produced, provided any "smoking gun," *i.e.*, "direct evidence" that they knew what Risen wrote was false or had serious doubts at the time of publication. Accordingly, Montgomery resorted to "circumstantial evidence" to establish actual malice. To the extent circumstantial evidence can ever be proof of actual malice, it must bear on Risen/HMH's subjective state of mind at the time of publication. Any effort by Montgomery to establish that either Risen or HMH subjectively doubted the truth of the challenged statements, however, fails.

To take but one of many examples, Montgomery cites a reference in his Amended Complaint to an interview Risen gave about the Book where he said "it is very difficult to tell what is actually true." Br. 20. But, as Risen pointed out in

his deposition, *see* Reply SUMF ¶107 (App.2174), and as a review of the interview makes clear on its face, *see* Am. Compl. Ex. B (App.104), Risen was referring to a totally different chapter in the Book, which had nothing to do with Montgomery. *See also* Op. 231 (interview statements "repeat allegations made in the Chapter").

The "circumstantial evidence" Montgomery points to begins and ends with his attacks on the credibility of Risen's sources. Montgomery's brief devotes page after page attacking Risen's sources. *E.g.*, Br. 25-26, 28. But in making this argument, Montgomery does not acknowledge Risen did not rely on any one source's version of events, he relied on documents of public record or published in news accounts, which remain uncontroverted to this day, and interviews with numerous high-placed government sources and others close to Montgomery or familiar with his work. SUMF ¶¶24-43 (App.1189-97); Risen Decl. ¶¶7-37 (App.1205-15) (and exhibits appended thereto) (App.1218-1677). *See also supra* 8-13.

Montgomery argues "[f]air reporting would also have to directly report and explain the motivations of [Risen/HMH's] sources to lie and cover for their own mistakes," Br. 28 – but the Chapter did include Montgomery's insistence that "the charges are leveled by critics with axes to grind." Op. 263 (citing App.65). Even if some sources were self-interested or of questionable credibility, reliance on them

would not amount to actual malice. *Lohrenz*, 350 F.3d at 1284 (no actual malice where defendants "acted on the basis of a biased source").[19]

Montgomery asserts that his unsupported version of events should have supplanted the overwhelming contrary information Risen obtained from numerous well-placed sources. *E.g.*, Br. 23-24. However, Montgomery's denials do not establish actual malice. *Liberty Lobby v. Anderson*, 1991 WL 186998, *8 (D.D.C. 1991); *Secord v. Cockburn*, 747 F.Supp. 779, 793 (D.D.C. 1990). Nor does failure to speak to allegedly favorable sources prior to publication. *Levan v. Capital Cities/ABC*, 190 F.3d 1230, 1243 (11th Cir. 1999) (defendant "not required to continue its investigation until it found *somebody* who would stand up for [plaintiff]"). Notably, Montgomery's repeated invocation of the Fifth Amendment at a 2010 deposition to the question regarding whether his software was a "complete fraud" permits an inference that it was a fraud and provides further support for Risen's conclusion not to credit Montgomery's version of events. Risen Decl. ¶22 (App.1210). *See Mitchell v. United States*, 526 U.S. 314, 328 (1999).

Nor were Risen/HMH obligated, as Montgomery suggests, Br. 29, to engage in more investigation and a "fact-checking" process before publishing the Book.

---

[19] *See, e.g., Cobb v. Time*, 278 F.3d 629, 637-38 (6th Cir. 2002); *Zeran v. Diamond Broad.*, 203 F.3d 714, 720 (10th Cir. 2000); *McFarlane*, 91 F.3d at 1513-14; *Silvester v. ABC*, 839 F.2d 1491, 1498 (11th Cir. 1988); *Keogh*, 365 F.2d at 971.

Failure to investigate is not evidence of actual malice since "a plaintiff will always be able to point to ways in which the defendant could have pursued another lead, or sought another piece of corroborating evidence." *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F.Supp.2d 20, 53 (D.D.C. 2005). *See also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Tavoulareas*, 817 F.2d at 798. As the Supreme Court underscored in *Harte-Hanks Communications v. Connaughton*, a case upon which Montgomery relies, Br. 44, actual malice turns not on whether a publisher "could have" investigated further, but whether the publisher had a subjective awareness of the statement's probable falsity at the time of publication. 491 U.S. 657, 667 (1989). Even under circumstances where a failure to investigate would constitute "'an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers,'" such failure does not establish actual malice, unless the publisher had "'obvious reasons to doubt'" the truth of the information. *Id.* at 666, 668 (citations omitted). *See also St. Amant*, 390 U.S. at 732-33, *Lohrenz*, 350 F.3d at 1285.

Montgomery's assertion that not fact-checking the Book is circumstantial evidence of actual malice lacks merit. Br. 44 (citing *Harte-Hanks*, 491 U.S. at 668). *Harte-Hanks* is distinguishable because the newspaper relied on a single source that was "consistently and categorically" contradicted by six other witnesses interviewed by its journalists. The Supreme Court concluded evidence

of obvious reason to doubt the veracity of a story and the newspaper's failure to listen to contrary sources suggested a "deliberate effort to avoid the truth" sufficient to support a jury's finding of actual malice. *Id*. at 683-85, 692. This is wholly different from what the court here described as the "plethora" of "news articles, court documents, and government records, predating the Chapter, which align with and corroborate the Chapter's general thrust." Op. 260. While fact-checking is not typically done in book publishing, Reply SUMF ¶74 (App.2166), Risen did have two knowledgeable reporters review the Chapter before publishing. *Id.*; SUMF ¶8 (App.1184-85).

Moreover, Risen disclosed differing accounts, including Montgomery's. "[R]eporting perspectives at odds with the publisher's own 'tend[s] to rebut a claim of malice.'" *Lohrenz*, 350 F.3d at 1286 (quoting *McFarlane*, 748 F.3d at 1304). Risen extensively interviewed Montgomery and included his version throughout – affirmative evidence of the absence of actual malice. *See Parisi v. Sinclair*, 845 F.Supp.2d 215, 218-19 (D.D.C. 2012). And Montgomery's general denials do not establish knowledge or serious doubts as to falsity. *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015); *Edwards v. Nat'l Audubon Soc'y*, 556 F.2d 113, 121 (2d Cir. 1977).

Montgomery does not – and cannot – dispute Risen relied on articles in reputable publications, from NBC News, Bloomberg News, the Wall Street

Journal, Playboy, as well as the New York Times, that published the core allegation that Montgomery's software was a fraud without correction, retraction, or suit. Reliance on reputable publications as a matter of law negates fault, whether negligence or actual malice. *See, e.g.*, *Dow Jones*, 838 F.2d at 1297; *Biro v. Condé Nast*, 963 F.Supp.2d 255, 279 (S.D.N.Y. 2013). Similarly, Risen's reliance on statements to the FBI, contained in court records, of a prior partner and former employees who questioned whether Montgomery's software existed and recounted how they were told to rig tests to dupe government officials, negates fault, whether negligence or actual malice.[20]

Finally, that Risen/HMH rejected Montgomery's supposed request for retraction after publication of the Book, Br. 45, cannot demonstrate actual malice, again as a matter of law, because it does not prove the wrongful state of knowledge at the time of the initial publication. *See N.Y. Times*, 376 U.S. at 286.[21] And even were there evidence of error, the "refusal to retract" only further supports "no actual malice." *Tavoulareas*, 759 F.2d at 132 n.51. Critically, Montgomery never demanded a retraction before the Book was published. Montgomery cited to the district court his email, nearly two years after the Times Article when Risen had

---

[20] HMH's reliance on Pulitzer-Prize winning journalist Risen provides a separate basis for finding no actual malice. *See Chaiken v. VV Publ'g*, 119 F.3d 1018, 1032 (2d Cir. 1997).

[21] *See also Lohrenz v. Donnelly*, 223 F.Supp.2d 25, 56 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003); *McFarlane*, 91 F.3d at 1515; *Biro*, 807 F.3d at 546.

contacted him for an interview for the Book, but, even then, he did not demand a retraction, citing only who Risen should have talked to or what he should have included, not any specific errors of fact.  Op. 258 n.31; Reply SUMF ¶65 (App.2162).  After a close review of all the evidence and arguments, the district court concluded, "[c]ollectively, this evidence paints a bleak picture for Montgomery's claims and Montgomery's effort to rebut it and demonstrate a triable issue of actual malice is unavailing."  Op. 261.  That decision should be affirmed.

### F.  The Fair Report Privilege Provides a Separate Basis For Summary Judgment on Disputed Statements

Describing the Book as "Fake News," Montgomery contends that Risen/HMH "dramatically misrepresent[] the court records, past news reporting, and government records which they claim to rely upon," Br. 25, 30, but, to the contrary, the fair report privilege provides a separate ground for dismissal of at least some of the statements in dispute – as the district court indicated.[22]  The privilege protects against defamation claims where – as here – a publication

---

[22]  The district court determined that, because it found other sufficient grounds to dismiss Montgomery's defamation claim, it was "unnecessary to definitively resolve to what extent the common law fair report privilege protects the statements made in the Chapter."  Op. 266 n.41.  Nevertheless, the court observed "in several instances, the Chapter describes allegations that were contained in FBI interview reports, Congressional testimony, and court documents," that "[w]hen it does so, Risen attributes the statements to those sources," and, therefore, "[i]n those instances, the statements would be shielded by the fair report privilege."  *Id*.

accurately summarizes statements in court records, congressional records, and government investigative reports.  It applies even if the underlying information ultimately proves to be false, if "the reports were substantially accurate" and fair, the reports attribute statements to the official records, and they "concern a governmental proceeding."  *White*, 909 F.2d at 527.  Here, the Chapter serves the critical function the fair report privilege is designed to protect: providing "both a fair and accurate accounting of public proceedings as well as informed commentary," *Coles v. Washington Free Weekly*, 881 F.Supp. 26, 34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996), and thus advancing "[t]he purpose of the privilege" by "promot[ing] public scrutiny of governmental affairs."  *Harper v. Walters*, 822 F.Supp. 817, 823 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994).

*First*, the Chapter discusses witness statements made in FBI investigative reports[23] filed in court proceedings, quotes sworn affidavits and deposition transcripts[24] and other filed court documents, and discusses the contents of

---

[23] *See Medico v. Time*, 643 F.2d 134, 139 (3d Cir. 1981) (FBI documents); *White*, 909 F.2d at 527-28 (committee report); *Global Relief Found. v. N.Y. Times*, 390 F.3d 973, 986-87 (7th Cir. 2004) (federal investigation report); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (police statement); *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys.*, 844 F.2d 955, 960 (2d Cir. 1988) (FBI official's statement); *Dowd v. Calabrese*, 589 F.Supp. 1206, 1217 (D.D.C. 1984) (DOJ investigation report).

[24] *See Q Int'l Courier v. Seagraves*, 1999 WL 1027034, *4 (D.D.C. Feb. 26, 1999) (civil complaint); *Lavin v. N.Y. News*, 757 F.2d 1416, 1419 (3d Cir. 1985) (affidavits); *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 687-88 (Cal. Ct. App. 1999) (deposition testimony).

congressional records.[25]   It also discusses the actions that "prompt[ed] such proceedings"; each of these plainly falls within the "broad[]" scope of the fair report privilege.  *See White*, 909 F.2d at 527.

**Second**, the Chapter *expressly* reports on government investigations, congressional records, and court proceedings.  The privilege applies here, where, it is "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings."  *Dameron*, 779 F.2d at 739; *see also Ditton v. Legal Times*, 947 F.Supp. 227, 230 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997).  The Chapter makes plain, either through "specific attribution" or "overall context" that it is reporting on official and judicial proceedings and the underlying actions that prompted them.[26]

**Third**, although Montgomery asserts the district court "through a jury at trial, must evaluate" official records relied upon for purposes of applying the fair report privilege, Br. 26, none of the cases upon which Montgomery relies, Br. 26-27, require that a jury perform this analysis.  *See Straub v. Lehtinen, Vargas &*

---

[25] *Crane v. Ariz. Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992) (secret investigation of House Select Committee); *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1097 (4th Cir. 1993) ("public remarks of a member of Congress").

[26] The district court's observation, in *dicta*, that discussion of the "surrounding event without explicitly referencing the contents of official government reports," may not be protected, Op. 266 n.41, does not reflect the broader scope of the fair reporting privilege suggested in *White*.  909 F.2d at 527.

*Riedi, P.A.*, 980 So.2d 1085, 1087 (Fla. App. 2007); *Stewart v. Sun Sentinal*, 695 So.2d 360, 362 (Fla. App. 1997). Nor would they, because whether the fair report privilege applies is a question of law courts routinely decide by comparing official records with the publication in suit. *See Q Int'l*, 1999 WL 1027034, *4-5; *Foretich v. Chung*, 1995 WL 224558, *1-2 (D.D.C. Jan. 25, 1995).

**Fourth**, Montgomery lacks evidence that the Chapter is anything but a fair and "substantially accurate," *White*, 909 F.2d at 527, account of the findings and allegations in the investigative reports, congressional records, and court proceedings. Montgomery complains instead that the Chapter omitted or did not report on all statements that Montgomery would have liked, Br. 26-28, but choice of what to include or exclude is an editorial judgment which a defamation plaintiff cannot dictate and with which courts do not interfere. *Coles*, 881 F.Supp. at 33; *see also Miami Herald v. Tornillo*, 418 U.S. 241, 258 (1974). Risen/HMH are not required to set forth the facts or draw the same conclusions that Montgomery would prefer for their statements to be protected fair reports. Reporting "is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times*, 399 N.E.2d 1185, 1187 (N.Y. 1979) (affirming summary judgment on fair report privilege); *see Yohe*, 321 F.3d at 44; *Coles*, 881 F.Supp. at 31 n.3. A comparison of the statements in the Chapter and facts and

allegations in the official records shows Risen's reporting was more than accurate and fair.

Indeed, it is undisputed that Risen repeatedly included Montgomery's denials, SUMF ¶¶7, 31, 44 (App.1184, 1193, 1197), making the report more than "fair" for purposes of the privilege.  *See Dorsey v. Nat'l Enquirer*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992).  And the Chapter, and Risen's comments in interviews post-publication, made clear that Montgomery was never prosecuted in connection with his fraud but instead kept getting contracts.  *E.g.*, Am. Compl. ¶¶151, 157 (App.35-38, 39-40)**.**

***Finally***, Montgomery's complaint that the fair report privilege does not apply because the preamble to the Book states Risen relied on some sources who spoke to Risen on condition of anonymity, Br. 29, does not defeat the application of the privilege.  The Book's preamble – a Note on Sources – was "a general statement about the use of confidential and anonymous sources" that applied to the entire nine-chapter Book.  *See* Reply SUMF ¶70 (App.2165).  The Chapter, on its face, shows Risen relied upon and attributed the central claims in dispute to official records and not only confidential sources, all of whom are public officials who have now been identified in the course of this litigation.  Risen Decl. ¶¶26-37 (App.1190-96).  Moreover, to the extent the Chapter relies on any confidential source, he or she merely corroborated official records.  *See Reeves v. ABC*, 719

F.2d 602, 607 n.3 (2d Cir. 1983) (fair report privilege where reporting "based partly on undisclosed sources,… used to corroborate information obtained from published reports and District Attorney press statements").

### G.    The District Court Correctly Held Montgomery's Other Tort Claims Fail

Montgomery briefly contends the district court improperly dismissed his other tort claims for tortious interference, intentional infliction of emotional distress, and assault.  Br. 51.  However, because Montgomery's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.  *See also* Op. 267.

"[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media*, 501 U.S. 663, 670 (1991)).  "The First Amendment considerations that apply to defamation therefore apply also to" Montgomery's additional tort claims.  *Farah*, 736 F.3d at 540 (dismissing tortious interference claim); *Hustler v. Falwell*, 485 U.S. 46, 50 (1988) (dismissing intentional infliction of emotional distress claims); *Forras v. Rauf*, 39 F.Supp.3d 45, 56 (D.D.C. 2014) (dismissing assault claim Montgomery's counsel brought for failure to show intent to harm or that statements were threats), *aff'd on other grounds*, 812 F.3d 1102 (D.C. Cir.),

*cert. denied*, 137 S.Ct. 375 (2016).  Montgomery also cannot submit evidence to prove these claims.[27]

## CONCLUSION

For the foregoing reasons, Risen/HMH respectfully request this Court affirm the district court's order granting Appellees summary judgment.

Dated: May 1, 2017

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:  /s/ Laura R. Handman
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
Tel: (202) 973-4200; Fax: (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com

*Attorneys for Defendants-Appellees*

---

[27] Montgomery cannot show intent or that statements were threats of civil assault, and cannot show "extreme and outrageous" conduct, intent, or severe distress as to IIED.  *See Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 92 (D.D.C. 2010) (assault); *Jackson v. D.C.*, 412 A.2d 948, 955 n.15 (D.C. 1980) (assault); *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (tortious interference); *Jung v. Jung*, 791 A.2d 46, 50 (D.C. 2002) (IIED).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B). This brief is submitted in 14-point Times New Roman font and contains 12,996 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: May 1, 2017                    */s/ Laura R. Handman*
                                      Laura R. Handman

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2017, I filed the foregoing Final

Appellees' Brief with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit via ECF.


By: /s/ Laura R. Handman
     Laura R. Handman