Case No.  16-7096

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

═══════════════════════════════════════════════════════════

Dennis L. Montgomery,
*Plaintiff-Appellant*
v.
James Risen, Houghton Mifflin Harcourt Publishing Company, and Houghton
Mifflin Harcourt Company
*Defendants-Appellees.*
_____

From the United States District Court For the District of Columbia
The Honorable Rudolph Contreras
Case No. 1:16-cv-00126-RC

_____

**AMENDED APPELLANT'S REPLY TO APPELLEES' BRIEF PURSUANT
TO NOTICE OF DEPUTY CLERK OF THE COURT**

***Oral Argument Requested***

_____

Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
2020 Pennsylvania Avenue,
N.W.  Suite 800
Washington, D.C. 20006
Tel: (561)-558-5536
Email: leklayman@gmail.com
Counsel for Appellant

 Date: May 11, 2017

## **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ............................................................................. 1

LEGAL ARGUMENT ........................................................................................ 2

    The District Court Erred by Dismissing All of Montgomery's Defamation
Claims .......................................................................................................... 6

    The District Court Erred By Allowing Appellees to Improperly Couch
Statements of Fact as Mere Opinion........................................................... 9

    Although the District Court Erred in Determining that Montgomery Was
Public Figure, Montgomery's Claims Should Have Survived in any Event
Because He Showed that Appellees' Defamatory Statements Were Made
With Actual Malice ..................................................................................... 11

        The District Court Erred When It Found That Montgomery Was a
Public Figure .......................................................................................... 12

            Montgomery Did Not Thrust Himself Into a Public
Controversy.................................................................................. 12

            Even If Montgomery Had Thrust Himself Into a Public Matter,
it was not Germane to the Defamation at Issue ...................... 14

        Regardless of Whether Montgomery Was a Public Figure, Appellees
Acted with the Requisite Actual Malice to Support Montgomery's
Defamation Claim ................................................................................. 15

    The Fair Reporter's Privilege Is Not Applicable Because Appellees'
Defamatory Statement Go Far Beyond What is Covered
by the Privilege............................................................................................ 17

    Montgomery Was and Remains Unable to Produce the Software Because it
has Been Deemed Classified By the U.S. Government and Appellees Cannot
Inspect It in Any Event as the Expert Does Not Have an Appropriate Security
Clearance ..................................................................................................... 19

CONCLUSION................................................................................................... 21

CERTIFICATE OF COMPLIANCE.................................................................. 23

CERTIFICATE OF SERVICE .......................................................................... 24

# TABLE OF AUTHORITIES

## *Cases*

*Associated Press v. NLRB*, 301 U.S. 103 (1937) ............................................. 17, 18

*Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974) .................................................... 12

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) ................. 15

*Levy v. American Mut. Ins. Co.*, 196 A.2d 475 (D.C. 1964)................................... 11

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ................ 12

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ............................ 11

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.D.C. 1989) ........................ 11

*Wolston v. Reader's Digest Ass'n,* 443 U.S. 157 (1979) .................................. 12, 13

## *Statutes*

18 U.S.C. § 793 ....................................................................................................... 20

18 U.S.C. § 798........................................................................................................ 20

18 U.S.C. § 1924...................................................................................................... 20

Appellant Dennis Montgomery ("Montgomery") hereby submits the following amended reply to Appellees James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Company ("HMHPC"), and Houghton Mifflin Harcourt Company's ("HMHC") (collectively "Appellees") Brief ("Appellees' Brief") in response to a notice received by Deputy Clerk, Ken Meadows, on May 11, 2017. Pursuant to Mr. Meadows' notice, a "Summary of Argument" section has been added.

## SUMMARY OF ARGUMENT

The District Court fundamentally erred by dismissing all of Montgomery's defamation claim as to statements that have absolutely nothing to do with whether Montgomery's software worked. In doing so, the District Court simply ignored clearly actionable libel and slander, and "threw the baby out with the bathwater." For instance, the defamatory nature of Risen's claim that Montgomery nearly convinced the Bush administration to order fighter jets to shoot down commercial aircrafts is unrelated to, and does turn on, the viability of Montgomery's software. This is just one of the many defamatory statements that do not turn on the viability of Montgomery's software that were clearly improperly dismissed.

Furthermore, to the extent that certain defamatory statements could, arguably, turn on production of Montgomery's software, the District Court's dismissal is still unwarranted and done in error. Indeed, as set forth in Montgomery's initial brief,

Montgomery's software was deemed classified by the intelligence agencies. Thus, production thereof would be in violation of numerous federal statutes that could submit Montgomery to significant imprisonment. As such, the District Court fundamentally erred in dismissing Montgomery's claims, and as such, must be reversed.

## LEGAL ARGUMENT

Montgomery brought this action against Appellees for maliciously defaming him by publishing a book called Pay Any Price: Greed, Power, and Endless War ("Pay Any Price"). In Pay Any Price, Appellees, at a minimum, with a reckless disregard for the truth, set about to destroy Montgomery's reputation and sell books by falsely labeling him as the:

> …maestro behind what many current and former U.S. officials…now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic.

App. 0064 Because Montgomery has come forward as a whistleblower, revealing the massive extent of illegal and unconstitutional surveillance of the American people perpetrated by the intelligence agencies, these agencies have been working to trash Montgomery's reputation in order to attempt to discredit Montgomery in the public eye. The intelligence agencies, therefore, used Risen and Pay Any Price as a tool in their quest to discredit Montgomery and "save their own skins" from possible

prosecution for surveillance crimes. This de facto quid pro quo relationship between Risen and the intelligence agencies allowed for Appellees to sell books and make a profit, and for Risen and the intelligence agencies to spin false and misleading facts in their favor, all at the expense of the "little guy," such as Montgomery, in this instance. As such Pay Any Price is nothing more than "fake news" – a tool for Appellees to reap a large profit and for the intelligence agencies to attempt to cover up their continued unconstitutional and illegal surveillance of the American People; a too convenient alliance. Allowing this to stand is manifest injustice at its core.

In sum, Montgomery was targeted by Appellees in their quest to make a large profit and sell books, regardless of the enormous cost to those that they defamed along the way. Appellees are collectively worth billions of dollars, and Montgomery is an individual with a terminable brain aneurism. Appellees thought that they could simply print whatever false and defamatory statements about Montgomery that they wanted - in order to stir up public interest and sell books - and that they would simply get away with it by virtue of their collective worth and size, as well as what they perceived at the time to be Montgomery's inability to fight back. **Indeed, it is telling that Risen's first and longstanding publisher Simon & Schuster refused to publish the book, raising a strong presumption that it was because of its defamatory material** and exposure to potential liability. App. 1997. Furthermore, **Appellees willfully and recklessly chose to not fact check** Pay Any Price because

3

they did not want to learn the truth. They just wanted to sell books. App. 2267-App. 2268.

The District Court fundamentally and critically erred by dismissing Montgomery's claims as to the numerous defamatory statements fabricated by Appellees, which Risen falsely touted were based on new, confidential information from various government sources in an attempt to sensationalize and sell as many books as possible. App. 1246. For instance, Risen falsely, and without evidentiary support claimed:

> **Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post - 9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened**. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

App. 0064 (emphasis added). Crucially, however, as set forth in Montgomery's initial brief, at deposition Risen – wanting to have his proverbial cake and eat it too - was unable or unwilling to actually name any of the "confidential sources" that he

allegedly received information from for Pay Any Price. App. 2264. (A: "There was never any action taken [to shoot down planes]. And it was just a conversation that I reported on. And so I never alleged that Mr. Montgomery was responsible for shooting down people or anything of the sort."). When pressed by Plaintiff-Appellant's counsel whether Defendant-Appellant Risen published President George W. Bush's fictitious orders to shoot down civilian airlines, App. 2264, Defendant-Appellee Risen stated "No, that's not correct." *Id*. Even more, assuming, *arguendo*, that the Bush administration did nearly shoot down commercial airplanes, it is impossible to argue that Montgomery, a mere technician, was responsible. This false statement completely ignores the fact that it is the intelligence agencies' highly skilled and trained analysts, working in tandem with members of President Bush's administration's National Security Council ("NSC"), that would have been responsible for such analysis and action, had it even occurred. Dismissal as to Appellees' false and defamatory statements such as this is evidence of the District Court's apparent desire, who is a member, in effect, of the intelligence community as a sitting judge on the Foreign Intelligence Surveillance Court ("FISC"), for whatever reason, to dispose of this entire matter on summary judgment and prevent Montgomery from presenting the matter to a jury and obtaining any type of

recovery.[1] On numerous occasions, after this matter was transferred to the District Court from the U.S. District Court for the Southern District of Florida, Plaintiffs' requested oral argument to focus the Court on the real matters at issue, given the huge and complicated size and nature of the transferred docket, but the District Court still decided to dismiss Montgomery's claims on summary judgment without even allowing Montgomery the benefit of oral argument.

For the reasons set forth in Montgomery's initial brief, and below, Montgomery respectfully requests that this Court reverse the District Court's order granting Appellees' Motion for Summary Judgment and allow this matter to properly proceed to trial.

## I.    The District Court Erred by Dismissing All of Montgomery's Defamation Claims

Pay Any Price was marketed as being based on new, confidential information from various government sources, which Risen explicitly states at the beginning of the book. App. 1246. However, at deposition, Risen was unable or unwilling to actually name the "sources" that Pay Any Price was based on, essentially being forced to admit that it was nothing more than a rehashed version of a tabloid Playboy

---

[1] The lower court's dual role as a sitting judge on both the District Court and the FISC, which oversees "its client," the intelligence agencies, creates the appearance of, if not actual, conflict of interest. This may help explain why the lower court would not even grant oral argument to Montgomery and its apparent predisposition to protect the intelligence agencies by precipitously dismissing the action.

article published in the form of a book. App. 2263. At deposition, it was clear that no one had told Risen that "Montgomery was the maestro behind what many current and former U.S. officials…believe was one of the most elaborate and dangerous hoaxes in American history." App. 2270; App 2269 (Risen testifying that what he wrote was simply a rehash of what others wrote). This claim, along with others set forth in Montgomery's briefs, was completely fabricated and then subsequently said to be based on "confidential sources" in what was no more than a marketing scheme implemented to garner more exposure, public interest, and sales of the book.

The falsity of Appellees' various claims about Montgomery is readily apparent. For instance, Risen claims that "**Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post - 9/11 age for what it was, a time to make money**." App. 0064. However, it is clear from the record that Montgomery was not actually the party who profited. Montgomery was merely a contractor for eTreppid. Any "profit" that was made would have gone to the company, or its founder, Warren Trepp. App. 0163-App. 0171.

Furthermore, <u>Pay Any Price</u> falsely holds Montgomery responsible for President George W. Bush's alleged decision to ground European flights and even the Bush administration's alleged consideration of shooting down commercial passenger planes. App. 0064. With these statements, Risen attempts to hold

Montgomery responsible for the Bush administration's decision to ground flights in Europe, and even more outrageously, tries to attribute an alleged near-decision to murder hundreds of innocent plane passengers to Montgomery, a mere technician. Assuming, *arguendo*, that the Bush administration actually did decide to ground flights from Europe and nearly shoot down planes, there is no way, logically, that Montgomery - a technician -  should be held responsible for the analysis of intelligence agency experts and the NSc. Clearly, it would have been the intelligence agencies and the NSC which had the responsibility to interpret the information within their considerable expertise and make their own recommendations to former President Bush. Montgomery was never involved in relaying false information to government intelligence agencies and made no claims as to "flight numbers and coordinates instructing Al-Qaeda where to attack [which led] President Bush to ban planes coming from Europe." Appellees' Brief at 2. However, Appellees apparently have no issue in recklessly and disingenuously publishing, among other false and misleading statements, that:

> **Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic.**

App. 0064. The defamatory and false nature of these statements is readily apparent, as Risen could not provide any credible information, under oath at

deposition, that supports his contention that <u>Pay Any Price</u> was based on "confidential sources" and, based on the record, that these statements at issue simply could not have been true. Thus, the District Court, in it's apparent haste, erred by dismissing Montgomery's defamation claims in toto.

## II.    <u>The District Court Erred By Allowing Appellees to Improperly Couch Statements of Fact as Mere Opinion</u>

Appellees misleadingly and disingenuously assert that many of the defamatory statements published in <u>Pay Any Price</u> are "non-actionable opinion and rhetorical hyperbole". However, the fact of the matter is that Risen chose to present the statements in question as unequivocal fact, and not as a personal belief or opinion. For example, Risen accused Montgomery of fabricating intelligence to officials in the highest reaches of the Bush administration. App 0007. This is clearly not a statement of opinion or hyperbole. Risen directly accused Montgomery of misconduct—something that Risen set forth as uncontroverted fact. In reality, however, Montgomery merely created a tool which government officials used to reach their own conclusions and interpretations. Thus, to set forth as uncontroverted fact that Montgomery fabricated intelligence is incredibly misleading and a duplicitous technique meant to damage Montgomery's reputation.

Furthermore, during the national interview called "Democracy Now," in addition to <u>Pay Any Price</u>, Risen expressly states that Montgomery was responsible for "**one of the great hoaxes of the war on terror**." Again, this is clearly set forth

as an uncontroverted fact, not an opinion. Risen also accepts the interviewer's question as to whether Montgomery is a "con man," by answering "yeah, yeah". If these truly were opinions or hyperbole, Risen could have easily prefaced such statements with phrases such as, "in my opinion" or "I think that". Instead, he intentionally presents each proclamation as unambiguous fact.

The defamatory statements written by Risen are false statements of fact, which Risen misleadingly distributed without credible verification. He alleges that Montgomery was paid millions of dollars by the government when Risen and the other Appellees know it was actually Warren Trepp and his company eTreppid which were paid large sums – another assertion of fact. Risen proclaims that Montgomery "created a rogue intelligence operation with little or no adult supervision" App. 0024. Again, this is clearly presented as fact, in Risen's own voice, and not as an opinion. If Risen wanted to convey that these statements were not facts, he would have said that he *believed* these things happened, or *thought* certain things about Montgomery. Instead of introducing or qualifying his statements this way, Risen tries to pass off his fabricated fantasies as indisputable truths.

Lastly, even in the unlikely event that this Court finds that Risen's defamatory statements are not strictly set forth as fact, but instead mixtures of opinion of fact, they still clearly <u>must go before a jury</u>, which will determine whether a statement is defamatory or not. "It is only when the court can say that the publication is not

reasonable capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001). "[I]f the language is capable of two meanings, one actionable and the other not, it is for the jury to determine which of the two meanings would be attributed to it by persons of ordinary understanding under the circumstances." *Levy*, 196 A.2d at 476. "[A] jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice." *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.D.C. 1989).  As such, the District Court erred in its decision to dismiss Montgomery's claims by allowing Appellees to pass of their false, defamatory statements of fact as mere opinion.

### III.   Although the District Court Erred in Determining that Montgomery Was Public Figure, Montgomery's Claims Should Have Survived in any Event Because He Showed that Appellees' Defamatory Statements Were Made With Actual Malice

As set forth in Montgomery's initial brief, the District Court clearly erred when it found that Montgomery was a limited purpose public figure. Even more, regardless of whether Montgomery was a limited purpose public figure – which he is not – Montgomery has also demonstrated that Appellees' defamatory statements were made with actual malice.

///

a.    The District Court Erred When It Found That Montgomery Was a Public Figure

Appellees do not contend, nor could they possibly do so, that Montgomery was a general public figure. Instead, Appellees falsely contend that Montgomery was a limited purpose public figure. This Court has set forth a three-pronged test for whether an individual is a public figure. *Waldbaum v. Fairchild Publ'ns, Inc*., 627 F.2d 1287 (D.C. Cir. 1980).   First, the Court must determine whether a public controversy existed. *Id*. at 1296. Second, the Court must analyze the plaintiff's role in that controversy. *Id*. at 1297. Third, the Court must assess whether the "alleged defamation [was] germane to the plaintiff's participation in the controversy." *Id*. at 1298. As applied here, the District Court clearly erred when it considered Montgomery a limited- purpose public figure because, Montgomery did not thrust himself into the forefront of a public controversy, and even if he did (which he did not), the defamation by Appellees was not germane to Montgomery's alleged participation.

i.     Montgomery Did Not Thrust Himself into a Public Controversy

As set forth by the U.S. Supreme Court in *Gertz v. Robert Welch Inc*., 418 U.S. 323 (1974), an individual may only be classified as a public figure if they have "thrust themselves into the forefront of particular public controversies in order to influence the resolution of the issues involved . . . they invite attention and comment." *Id*. at 345. Thus, it is clearly not enough for an individual to merely be

12

"involved in or associated with" a public matter. *See Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 167 (1979). Instead, the individual must "voluntarily thrust" or "inject…himself into the forefront." *Id*. at 166.

Appellees disingenuously and misleadingly overstate the extent to which Montgomery "thrust" himself into a public controversy. Appellees improperly attempt to blend instances in which Montgomery was involuntarily dragged into the public eye with the alleged instances in which Montgomery "voluntarily thrust" himself into a public matter – which are, in any regard, few and far between. This litigation tactic, meant only to confuse the Court, must be ignored. Indeed, the only instance that even arguably comes close to an attempt to "voluntarily thrust" himself into the public domain is a ten-year-old NBC News interview, which only lasted for approximately 45 seconds, and that was entirely unrelated to the defamation at issue. App. 2280-App.2281; App. 2282.  In fact, the voluntary nature of the NBC News interview can be seriously questioned, given the fact that Montgomery only agreed to do it at the insistence of his counsel at the time on a separate, unrelated False Claims Act. *Id*. Even more, Montgomery had filed the complaint - alleging that then-Congressman Jim Gibbons had taken bribes from his former business partner, Warren Trepp – in private. It was only after the court unsealed the complaint, and the *Wall Street Journal* published a story on the matter that Montgomery, in order to protect his own interests and upon the advice of counsel at the time, reluctantly

13

gave the interview. It is clear that Montgomery never "voluntarily thrust" himself into a public matter, but simply had no choice after the court unsealed the complaint and the *Wall Street Journal* had already published a story on it. Lastly, Appellees also, incredibly, state without hard proof that Montgomery <u>tried</u> to appear on Fox News in 2014. Even if this were true, Appellees clearly concede that no actual television appearance was made. SUMF 23. It is disingenuous, at best, to argue that an individual "voluntarily thrust" himself into a public matter when that individual never even actually appeared in public.

        ii.    <u>Even If Montgomery Had Thrust Himself into a Public Matter, it was not Germane to the Defamation at Issue</u>

As stated above, the only instance where it could even be argued that Montgomery "voluntarily thrust" himself into a public matter was the ten-year-old NBC News interview, which lasted only approximately 45 seconds. *Id*. Regardless, the interview – which was only done by Montgomery at the insistence of his counsel at the time – was simply not germane to the defamation at issue here. Indeed, the subject of the interview stemmed from a quiet whistleblower complaint with the Defense Intelligence Agency and the Central Intelligence Agency. As stated previously, only when the court unsealed the documents, and <u>after</u> the *Wall Street Journal* penned a story Montgomery's private accusation that Jim Gibbons had taken bribes from his former business partner, Warren Trepp, did Montgomery – reluctantly, in order to protect his own interests and upon insistence of counsel –

14

give an interview to NBC News. *Id*. Even more, whether or not Mr. Gibbons had

taken bribes from Mr. Trepp simply has nothing to do with the defamation at issue.

This is even more glaring in the face of Appellees' false contention that

Montgomery's claims solely rest upon whether the software worked. Appellees are

trying to talk out of both sides of their mouth, and as such, their contention must fail.

      b.    <u>Regardless of Whether Montgomery Was a Public Figure, Appellees Acted with the Requisite Actual Malice to Support Montgomery's Defamation Claim</u>

In the unlikely event that this Court finds that Montgomery was a limited

purpose public figure (he was not, as discussed above), Montgomery's defamation

claim still must be allowed to proceed because Appellees acted with actual malice

in publishing the defamatory statements at issue. The Supreme Court in *Harte-*

*Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) held that:

> it is clear that the conclusion concerning the newspaper's departure
> from accepted standards and the evidence of motive were merely
> supportive of the court's ultimate conclusion that the record
> demonstrated a reckless disregard as to the truth or falsity of
> [defendant]'s allegations and thus provided clear and convincing proof
> of actual malice as found by the jury. A plaintiff is entitled to prove the
> defendant's state of mind through circumstantial evidence and it cannot
> be said that evidence concerning motive or care never bears any relation
> to the actual malice inquiry."

*Id.* at 668. Thus, a party may rely upon circumstantial evidence to demonstrate that

the defendant acted with actual malice, or reckless disregard as to the truth or falsity

of the allegations.

Importantly, at deposition, Risen could not, or would not, name any of his alleged "sources" that he relied upon to his defamatory statements about Montgomery. However, in Pay Any Price, Risen clearly sensationally attributes many of the false and defamatory allegations to "confidential source information." App. 1246. Now, Appellees disingenuously claim that Risen instead relied upon articles "from NBC News, Bloomberg News, the Wall Street Journal, Playboy, as well as the New York Times…." Appellees' Brief at 49. However, this is not what what Pay Any Price was marketed and sold as. As Appellees tout at the beginning of Pay Any Price, the publication is based on new, confidential information from various government sources, which has been distorted and falsified, knowingly and recklessly, and is therefore not a result of a republication of previous articles mentioning Montgomery Otherwise, there would logically be no reason for Pay Any Price.

Even more, at a minimum, Appellees acted with actual malice when falsely asserting that Montgomery "nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic." App. 0064. When pressed by Montgomery's counsel whether Risen knew of President George W. Bush issued orders to shoot down civilian airlines, App. 2264, Risen stated "No, that's not correct." Risen admitted that there was no proof and no sources, confidential or otherwise, that led him to publish that

Montgomery was responsible for a former president issuing orders to shoot down aircraft. He also admitted that those published statements were not based on the software. App. 2270; App. 2269. Furthermore, logically, it is nonsensical for Appellees, including Risen, to attribute any contemplation by the Bush administration to shoot down civilian aircrafts – whether it occurred or not – to Montgomery. Montgomery was merely a technician, not an intelligence agency analyst or NSC expert. Such an assertion entirely ignores, on purpose, the scores of analysts and advisors in the Bush administration's intelligence agencies that would have had to input and analyze data and create their own conclusions. Such an irresponsibly, reckless, and malicious statement was clearly made with absolutely no regard for the truth and only to sell books, and as such Appellees acted with the requisite actual malice even in the unlikely event that this Court finds that Montgomery was a limited purpose public figure.

## IV.  The Fair Reporter's Privilege Is Not Applicable Because Appellees' Defamatory Statement Go Far Beyond What is Covered by the Privilege

To the extent that Appellees attempt to shield themselves from liability for maliciously publishing the false and defamatory statements at issue by asserting the Fair Reporter's Privilege, it too must fail because Appellees go far beyond what is protected under this privilege. Crucially, this privilege was not meant to grant "special immunity from the application of general laws." *Associated Press v. NLRB*, 301 U.S. 103, 132 (1937). Thus, this privilege does not apply when the statement at

issue is the product of an intentional lie or a careless error.

Appellees attempt to disingenuously and misleadingly couch their intentional omissions as mere "editorial judgment which a defamation plaintiff cannot dictate and with which courts do not interfere." Appellees' Brief at 54. As set forth in Montgomery's initial brief, Risen's omissions go far beyond mere "editorial judgment." Instead, Pay Any Price is constituted of false and misleading one-sided conclusions, taken out of context, and presented falsely as absolute fact. It is nothing more than a hatchet job meant to defame and smear Montgomery, and to assist the government officials who were seeking to avoid responsibility for their official decisions by shifting it to a private citizen, and of course sell books. No where is this more evident in Risen's accusation, set forth with no credible support, that Montgomery's work as a technician led to the Bush administration nearly shooting down commercial aircrafts, which presents the truly outrageous conclusion that former President George W. Bush and his foreign policy leadership team are not responsible for government decisions. App. 0064. Thus, there is nothing "fair" about the reporting that Risen did. Application of the Fair Reporter's Privilege to Risen's one-sided character assassination clearly serves only to grant Appellees "special immunity from the application of general laws," which is expressly disallowed by the Supreme Court in *Associated Press*. *Id*.

///

## V.     Montgomery Was and Remains Unable to Produce the Software Because it has Been Deemed Classified By the U.S. Government and Appellees Cannot     Inspect It in Any Event as the Expert Does Not Have and Appropriate Security    Clearance

While Appellees hang their argument on the fact that the District Court expressed that it "has serious reason to doubt that the software, is, in fact, classified", the fact remains that the District Court can not state with certainty that Plaintiff-Appellant's software is not classified. If the District Court truly believed that the software was not classified, it would have stated that assertion in definite terms. Indeed, given the haste with which the District Court apparently wanted to dispose of this case, without even oral argument on Appellees' motions to dismiss, it likely would have found a way to state definitively that the software was not classified if it could have done so. Instead, the District Court can only "cast doubt" upon Montgomery's position that the software is classified without any basis or evidence for its opinion. This "assertion," therefore, means nothing.

The fact remains that the software has been designated by the federal government as classified, and thus clearly illegal and criminal for Montgomery to turn it over to the District Court or Appellees. App. 1178-App. 1181. Nowhere is evidence of classification stronger than the fact that when Appellees attempted to subpoena the technology, the government refused to produce it to them as it would compromise national security. The government's reaction makes complete sense, given the fact that the transmission of classified information is a violation of

19

numerous state and federal laws which strictly prohibit the transmitting and mishandling of classified information. *See* 18 U.S.C. § 793 (gathering, transmitting or losing defense information); 18 U.S.C. § 798 (disclosure of classified information); 18 U.S.C. § 1924 (unauthorized removal and retention of classified documents or material). The issue of the production of the technology is nothing more than a litigation tactic, fabricated by Appellees, to put Montgomery into a catch-22 situation whereby he would need to face substantial jail time – up to ten years – in order to simply prove his defamation case.  Indeed, the "expert" set forth by Appellees would never even have been able to view the technology even if Appellees were able to obtain it, since the "expert" lacked the requisite security clearance to view classified material. Unfortunately, the District Court fell for this ruse and dismissed Montgomery's claims.

Appellees repeatedly refer back to the nearly decade old Protective Order in Nevada which merely states that "the parties are not precluded from "serving or taking any discovery from other Parties or third parties relating to, or questioning . . . [t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties." App. 0805-App. 0806. In no way does this Protective Order give the Montgomery, Appellees, or even the District Court permission to violate multiple federal and state statutes in divulging classified information possessed by the CIA, DOJ, and the FBI. Appellees have

20

requested under subpoena the technology from the CIA, DOJ, and the FBI and have been summarily shut down by each government agency. At this point, it is painstakingly apparent that Appellees' request is nothing more than a diversionary tactic.[2]

## VI.   **Conclusion**

Based on Montgomery's Initial Brief and the Reply, Appellant Dennis Montgomery respectfully requests that this Court reverse the District Court's erroneous decision to grant Defendants-Appellees' Motion for Summary Judgment. Montgomery - just like any individual - is entitled to his day in court and to present his case to a jury of his peers.  Appellees set forth misleading and false statements as fact, sensationalizing what had actually happened in an effort to sell books. Indeed, Appellees targeted Montgomery, making him the "Emperor of the War on Terror" in Chapter 2 and the seminal focus of the book in fulfillment of their de facto quid pro quo relationship with the intelligence agencies because they perceived at the time that Montgomery – a mere individual with a terminable brain aneurism – would be unable to fight back. Thus, Appellees believed that Montgomery would be

---

[2] Based on the recent WikiLeaks leaks, the intelligence agencies are still using Montgomery's technology. *See* Cory Derespina, *WikiLeaks Releases 'Entire Hacking Capacity of the CIA'*, Fox News, Mar. 7, 2017, available at: http://www.foxnews.com/us/2017/03/07/wikileaks-releases-entire-hacking-capacity-cia.html.  Are we to believe that the government itself would continue to use technology that is based on "worthless software"? Regardless, this issue must go to a jury to decide.

an easy target for their fabricated, defamatory statements, and that – based on their collective net worth in the billions – they would be able to simply publish for "fun and profit." This manifest injustice simply cannot stand. Montgomery must be allowed his day in court to present this matter to a jury of his peers.

Dated: May 11, 2017                        Respectfully submitted,


        /s/ *Larry Klayman*_____
LARRY KLAYMAN, ESQ.
KLAYMAN LAW GROUP, P.A.
2020 PENNSYLVANIA AVENUE,
N.W.  SUITE 800
WASHINGTON, D.C. 20006
561-558-5536
EMAIL: *LEKLAYMAN@GMAIL.COM*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2017, I electronically filed the foregoing Amended Reply with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

　　/s/ *Larry Klayman*　　　　　

LARRY KLAYMAN, ESQ.

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Circuit Rule 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 5, 250 words, less than the 6,500 words allowed under this rule.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 15.28 in 14-point Times New Roman.

      /s/ *Larry Klayman*
LARRY KLAYMAN, ESQ.